DAVID MANNING CHODOS, ESQ.  (State Bar No.:39555)
CHODOS & ASSOCIATES
1880 Century Park East, Suite 1450
Los Angeles, California 90067-1615
Telephone:  (310) 203-3888
Fax:        (310) 203-3866

Attorneys for Defendant
INTERNATIONAL MEDIA FILMS, INC.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PARAMOUNT PICTURES CORPORATION, a Delaware corporation; and MELANGE PICTURES LLC, a Delaware corporation,<br><br>Plaintiffs,<br><br>vs.<br><br>INTERNATIONAL MEDIA FILMS, INC., a Nevada corporation,<br><br>Defendants. | Case No. CV 11-09112 SJO (AJWx)<br><br>**DEFENDANT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW**<br><br>Honorable Justice James Otero<br><br>Dept. 12<br><br>Pretrial Conference<br>February 4, 2013, :9:00 a.m.<br>Courtroom 1<br><br>Trial Date: February 12, 2013 |

-1-
**DEFENDANT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

## I. INTRODUCTION

**A. Timing Issues and Problems Peculiar to this Action**

This action revolves around competing claims based upon competing chains of title going back over 50 years. The witnesses and participants in the key transactions or purported transactions central to this action are long dead. Many of Defendants documents are in Italian. The crucial documents and transactions span two continents and over five decades.

Given these hurdles, conducting the discovery and assembling the evidence necessary to resolve the competing claims has been especially time consuming. At the same time, the parties have engaged, and are still engaging in relatively complex efforts to attempt, thus far without success, to forge a settlement of this matter.

As a result of these problems, the parties sought an extension of time to complete discovery and preparation for trial. On November 1. 2012. the court granted the parties' request and extended the discovery cutoffs, but did not vacate or continue the trial date. As a result, the parties are drafting exhibit and witness lists while still learning vital facts. As this brief is written, the deposition of Plaintiff Melange had not yet occurred, and responses to Defendants' written discovery, also expected to provide information likely to have a substantial effect on the evidence, written and oral that will likely be presented to this court, has not yet been revealed.

We do not contend that this is the fault of the Defendants or their counsel. It is rather the product of the complexity and messiness of the available evidence and the lack of percipient witnesses to the central transactions at issue.

What these circumstances portend, however, that facts not yet revealed as relevant or vital may require the revision and updating of the respective parties' contentions and the oral and written evidence upon which they will ultimately rely..
.

**B. The Basic Controversy Inciting this Action.**

Both the Plaintiffs and the Defendant claim ownership to the right to exploit the

movie La Dolce Vita based upon differing chains of title starting from the same transaction ( the "Riama - Cinemat transfer, discussed in more detail *infra)* occurring over half a century ago. The parties agree on and indeed depend upon the validity and authenticity of that transaction. As we note, it is the competing versions of what happened afterwards that is crucial to the resolution of this controversy. While the Plaintiffs' Complaint rather stridently attempts to portray the defendant IMF as a brazen usurper, IMF's claim to ownership it based upon a well documented series of transactions, which unlike Plaintiffs' are thoroughly authenticated, in many cases by notaries, who, in Italy, have the function of magistrates.

## II.

## A SYNOPSIS OF THE LAWSUIT:

Plaintiffs Paramount Pictures Corporation ("Paramount") and Melange Pictures, LLC ("Melange") brought the instant action against Defendant International Media Films, Inc. ("IMF") for declaratory relief and copyright infringement, claiming that they have the exclusive rights to the exploitation of the Frederic Fellini motion picture *La Dolce Vita* ("Picture" or "LDV") in the United States and Canada and that IMF is infringing upon Plaintiffs' right.

IMF contends that, to the contrary, IMF held the exclusive right to distribute the Picture in United States and Canada until IMF sold those rights to International Classic Films ("ICF") in 2008, before the Plaintiff's lawsuit was filed. (For reasons the Plaintiffs have not enunciated, Plaintiffs declined to name ICF as a defendant when, early in this litigation, they were notified of that transfer.)

## III.

## WHAT PLAINTIFFS HAVE TO PROVE:

In order to sustain this action against IMF, Plaintiffs have the burden of proof on two issues (1)That they own the exclusive rights to distribute the Picture in the United States and Canada, and therefore have standing to bring this action; and

(2) That IMF did not have any such rights. As we shall establish, Plaintiffs cannot sustain either burden.

In the course of discovery, Plaintiffs have provided IMF with a series of purported transfers, assignments and copyright registrations and renewals on which they rely for proof of their ownership in the Picture. Close inspection of these documents reveals a what proves to be a fatal absence of authentication of their most essential documents and certain unbridgeable gaps in their chain. Those deficiencies, and especially one of them, operate to prevent Plaintiffs from making a *prima facie* showing of copyright ownership.

## IV.

## HISTORICAL BACKGROUND TO THIS ACTION

As far back as 2002, Plaintiff Paramount has confronted IMF with its claim that Plaintiffs exclusively own the rights to the Picture; and IMF is merely infringing upon them. Armed with a string of well authenticated title documents, IMF immediately and repeatedly rejected each such claim. When IMF's counsel sent Paramount a letter pointing out the deficiencies in its position over five years ago. Paramount, although clearly the party with superior economic capacity to wage litigation war on the issue, chose to do nothing for several years, apparently hoping to take advantage of a possible adverse ruling in a then pending copyright infringement action that IMF had filed against the producer of a pornographic version of the Picture in the Southern District court in New York, as further discussed below ("SDNY Action"). Plaintiffs believed they could ride the coattails of the defendant in that action and avoid an on-the-merits confrontation that would require independent examination of their claimed ownership in the Picture.

**A.  The SDNY Action**  The SDNY Action upon which Plaintiffs relied was *International Media Films, Inc. v. Lucas Entertainment, Inc., et al.*, United States District Court for the Southern District of New York Case No. 07 Civ. 1178 (JGK)

filed February 15, 2007. Although Plaintiffs were not a party to that suit (having chosen not to join it) they actively participated in it and assisted the defendant in disputing IMF's chain-of-title.

In the SDNY Action, IMF had brought a copyright infringement claim against defendant Lucas Entertainment, Inc. ("Lucas"), which had distributed a sexually explicit version of the Picture. Lucas brought a motion for summary judgment challenging IMF's standing as owner of the copyright, further requiring IMF to produce evidence that it held the copyright to the Picture, which was essential to IMF's standing in bringing the infringement claim. Lucas' motion was supported by three non-percipient declarations challenging the authenticity the registration of the Picture by Hor, one of IMF's predecessors in interest. Because, unlike this action, IMF had the burden of proof in the SDNY Action, and the authenticity of the original registration documents had been challenged, the SDNY court ruled that under Rule of Evidence §1003, the absence of the original documentation precluded the court from considering IMF's a particular document evidence of its predecessor's acquisition of the rights to the Picture. When IMF was unable to locate and produce a key original document, the SDNY court granted Lucas' motion for summary judgment and found that IMF had not proffered "sufficient admissible evidence from which a reasonable fact finder could conclude that it was the copyright owner of the Fellini film." (The SDNY judge apparently overlooked over the fact that the questioned transfer was an Italian transaction, and that the certification of a notary public in Italy did in fact authenticate the notarized document without regard to whether or not it had been registered. He also overlooked the fact that under the Federal Rules of Evidence, a notarized document is self-authenticating.)

**B.  This Court Rejects Plaintiffs' Attempt to Rely upon the SDNY Action**

After the Summary Judgment was entered in the SDNY court, Plaintiffs filed the instant action which contained a count for declaratory relief seeking a declaration

that IMF has no ownership interest in the Picture. Plaintiffs immediately filed a motion for partial judgment on the pleadings against IMF seeking judicial declaration on the cause of action based on the claim that the SDNY Action collaterally estopped IMF from defending itself in the instant action and therefore IMF could not assert ownership rights in the Picture.

After thorough briefing of the issue, this court rejected Plaintiffs' collateral estoppel and issue preclusion arguments, noting among other things, that the New York Court had never expressly ruled that IMF did not own IMF. The opinion issued left Plaintiffs with the burden of independently proving both that they owned the rights to the Picture in question, and that IMF did not. For reasons we shall illustrate, this could be rather difficult task.

## V.

## THE COMPETING CHAIN-OF-TITLE THEORIES

**A. IMF's Chain-Of-Title Documents**

IMF's ownership of the Picture is evidenced by a series of transfer documents that comprise its chain-of-title. The first of these transfers occurred on March 9, 1962, when Riama Film S.P.A. ("Riama") transferred "all rights and specifically the rights of economic use and representation..." in the Picture to Cinemat S.A. ("Cinemat") for a territory comprising the entire world excluding Italy, France, and their respective former territories'. (Exhibit 4)The validity of that transfer is not in dispute. Plaintiffs agree that this transfer was valid.

After a series of subsequent transfers (further identified below), IMF received its ownership rights to the Picture on September 20, 2001, from Cinestampa Intemazional ("Cinestampa"). The documents evidencing IMF's chain-of-title are as follows:

**Riama-Cinemat (1962)** The original holder of the rights, Riama, transferred the rights (with minor exclusions) to Cinemat by written agreement dated March 9, 1962. The transfer was authenticated by the notarized declaration of the vendor's

representative. Plaintiffs do not challenge the validity of that transfer.

**(Cinemat - Hor (1980))** Cinemat transferred its rights to the Liechtenstein company Hor A.G. by written agreement dated December 9, 1980 (the "Cinemat-Hor agreement"). The transfer was verified and confirmed by a notarized declaration by Bruno Hugi, CEO of Cinemat. (Exhibit 102)

**(Hor - Oriental 1981)** Hor transferred its rights to Oriental Films S.r.1 ("Oriental Films") by written agreement dated November 20, 1981.

**(Oriental-Cinestampa 1998)** Oriental Films transferred its rights in Picture to Cinestampa by written agreement dated January 7, 1998.

**(Cinestampa - IMF 2001)** Cinestampa transferred its rights to IMF by written agreement dated September 20, 2001. Of these transfers, it is the 1980 Cinemat-Hor agreement that Plaintiffs challenge. Indeed, the key question in this lawsuit could be simply put: To whom did Cinemat transfer its rights to the Picture, to Hor, as we contend, or to Astor Films International, as Plaintiff contends?

**B. Plaintiffs' Asserted Chain of Title.**

Plaintiffs provided their own chain of title theory by which Astor purportedly purchased LDV from Cinemat, borrowed a lot of money, went bankrupt, and whatever rights it had were purchased out of bankruptcy by the predecessors to Paramount/Melange. The key dispute involving the competing chains-of-title has to do with the question of who Cinemat validly transferred its rights to; whether the transfer was to Astor, who Plaintiff claims as part of their chain of title, or to Hor, IMF's predecessor. Plaintiffs contend that Cinemat transferred the rights to the Picture (at least for the United States and Canada) to Astor in 1962. Based upon authenticated transfer documents, IMF asserts that Cinemat transferred the rights to its predecessor in title, Hor in 1980.

` A critical document to Plaintiffs' chain, therefore, is the purported agreement between Cinemat and Astor ("1962 Cinemat-Astor Agreement") whereby Cinemat supposedly transferred the Picture rights to Astor (this 1962 "agreement" produced by

Plaintiffs in discovery and marked as Exhibit 3. Plaintiffs claim that the 1962 Cinemat-Astor Agreement is a copy of the original transfer document.

Plaintiffs' counsel has presented us with a number of unattributed news clippings about Astor and its acquisition and exploitation of the film. While those stories talk about a purchase, the actual purported purchase documents, none of which are notarized or otherwise authenticated, tell another story entirely.

## VI.
## THE STRANGE IMPROBABILITY IN THE CINEMAT-ASTOR AGREEMENT.

The Cinemat Astor document contains the following revealing language:

"WHEREAS International desires to purchase and acquire the ownership of the Film together with the rights thereto which are hereinafter specified, and

"WHEREAS, the seller [identified on page one as Cinemat] **is now the owner of the Film and the rights desired to be acquired** by the purchase and is willing to sell the same to the purchase subject to and pursuant to the terms hereinafter stated" (PAR 00002)

Even a casual inspection of the purported 1962 Cinemat-ASTOR Agreement and a comparison of it with authenticated and registered Riama-Cinemat document demonstrates that the Cinemat-Astor document is not what it purports to be. What makes it manifestly questionable is the fact that a comparison between it and the authenticated and undisputed March 9, 1962 transfer document from Riama to Cinemat (Exhibit "B"), is that, contrary to the assertion quoted above (Trial Exhibit 3), Cinemat was *not the owner* of any such rights on January 8, 1962, when it made the purported transfer to Astor. It did not acquire these rights from Riama until March 9, 1962, two months after it supposedly sold that same interest to Astor. (See, the March 9, 1962 Riama-Cinemat Agreement (Trial Exhibit 4), appearing at PAR 00035,

-8-
**DEFENDANT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

00036). (As we have noted, the validity and date of the March 9, 1962 Riama-Cinemat transfer is not in dispute.)

Aside from the legal issue of whether an agreement that purportedly transfers rights that the transferor does not possess can be valid, the language of the 1962 Cinemat-Astor Agreement also raises serious questions as to its authenticity:

First, nothing in the language of the 1962 Cinemat-Astor Agreement (Exhibit 4) suggests that Astor intended to buy, or that Cinemat intended to sell, a future interest, or that Cinemat was in the process of acquiring said interest in the Picture at the time the transaction took place. Indeed, the language quoted above indicates exactly the opposite, i.e. that Cinemat already owned the rights in the Picture, which was clearly false.

Second, the 1962 Cinemat-Astor Agreement lacks any language dealing with the possibility that Cinemat may not succeed in acquiring the ownership rights to the Picture from Riama, or a release of Astor's obligations under the agreement if said rights cannot be acquired.

Third, in the real world no purchaser would agree to make unconditional and immediate payments of $200,000.00 at closing, another $100,000.00 the next day and additional payments of $100,000.00 per month over the course of the next year (totaling $1,500,000.00), for property rights that the seller does not own (and did not come to own until months later). (See, Exhibit "A" to the Mediation Brief. page PAR 00007).

It should prove somewhat difficult for the parties to the transaction to explain these anomalies, especially since the purported transaction occurred fifty years ago, the signatories are all dead, and the entities involved have long since dissolved. Indeed, that is precisely why documents such as those upon which Plaintiffs rely are routinely notarized or otherwise authenticated.

In addition to the foregoing, the following issues also make the authenticity of the January 8, 1962 Cinemat-Astor Agreement (Exhibit "A") quite questionable:

-9-
**DEFENDANT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

1. Contrary to established practice for Italian entities, the 1962 Cinemat-Astor Agreement is not notarized and there is no document of record to authenticate it. (See, by contrast, Exhibit "D", the notarial declaration authenticating the 1980 Cinemat-Hor transfer in IMF's chain-of-title).

2. The 1962 Cinemat-Astor Agreement has two first pages (PAR 00001, 00002); one that begins with a superimposed half paragraph, which is totally disassociated from the language that follows it, and another that contains a standard opening paragraph. Common to both "first pages", however, is what purports to be an identical exhibit stamp with identical handwritten insertions that indicate the stamp mark was copied onto the document, rather than having been directly stamped by the court. The presence of that stamp indicates that Plaintiffs did not have the original document and were not copying from one.

3. Only some of the pages of the 1962 Cinemat-Astor Agreement are clearly legible. Other pages are so blurred/smudged that they cannot be read (See, PAR 00001, 00011). This strongly suggests that not all of the pages were copied from the same original document, but from a confabulation of documents. .

4. On page 3 of the 1962 Cinemat-Astor Agreement (PAR 00004), to the left of the interlineated words "be deemed to have", there also appears to be a handwritten notation that says "not an original", indicating that whatever this document is, it is neither the original nor an accurate, unmodified copy of the original.

5. There is also a very serious question as to why Bruno A. Hugi, a European banker would subsequently assign the Picture rights to Hor in a signed written agreement with a supporting declaration, if he had already transferred the rights to Astor. (Trial Exhibits 3 and 101) Such an act would clearly have been a felony in any country.  (So, by the way would be entering into a transaction to sell something you do not own yet, in absence of a evidence that you had informed the buyer that you do not own it but are merely in the process of acquiring it.)

6. Perhaps most important issue is that unlike, the 1980 Cinemat-Hor

documents which are notarized and therefore self-authenticating under *Federal Rules of Evidence, Rule 901* and the corresponding Italian rule, **none** of the purported documents between Cinemat and Astor were registered or authenticated. In the absence of evidence some way of authenticating the documents, they can be held inadmissible to prove that Cinemat transferred the rights at issue to Astor prior to the execution of the 1980 Cinemat-Hor documents. This failure is fatal under both *Rule 901* and under comparable Italian law, *Italian Civil Code § 1704*. The Cinemat-Astor documents were executed 50 years ago, none of the signatories are alive to attest to the transfer and that the Astor and Cinemat entities were dissolved long ago. Plaintiffs seek to invoke the ancient document rule to authenticate it, ignoring the fact that one of the requirements to the application of that rule is that the document's appearance leads to the conclusion that it is what it purports to be.

## VI.
## PLAINTIFFS' ATTEMPT TO GET AROUND THE QUESTIONS ABOUT THE PURPORTED CINEMAT-ASTOR TRANSFER.

Plaintiffs claim that they have sufficient corroborating evidence to accredit the purchase although they do not claim to have and cannot account for original documents. They claim that what they contend are contemporaneous newspaper articles from unattributed sources about the purported transaction are circumstantial evidence of its authenticity. They also claim they are entitled to the benefit of the "ancient documents" rule, by which documents over 20 years old can escape being. That doctrine, however has one condition that the Defendants cannot meet. The rule (Rule 901 (a) (8) states that to authenticate a document under tat evidence that it: "

    (A) is in a condition that creates no suspicion about its authenticity;"

    (B) was in a place where, if authentic, it would likely be; and

    (C) is at least 20 years old when offered.

We don't know what evidence Plaintiffs will have that the Cinemat - Astor document is in a place where, if authentic, it would likely be. The documents were

apparently retrieved by the trustee in bankruptcy.  The real issue will be a whether purported copy of the document, (1) containing pages that vary widely in their clarity, (2) bearing handwriting and a stamp that the original could not have contained and (2) having the appearance of being a confabulation of different copies or versions a document rather than a single copy of a single document could qualify as being  " in a condition that creates no suspicion about its authenticity."

The central documents relevant in examining Plaintiffs' claims, therefore, in chronological order are as follows:

1. The January 8, 1962 agreement ( "Trial Exhibit 3"), whereby Cinemat purports to sell to Astor all ownership rights to the Picture throughout the world, except for certain territories, upon completion of certain payments (RPD Response PAR 00001).  (As we have noted, this document was executed months before Cinemat first acquired the rights it was purporting to sell)

2.  The undisputed March 9, 1962 assignment in which Riama (the entity comprised of the Picture's original producers ("Producers") assigns all of its rights to the Picture for the "entire world", (except for the Producer's territories, i.e. Italy, the former Italian colonies, France, Belgium and Luxemburg to name a few) to Cinemat (Exhibit "B").

3. A purported assignment from Cinemat to ASTOR on July 25, 1962 for "all of its right, title and interest in and to the copyrights of the film "La Dolce Vita" for the United States and Canada", including the right to renew copyrights and registrations. This is a one page unauthenticated document signed on the same day or the day after the letter agreement of July 26, 1962 described below and executed when, according to the Plaintiffs, Cinemat was suing ASTOR.

4. Plaintiffs' July 26, 1962 letter agreement ( the "July 26, 1962 Agreement"), whereby Cinemat confirms that all the payment of the January 8, 1962 Agreement have been satisfied  "Cinemat has no further rights of any kind in and to the Film in the United States-Canada Territories and that Astor has no further obligations under

the agreement" (RPD Response PAR 00043). That document however was purportedly executed ten days **after** Cinemat had filed a lawsuit against Astor claiming that Astor had **not** made the payments due under the January 8, 1962 agreement and after it had obtained a default judgment against ASTOR. That default judgment was still in place when documents 3 and 4 above were purportedly executed.

As we note above, none of these documents is authenticated by a notary or recorded anywhere. It highly significant that the purported transactions upon which Plaintiffs rely concern a transfer from an Italian entity of a registered Italian film and thus, is governed by Italian law. Under Italian law, failure to authenticate a document (i.e., register or notarize with a stamp and seal) is fatal to a claim that it pre-existed a competing transfer (here, the 1980 Cinemat-Hor transfer). *Italian Civil Code Article 1704*.

In other words, the fact that none of the purported documents between Cinemat and Astor are registered or authenticated could be held to render them useless to support a claim that Cinemat transferred the rights to the Picture to Astor, prior to transferring them to Hor. *Federal Rule of Evidence §902* similarly requires authentication of a document as a condition for admissibility. It provides that a notarized document, such as the 1980 Cinemat-Hor documents would be self-authenticating.

Non-notarized documents would have to be authenticated by independent evidence as a condition of admissibility. Under both American and Italian law, therefore, an unauthenticated document may not be used as evidence of ownership where the transaction is being challenged. As we note elsewhere, none of the signatories to any of the critical documents in Plaintiff's chain are living, and none of the companies they represented exist.

**A. Plaintiffs' Other Purported Chain-Of-Title Documents Have Several Unexplained Gaps**

On June 17, 1965, the trustee in Astor's bankruptcy transferred all Astor's

United States and Canadian rights in the Picture to Ardisco Financial Corporation ("Ardisco") (PAR 00058). However, prior to the bankruptcy, Astor had recorded a mortgage on August 24, 1962, granting a security interest in its film library to Inland Credit Corporation ("Inland") (PAR 00046). On January 30, 1969, Ardisco then assigned all its right title and interest in the US Copyrights to Unger Productions, Inc. ("Unger") (PAR 00102).

The record reflects an abstract of a subsequent Mortgage Purchase Agreement dated September 21, 1965, whereby Inland granted distribution rights in the Picture to Landau Releasing Organization ("Landau") (PAR 00069).

This document is highly suspect. First, it is unsigned. Second, it is merely a summary of an agreement, not the agreement itself. This document alone is not sufficient to evidence that the rights to the Picture were validly transferred from Inland to Landau. In order to bridge this gap, Plaintiffs must produce the original agreement, not simply a summary of it.

Plaintiffs' chain-of-title contains several gaps in the post-Astor bankruptcy period. As discussed above, Plaintiffs' record suggests that both Ardisco Inland had some rights to the Picture; however what these rights were has not been explained. In attempting to explain the transfer of rights in the Picture, Plaintiffs merely state that:

1. Landau acquired Inland's security interest in Astor's rights in the Picture;

2. Astor declared bankruptcy and the trustee assigned Astor's rights in the Picture to Ardisco;

3. Ardisco assigned all its rights in the Picture to Unger Productions, Inc. ("Unger"). *"Upon information and belief, Under Productions was an affiliate of Landau."*

4. Together, Landau and Unger through an affiliated entity exploited the Picture. (Plaintiffs Supplemental response to Defendant's First Set of Interrogatories, submitted November 20, 2012, page 15, lines 3-18). Plaintiffs' representation that "upon information and belief" the companies were affiliated is not sufficient to

establish continuous chain-of-title. Specifically, with respect to the Ardisco/Unger transfer and the Inland/Landau transfer it is still unclear: (I) what interest each party had in the Picture; (ii) what interest, if any was granted to Landau in 1965 (assuming that the mortgage summary document can be authenticated); (iii) what interest was assigned to Unger in 1969; and (iv) how the two companies merged into the "The Landau/Unger Company, Inc." Plaintiffs fail to produce any documentation to support the "information and belief" that they are relying on.

## VII

## DEFENDANT IMF'S AFFIRMATIVE DEFENSES

Of the Affirmative Defenses it pled earlier in the history of this case, IMF will rely upon the following

**A. THIRD AFFIRMATIVE DEFENSE: Statute of Limitations.**

The relevant statute of limitations is 17 U.S.C.A. § 507, a three year statute. Documents flowing between IMF and Paramount demonstrate that the latter was aware of IMF's ongoing exploitation of the film back in 2006. It did not file suit until November of 2011, after IMF sold its right to the film to International Classic Films.. .

**B. SIXTH AFFIRMATIVE DEFENSE: Bona fide Purchaser for Value**: If, contrary to the evidence the Court found that IMF had infringed any copyright interest held by Plaintiff, it did so with innocent intent. relying IMF purchased the rights to LDV in good faith, based upon the apparent authenticity of the chain of title leading up to its purchase.,based upon authenticated transfers, supported by notarized statements and declarations. .

**C. EIGHTH AFFIRMATIVE DEFENSE:** . Estoppel:

A paradigmatic estoppel arises from prior conduct by the asserting party that is somehow at odds with a point now sought to be asserted in litigation.. (See *Getty v. Getty*,, 187 Cal. App.3d 1159, 1185, 232 Cal.Rptr. 603. When Paramount first asserted its rights against IMF, IMF's counsel provided his analysis of why

Paramount's claims were meritless. Rather than pursue its position Paramount withdrew, indicating its acquiescence, IMF perfected its distribution agreements partially based upon Paramount's withdrawal, thus having detrimentally relied on Paramount's decision not to pursue its purported claims.

D.   **TWELFTH AFFIRMATIVE DEFENSE:** Laches

Laches is based upon the proposition that one who seeks the assistance of a court of equity may not sleep on his rights   The elements of laches are: (1) delay in asserting a right or a claim; (2) the delay was not reasonable or excusable; and (3) prejudice to the party against whom laches is asserted. ( *Miller v. Glenn Miller Productions, Inc.* (9th Cir.2006) 454 F.3d 975, 997.  The delay consists of Plaintiffs' inaction for over four years between the time IMF's counsel set forth his rebuttal to Plaintiffs' assertion and Paramount made no reply and failed to take action to a vindicate its rights, and the filing of its action in late 2011, after IMF had obligated itself to distributors and sold its interest to ICF, thus incurring liability to each.  IMF asserts that given Paramount's failure to act during that time it was reasonable in assuming that it had abandoned or decided not to pursue its claims.

E.   **FIFTEENTH  AFFIRMATIVE DEFENSE:** Failure to Allege a proper claim for  relief under the Federal Declaratory Judgment Act, (28 U.S.C. § 2201).  Plaintiffs seek to limit the relief to the  limited prayer apparently intended to prevent the court from declaring IMF as holder of the rights to LDV but not permitting a contrary finding.. So limiting the prayer invalidates a declaratory relief action under the Federal act. .

F.  **NINETEENTH AFFIRMATIVE DEFENSE:** Equitable Indemnity**.** The elements of a cause of action for indemnity are (1) a showing of fault on the part of the indemnitor and (2) resulting damages to the indemnitee for which the indemnitor is contractually or equitably responsible. West's Ann.Cal.Civ.Code § 1432.  To the extent Defendant were to be held liable, it would be entitled to indemnity from the

Cinestampa, who sold the rights to LDV to it claiming to own it, and from the others similarly situated in its chain of title.

**G. DEFENSES IMF WILL NOT PURSUE.** Based upon the facts now known to IMF, it will not pursue the First, Second, Fourth, Fifth, Seventh, Ninth, Tenth or Eleventh Affirmative Defenses.

# VIII

# ANTICIPATED EVIDENTIARY ISSUES

The primary evidentiary issue will go to the authenticity and admissibility of the Plaintiffs' Chain of Title Documents. While we will know more about that issue when we receive the pending responses to interrogatories and the deposition of Plaintiff, we anticipate the serious question going to the admissibility of the documents purportedly evidencing the transfer from Cinemat to Astor., for the reasons set forth above.

This indeed is a pivotal issue in this case. If the Cinemat-Astor documents are held inadmissable, fatally lacking in foundation or authenticity, or are found to be unauthentic by the trier of fact, plaintiffs lose their standing to bring the instant action and the case is effectively over. Federal Rule of Evidence §§901. 902  Italian Civil Code § 1704.

# IX

# BIFURCATION OF ISSUES

Defendant does not seek bifurcation of issues.

Dated: January   , 2013              CHODOS & ASSOCIATES


                                     By:_____/s/_____
                                           David Manning Chodos
                                           Attorney for Defendant

INTERNATIONAL MEDIA FILMS, INC.

. .

L:\WPDATA\BUS\IMF\PLEADINGS\CONT-BR9.WPD

**DEFENDANT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW**