DAVID HALBERSTADTER (SBN 107033)
david.halberstadter@kattenlaw.com
REBECCA F. GANZ (SBN 265199)
rebecca.ganz@kattenlaw.com
KATTEN MUCHIN ROSENMAN LLP
2029 Century Park East
Suite 2600
Los Angeles, CA 90067-3012
Telephone:  310.788.4400
Facsimile:  310.788.4471

Attorneys for Plaintiffs
PARAMOUNT PICTURES CORPORATION
and MELANGE PICTURES LLC

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PARAMOUNT PICTURES CORPORATION, a Delaware corporation; and MELANGE PICTURES LLC, a Delaware corporation,<br><br>          Plaintiffs,<br><br>     vs.<br><br>INTERNATIONAL MEDIA FILMS, INC., a Nevada corporation,<br><br>          Defendant. | CASE NO.: CV11-09112-SJO (AJWx)<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>*[Filed Concurrently with [Proposed] Statement of Undisputed Facts; Notices of Lodging; Declarations of Richard Redlich, Jr., Stephanie Woodhead and David Halberstadter]*<br><br>Date:  June 3, 2013<br>Time: 10:00 a.m.<br>Place: Courtroom 1 |

1

TO DEFENDANT AND ITS ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on June 3, 2013 at 10:00 a.m. in Courtroom 1 of the above-entitled court, located at 312 North Spring Street, Los Angeles, CA 90012-4701, Plaintiffs Paramount Pictures Corporation ("Paramount") and Melange Pictures LLC ("Melange") (collectively, "Plaintiffs") will and hereby do move for partial summary judgment on their Complaint against Defendant International Media Films, Inc. ("IMF"). Plaintiffs' motion (the "Motion") is made on the grounds that there is no genuine issue of material fact and Plaintiffs are entitled to partial judgment as a matter of law on the following issues:

Issue 1:  Partial summary judgment should be granted in favor of Plaintiffs and against IMF on the First Claim for Relief, which seeks a judicial declaration that IMF does not own, and at no time has owned, the United States copyright in the motion picture *La Dolce Vita* (the "Picture"), because there is no genuine issue of material fact that Plaintiffs, and not IMF, own these rights.

Issue 2:  Partial summary judgment should be granted in favor of Plaintiffs and against IMF on the Second Claim for Relief, which seeks a judicial declaration that Plaintiffs own, and at all relevant times have exclusively owned, the United States copyright in the Picture, because there is no genuine issue of material fact that Plaintiffs own these rights.

Issue 3:  Partial summary judgment should be granted in favor of Plaintiffs and against IMF on the Third Claim for Relief for direct copyright infringement by IMF, because there is no genuine issue of material fact as to (i) Plaintiffs' copyright ownership of the Picture and (ii) IMF's unauthorized exploitation of the Picture within the applicable statute of limitations.

Issue 4:  Partial summary judgment should be granted in favor of Plaintiffs and against IMF on the Fourth Claim for Relief for contributory infringement by IMF, because there is no genuine issue of material fact (i) as to Plaintiffs' copyright ownership of the Picture, (ii) as to the direct infringement of Plaintiffs' rights in the

Katten
KattenMuchinRosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

2

Picture by IMF's licensees, (iii) that IMF had actual knowledge of the infringement of the Picture by its licensees, and (iv) that IMF has caused, enabled, facilitated, and materially contributed to that infringement.

Issue 5:  Partial summary judgment should be granted in favor of Plaintiffs and against IMF on the Fifth Claim for Relief for vicarious infringement by IMF, because there is no genuine issue of material fact (i) as to Plaintiffs' copyright ownership of the Picture, (ii) as to the direct infringement of Plaintiffs' rights in the Picture by IMF's licensees, (iii) that IMF has had the right and ability to control and/or supervise the infringing conduct of its licensees, and (iv) that IMF has had a direct financial interest in, and has derived substantial financial benefit from, the direct infringement of Plaintiffs' exclusive rights in the Picture by IMF's licensees.

This Motion is made following an in-person conference of counsel pursuant to L.R. 7-3, which occurred on March 20, 2013. [Declaration of David Halberstadter, ¶ 17.]

This Motion is based upon this Notice of Motion and Motion, the attached Memorandum of Points and Authorities; the concurrently-filed [Proposed] Statement of Undisputed Facts and Conclusions of Law; the supporting Declarations of Richard Redlich, Jr., Stephanie Woodhead and David Halberstadter; the pleadings and other documents on file with the Court; such other and further matters of which this Court must or may take judicial notice; any argument that may be heard by the Court at the time of the hearing; and any other matters that may be considered by the Court.

Dated:  April 3, 2013                                KATTEN MUCHIN ROSENMAN LLP


By:   /s/ David Halberstadter
      David Halberstadter
      Attorneys for Plaintiffs
      Paramount Pictures Corporation
      and Melange Pictures LLC

31727287v4

# TABLE OF CONTENTS

I.     PRELIMINARY STATEMENT ..................................................................1

II.    FACTUAL BACKGROUND ....................................................................2

    A.     Plaintiffs' Chain of Title to the United States and Canadian Rights
        in The Picture ...............................................................................2

        1.     From Riama To Astor Pictures, Inc. .................................................3

        2.     From Astor Pictures To The Landau-Unger Company ..................5

        3.     Landau-Unger Becomes Commonwealth United Entertainment. ...6

        4.     From CUE To National Telefilm Associates, Inc. ........................6

        5.     NTA Becomes Republic Pictures, Inc. ............................................8

        6.     Republic Pictures' Filings With The Copyright Office..................8

        7.     From Republic Entertainment Inc. To Melange And Paramount....8

    B.     IMF's Purported Chain of Title to The Picture...........................................9

    C.     Plaintiffs' Predecessors Openly Exploited The Picture In The United
        States; IMF's Predecessors Neither Exploited The Picture Nor Objected
        To The Exploitation By Plaintiffs' Predecessors.....................................10

    D.     IMF's Direct and Secondary Copyright Infringement.............................10

III.   ARGUMENT.........................................................................................12

    A.     Melange Is The Copyright Owner Of The Picture In The United States;
        Paramount Is Melange's Exclusive Licensee; And IMF Owns No
        Rights In The Picture Whatsoever In The United States. ........................12

    B.     All Of Plaintiffs' Chain-Of-Title Documents Are Indisputably
        Authentic And Admissible.........................................................................13

        1.     The Business Records That Plaintiffs Inherited From
            Republic Are Admissible As Plaintiffs' Own Business
            Records. ..............................................................................14

        2.     The Overwhelming Majority Of Plaintiffs' Chain Of Title
            Documents Constitute "Ancient Documents," As Well...............16

i

31727287v4

3.     Any Remaining Chain Of Title Documents Were Filed Or Recorded In A Public Office. ....................................................... 17

C.     IMF Has Directly Infringed Upon Plaintiffs' Rights In The Picture. ....... 18

D.     IMF Is Also Liable For Contributory Infringement ................................. 18

E.     IMF Is Also Liable For Vicarious Infringement. .................................... 19

IV.   CONCLUSION .................................................................................................. 20

31727287v4

# TABLE OF AUTHORITIES

## Cases

*A&M Records, Inc. v. Napster, Inc.*,
    239 F.3d 1004 (9th Cir. 2001) ...................................................................18

*Ellison v. Robertson*,
    357 F.3d 1072 (9th Cir. 2004) ............................................................18, 19

*Federal Deposit Ins. Corp. v. Staudinger*,
    797 F.2d 908 (10th Cir. 1986) ...................................................................15

*FirstMerit Bank, N.A. v. Balin*,
    2012 WL 4017948 (N.D.Ill. 2012) .............................................................16

*Fleischer Studios, Inc. v. A.V.E.L.A., Inc.*,
    654 F.3d 958 (9th Cir. 2011) .....................................................................13

*Fonovisa, Inc. v. Cherry Auction, Inc.*,
    76 F.3d 259 (9th Cir. 1996) .......................................................................18

*International Media Films, Inc. v. Lucas Entertainment, Inc.*,
    703 F.Supp.2d 456 (S.D.N.Y. 2010) ...........................................................1

*Matter of Ollag Construction Equipment Corp.*,
    665 F.2d 43 (2d Cir. 1981) .........................................................................15

*McQueeney v. Wilmington Trust Co.*,
    779 F.2d 916 (3d Cir. 1985) .......................................................................14

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
    545 U.S. 913 (2005) ...................................................................................19

*MRT Const. Inc. v. Hardrives, Inc.*,
    158 F.3d 478 (9th Cir. 1998) .....................................................................15

*Twentieth Century Fox Film Corp. v. Dastar Corp.*,
    2000 WL 35503105 (C.D.Cal. 2000) .........................................................16

*U.S. Bank Nat. Ass'n v. American Screw & Rivet Corp.*,
    2010 WL 3172772 (N.D.Ill. 2010) .............................................................16

*U.S. v. Adefehinti*,
    510 F.3d 319 (D.C.Cir. 2007) ....................................................................15

Katten
KattenMuchinRosenmanLLP

2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel  310.788.4471 fax

iii

31727287v4

*U.S. v. Demjanjuk*,
    367 F.3d 623 (6th Cir. 2004) ................................................................16

*United Fabrics International, Inc. v. C & J Wear, Inc.*,
    630 F.3d 1255 (9th Cir. 2011) ..............................................................13

*United States v. Childs*,
    5 F.3d 1328 (9th Cir. 1993) ..................................................................15

*United States v. Goichman*,
    547 F.2d 778 (3d Cir.1976) ..................................................................14

*United States v. Kairys*,
    782 F.2d 1374 (7th Cir. 1986) ..............................................................16

*United States v. Stelmokas*,
    100 F.3d 302 (3d Cir.1996) ..................................................................16

*Washington Shoe Co. v. A–Z Sporting Goods Inc.*,
    704 F.3d 668 (9th Cir. 2012) ................................................................12

**Statutes**

17 U .S.C. § 104A ...........................................................................................8

17 U.S.C. § 106 ............................................................................................18

17 U.S.C. § 410(c) .......................................................................................12

17 U.S.C. § 501 ............................................................................................18

17 U.S.C. § 501(a) .......................................................................................18

**Other Authorities**

Fed.R.Evid. 803(16) .............................................................................14, 16

Fed.R.Evid. 803(6) .........................................................................14, 15, 16

Fed.R.Evid. 803(8) ......................................................................................17

Fed.R.Evid. 901(a) ......................................................................................13

Fed.R.Evid. 901(b)(1) ...............................................................................2, 14

Fed.R.Evid. 901(b)(7) ..........................................................................2, 14, 17

**Katten**
KattenMuchinRosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

iv

Fed.R.Evid. 901(b)(8) ........................................................................2, 14, 16

Fed.R.Evid. 902(11) ..................................................................................15

Fed.R.Evid. 902(12) ..................................................................................15

**Treatises**

2 *Entertainment Industry Contracts*, Non-Theatrical Distribution ¶ 21.01
    (LexisNexis 2008) ..............................................................................7

3 M. & D. Nimmer, *Nimmer on Copyright* § 12.11[C] (1996) ....................13

Wright & Gold, *Federal Practice and Procedure: Evidence* § 7113....................16, 17

**Katten**
KattenMuchinRosenman LLP

2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

31727287v4

## I.  **PRELIMINARY STATEMENT**

Plaintiff Melange owns United States copyright registrations for the original, Italian-language version, an English-language subtitled version and an English-language dubbed version of the classic Federico Fellini motion picture, *La Dolce Vita* (the "Picture"), all of which Melange has exclusively licensed to Paramount.  For the past 50 years, Plaintiffs and their predecessors in interest have lawfully distributed the Picture throughout the United States and Canada through a variety of platforms, including, but not limited to, theatrically, on broadcast and cable television, and in home video format.  Much more recently, IMF has engaged in its own, parallel course of distributing, or authorizing others to distribute, the Picture.  IMF has further demanded that Paramount and its licensees cease and desist in their exploitation of the Picture, and has generally held itself out to the public as though IMF, rather than Plaintiffs, owns the exclusive United States rights to the Picture.[1]

Against this backdrop, this case ultimately boils down to two competing claims of ownership, each of which is irreconcilable with the other.[2]  These competing claims are irreconcilable because while both Plaintiffs' chain of title and IMF's purported chain of title begin with the same company – Cinemat S.A. ("Cinemat") – IMF's chain relies upon a purported grant from Cinemat that took place in 1980, *eighteen years* after Cinemat had already transferred the United States and Canadian rights to Astor Pictures, Inc. ("Astor Pictures"), to which Plaintiffs ultimately succeeded.  This is confirmed by a 1962 letter agreement between Cinemat and Astor Pictures, wherein

---

[1]     IMF has even continued to engage in this infringing conduct after a federal court in New York fully and finally adjudicated - in a copyright infringement action in which IMF was the plaintiff - that IMF owns no such rights.  A district court in the Southern District of New York ruled that IMF lacked the evidence to establish even a *prima facie* case of its copyright ownership of the Picture because, among other things, its evidence of ownership was of questionable authenticity.  *See International Media Films, Inc. v. Lucas Entertainment, Inc.*, 703 F.Supp.2d 456 (S.D.N.Y. 2010).

[2]     Once it is adjudicated that Plaintiffs, rather than IMF, are the exclusive copyright owners of the Picture in the United States, Plaintiffs' claims for direct, contributory and vicarious infringement are easily established, as IMF has admittedly exploited, and licensed third parties to exploit, the Picture in the United States.

Cinemat acknowledged that it had "no further rights of any kind in and to the Film in the United States-Canada Territory." If Cinemat's grant to Astor Pictures in 1962 was valid, it necessarily follows that Cinemat held no rights to grant in 1980, making the initial link in IMF's purported chain of title broken from the outset.

Faced with this inconvenient truth, IMF's principal defense is to question the authenticity and validity of Plaintiffs' chain of title documentation, particularly the documents evidencing Cinemat's 1962 transfer to Astor Pictures. As will be demonstrated below, all of IMF's attempted challenges to Plaintiffs' chain of title documents are meritless. The authenticity of each and every chain of title document offered by Plaintiffs is established on multiple grounds;[3] and, simply put, IMF cannot offer any evidence or meritorious argument why any of these documents is not what it purports to be. For these reasons, the Motion should be granted.

## II.   FACTUAL BACKGROUND

### A.   Plaintiffs' Chain of Title to the United States and Canadian Rights in The Picture

The Picture was written and directed by the critically acclaimed director, Federico Fellini, in 1960. It was produced in Italy by Riama Films S.p.A. ("Riama"). The Picture was nominated for four Academy® Awards, winning one, and also earned the Palme d'Or at the 1960 Cannes Film Festival. [Statement of Undisputed Facts and Conclusions of Law ("SUF") 1-3.]

Plaintiffs' "chain of title" to the Picture - *i.e.*, the series of grants and transfers

---

[3]      Most of the documents offered by Plaintiffs come from the business records of Plaintiffs' immediate predecessor, Republic Entertainment LLC ("Republic"). Plaintiffs "inherited" these business records when they succeeded to Republic's rights in the Picture. As a matter of established law, Republic's former business records now constitute Plaintiffs' business records (because, among other things, Plaintiffs rely upon their accuracy in the ordinary course of business), and properly may be authenticated by an employee of Plaintiffs with personal knowledge of how the documents are maintained. Fed.R.Evid. 901(b)(1). Most of these same documents also qualify as "ancient documents" because they are in a condition that creates no suspicion about their authenticity, they were maintained in a place where, if authentic, they would likely be, and they are more than 20 years old. Fed.R.Evid. 901(b)(8). The remaining chain of title documents are public records. Fed.R.Evid. 901(b)(7).

Katten
KattenMuchinRosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

31727287v4

through which Plaintiffs came to own the United States and Canadian rights in the Picture - demonstrates a clear and irrefutable succession from Riama to Plaintiffs.

### 1. From Riama To Astor Pictures, Inc.

Plaintiffs' chain of title begins with an initial transfer in 1962, by Riama to Cinemat. That same year, Cinemat transferred all of its rights to Astor Pictures International, Inc. ("Astor Int'l"). Astor Int'l then transferred the United States and Canadian rights in the Picture to its subsidiary, Astor Pictures; and Cinemat thereafter approved and consented to this transfer and acknowledged that it no longer possessed any United States or Canadian rights in the Picture whatsoever. [SUF 4-14.] These "links" in Plaintiffs' chain, which completely destroy IMF's asserted chain of title,[4] are explained in greater detail below.

Pursuant to an agreement dated January 7, 1962, Cinemat agreed to transfer to Astor Int'l all of the worldwide rights in the Picture, excluding only France, Italy and their respective former colonies (the "Cinemat-Astor Int'l Agreement"). [SUF 4.][5] The Cinemat-Astor Int'l Agreement provides, among other terms and conditions, that in consideration for Cinemat's grant of rights in the Picture, Astor Int'l would pay Cinemat the total sum of $1.5 million, in accordance with a payment schedule set forth in the agreement. [SUF 5.] Astor Int'l's obligation to make installment payments of the purchase price for the rights in the Picture was secured by a series of promissory notes which were made exhibits to the agreement. [SUF 6.]

---

[4]   As mentioned above, if Cinemat transferred its United States and Canadian rights in the Picture to Astor Pictures in 1962 and acknowledged that it no longer possessed these rights, it had no such rights to convey to IMF's predecessor in interest eighteen years later, in 1980.

[5]   At the time, Cinemat apparently had not yet executed its agreement with Riama; that agreement was signed on March 9, 1962. [SUF 8.] IMF is likely to make much ado over the timing of these two transactions (*i.e.*, that the agreement between Cinemat and Astor Int'l preceded the agreement between Riama and Cinemat). The timing of these two transactions is utterly irrelevant to the authenticity of the Cinemat-Astor International Agreement because it does not raise any serious question that this agreement is other than what it purports to be; and it has no effect upon the validity of the Cinemat-Astor International Agreement or the subsequent agreements between Cinemat and Astor Pictures.

Katten
KattenMuchinRosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

**CASE NO. CV11-09112-SJO (AJWx)**

Paragraph 5 of the Cinemat-Astor Int'l Agreement expressly provides:

> It is agreed that until the completion of all payments required to be made by the Purchaser [*i.e.*, Astor Int'l] to the Seller [*i.e.*, Cinemat] in accordance with Paragraph 3 herein: . . . b) All copyrights to the Film and registrations if and where existing thereof shall remain in the name of the Producers [*i.e.*, Riama] and/or the Seller.

[SUF 7.]   The Cinemat-Astor Int'l Agreement thus evidences both (i) Cinemat's intention not to formally transfer any rights of copyright in the Picture to Astor Int'l until Cinemat had been paid in full, and (ii) that the copyrights in the Picture would remain in either Riama's or Cinemat's name until full payment was received.

By an agreement dated March 9, 1962 between Riama and Cinemat (the "Riama-Cinemat Agreement"), Riama memorialized its transfer to Cinemat all of its rights in the Picture worldwide, excluding only France, Italy and their respective former colonies.  [SUF 8.]  Accordingly, as of March 1962, Riama had transferred rights in the Picture to Cinemat, and Cinemat had contracted to transfer those rights (upon payment in full) to Astor Int'l.[6]

On July 25, 1962, Cinemat executed a written assignment in favor of Astor Pictures (the "Cinemat Assignment").  [SUF 9.]  Pursuant to the Cinemat Assignment, Cinemat assigned to Astor Pictures all of Cinemat's right, title and interest in and to the copyrights in the Picture for the United States and Canada.  [SUF 10.]  A letter agreement between Cinemat and Astor Pictures dated July 26, 1962 explains why the Cinemat Assignment was executed.  The letter agreement (the "Cinemat-Astor Pictures Agreement") recites that pursuant to the Cinemat-Astor Int'l Agreement, the rights in the Picture that Cinemat had transferred to Astor Int'l included the United States and Canadian rights.  [SUF 11.]  After the execution of the Cinemat-Astor Int'l Agreement in January 1962, Astor Int'l had transferred the United States and Canadian rights to Astor Pictures.  By the Cinemat-Astor Pictures Agreement,

---

[6]    As the Cinemat-Astor Int'l Agreement contemplated, until March 1962 the copyrights in the Picture remained in Riama's name and, following execution of the Riama-Cinemat Agreement, the copyrights remained in Cinemat's name.

CASE NO. CV11-09112-SJO (AJWx)

Cinemat formally consented to this transfer, and expressly acknowledged that payment for the United States and Canadian rights in the Picture had been made in full, affirming that Cinemat had "no further rights of any kind in and to the Film in the United States-Canada Territory."  [SUF 12-14.][7]

Accordingly, by July 1962, Riama (the Picture's producer) had transferred to Cinemat all of its rights in the Picture worldwide (excluding only France, Italy and their respective former colonies); Cinemat had transferred all of these worldwide rights to Astor Int'l; Astor Int'l had transferred the United States and Canadian rights in the Picture to Astor Pictures, with Cinemat's express consent (and with a separate assignment directly from Cinemat to Astor Pictures to eliminate any ambiguity); and Cinemat expressly acknowledged that it no longer possessed any rights in the Picture in the United States and Canada.

### 2.    From Astor Pictures To The Landau-Unger Company

Astor Pictures financed its acquisition of the United States and Canadian rights in the Picture with a loan from Inland Credit Corporation ("Inland Credit").  Pursuant to a Mortgage of Chattels dated August 21, 1962 between Astor Pictures and Inland Credit, Astor Pictures granted Inland Credit a security interest in its rights in the Picture as collateral for the loan.  [SUF 15.]

Astor Pictures apparently struggled to stay afloat financially and, eventually, filed for bankruptcy.[8]  Pursuant to a Trustee's Bill of Sale dated June 29, 1965, Astor Pictures' bankruptcy trustee assigned all of Astor Pictures' rights in the Picture (*i.e.*, all rights in the United States and Canada) to Ardisco Financial Corporation

---

[7]    As a result of these transactions, Cinemat possessed no United States or Canadian rights in the Picture to convey to IMF's predecessor in 1980.

[8]    Newspaper articles published at the time evidence that Astor Pictures defaulted on its payments to Cinemat, which sued to collect the payments (which action eventually was settled); that after Astor Pictures borrowed funds from Inland Credit to make the payments to Cinemat, Astor Pictures defaulted on the loan, leading Inland Credit to schedule a foreclosure auction (which it subsequently cancelled); and that Astor Pictures finally filed for bankruptcy.  [SUF 16.]

Katten

KattenMuchinRosenmanLLP

2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

("Ardisco"). [SUF 17.][2]

In September 1965, Inland Credit sold its security interest to Landau Releasing Organization, Inc. ("Landau Releasing"). [SUF 19.] By an Assignment dated January 30, 1969, Ardisco assigned all of its rights in the Picture (*i.e.*, the rights that it had acquired out of Astor Pictures' bankruptcy) to Unger Productions, Inc. ("Unger Productions"). [SUF 24.] Both Landau Releasing and Unger Productions were subsidiaries of their parent company, The Landau-Unger Company ("Landau-Unger"). [SUF 20, 21.] Accordingly, as of January 1969, Landau-Unger owned all of the United States and Canadian rights in the Picture that formerly had been owned by Astor Pictures. [SUF 25.]

### 3.   Landau-Unger Becomes Commonwealth United Entertainment.

In August 1967, Landau-Unger and all of its subsidiaries were acquired by Commonwealth United Corporation ("CUC"). [SUF 22.] Following this acquisition, Landau-Unger and its subsidiaries went through name changes: Landau-Unger became Commonwealth United Entertainment Corp. ("CUE"); Landau Releasing was renamed Commonwealth United Releasing Organization ("CURO"); and Unger Productions' name was changed to UPI Productions, Inc. ("UPI"). [SUF 23.]

### 4.   From CUE To National Telefilm Associates, Inc.

Between 1971 and 1973, CUE (formerly Landau-Unger) and National Telefilm Associates, Inc. ("NTA") entered into a series of license agreements by which NTA gradually acquired more and more rights in the Picture. Pursuant to an agreement dated as of June 30, 1971, CUE granted to NTA the exclusive and perpetual right to distribute the Picture in the United States and Canada for broadcast and cable television exhibition, non-theatrical exhibition and theatrical exhibition in Canada

---

[2] Ardisco was a subsidiary of Inland Credit. [SUF 18.] It therefore is likely that Inland Credit caused Ardisco to acquire the rights in the Picture out of Astor Pictures' bankruptcy in partial satisfaction of Inland Credit's secured loan.

31727287v4

only (the "NTA Television Rights Agreement").  [SUF 26.][10]  Pursuant to a separate agreement between CUE and NTA dated as of June 29, 1972, CUE also granted NTA the exclusive and perpetual right to distribute the Picture for theatrical exhibition in the United States (the "NTA Theatrical Rights Agreement").  [SUF 27.]

In April 1973, CUE changed its name again, to Iota Entertainment, Inc. ("Iota").  [SUF 28.]  Pursuant to a third agreement between Iota and NTA dated November 12, 1973, Iota granted NTA the exclusive and perpetual United States and Canadian videotape/disc cassette rights (*i.e.*, home video rights) in the Picture (the "NTA Home Video Rights Agreement").  [SUF 29.]  Accordingly, as of November 12, 1973, NTA was the owner of the perpetual, exclusive right to distribute the Picture in the United States and Canada for broadcast and cable television exhibition, non-theatrical exhibition, theatrical exhibition and home video exploitation.  [SUF 30.] Given the scope of the rights granted to NTA, it is not clear what rights, if any, remained with Iota.

In any event, in 1982, Iota Industries, Inc. – the sole stockholder of Iota – filed for bankruptcy.  Through Iota Industries' Bankruptcy Trustee and with the Bankruptcy Court's approval, all of Iota's stock was sold to Redwood Investors Syndicate ("RIS").  [SUF 31, 32.]  In order to fund its acquisition of Iota's stock, RIS had obtained a secured loan from NTA, and RIS pledged the stock and assets of Iota as collateral for the loan.  [SUF 33.]  RIS eventually defaulted on its loan from NTA; and pursuant to a Transfer and Release dated July 30, 1984, RIS unconditionally and irrevocably transferred to NTA all of its right, title and interest in the stock and assets of Iota.  By this transaction, NTA  acquired whatever rights in the Picture had remained with Iota.  [SUF 34.]

Accordingly, as of July 30, 1984, by virtue of (i) the NTA Television Rights

---

[10]    "Non-theatrical exhibition" commonly refers to exhibitions in venues that are not commercial theaters, such as on college campuses, airplanes, cruise ships and military installations.   2 *Entertainment Industry Contracts*, Non-Theatrical Distribution ¶ 21.01 (LexisNexis 2008).

Katten

KattenMuchinRosenman LLP

2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

CASE NO. CV11-09112-SJO (AJWx)

Agreement, (ii) the NTA Theatrical Rights Agreement, (iii) the NTA Home Video Rights Agreement and (iv) the Transfer and Release, NTA was the owner of all of the United States and Canadian rights in the Picture that formerly had been owned by Iota/CUE/Landau-Unger/Astor Pictures.  [SUF 35.]

### 5.   NTA Becomes Republic Pictures, Inc.

Since at least 1972, NTA also had owned the film library of the original Republic Pictures Corporation.  [SUF 36.]  In January 1985, NTA formally merged with Republic Pictures Corporation and retained the Republic name.  [SUF 37.]

### 6.   Republic Pictures' Filings With The Copyright Office

In 1989, Republic Pictures Corporation obtained both an original and a renewal United States copyright registration for the English-language subtitled version of the Picture.  [SUF 38.]  In 1991 and 1994, respectively, Republic Pictures Corporation also obtained an original and a renewal United States copyright registration for the English-language dubbed version of the Picture.  [SUF 39.]

In 1994, Republic Pictures Corporation changed its name to Republic Entertainment Inc.  [SUF 40.]  On December 31, 1996, Republic Entertainment Inc. recorded in the United States Copyright Office a "GATT Restoration Notice," evidencing its restoration of the United States copyright in the original, Italian language version of the Picture.  [SUF 41.][11]  And on April 27, 1998, the United States Copyright Office issued to Republic Entertainment a copyright registration for the original, Italian-language version of the Picture.  [SUF 42.]

### 7.   From Republic Entertainment Inc. To Melange And Paramount

In 2005, Republic Entertainment Inc. converted from a corporation to a limited

---

[11]   An amendment to the Copyright Act enacted in 1994, known as the Uruguay Round Agreements Act, conferred protection on "restored works," vesting automatically on the date of enactment.  *See generally* 17 U .S.C. § 104A.  To be restored to United States copyright protection, a work had to be from a "source country" that either adhered to the Berne Convention or which was a World Trade Organization member country, and which was still protected in the "source country" at the time of restoration.  *Id.* at § 104A(h). In addition, the work had to have fallen into the public domain in the United States for certain enumerated reasons, such as a failure to apply for renewal or publication without a proper copyright notice.  *Id.*

Katten
KattenMuchinRosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

liability company, and became Republic Entertainment LLC.  [SUF 43.]  Pursuant to a Short Form Assignment executed December 21, 2005, Republic Entertainment LLC assigned its rights in the Picture to Melange.  [SUF 44.]  Pursuant to a Short Form Memorandum of Distribution Rights also executed on December 21, 2005, Melange exclusively licensed to Paramount the right to distribute and otherwise exploit the Picture in the United States and Canada.  [SUF 45.]  Accordingly, as of December 21, 2005, Melange was the copyright owner of the Picture in the United States and Canada, and Paramount was Melange's exclusive licensee of these rights.

## B.   IMF's Purported Chain of Title to The Picture

IMF claims to have acquired ownership of the same rights in the Picture that Plaintiffs own through a series of transactions that is irreconcilable with Plaintiffs' chain of title.  IMF does not dispute that in 1962, Riama (the Picture's producer) transferred the worldwide rights in the Picture (excluding Italy, France and their respective former colonies) to Cinemat.  IMF claims, however, that in 1980 – eighteen years after Cinemat unquestionably transferred its rights in the Picture to Astor Pictures and Cinemat acknowledged in writing that it had no further rights of any kind in the Picture in the United States and Canada - Cinemat purportedly transferred the United States rights in the Picture to a Liechtenstein company called Hor A.G. ("Hor").

The next link in IMF's purported chain occurs one year later (in 1981), when Hor supposedly transferred these rights to an Italian company called Oriental Films S.r.1. ("Oriental").  Oriental purportedly held these rights for the next 17 years.  At some point, Oriental apparently became subject to a liquidation proceeding; and, in 1998, Oriental's "liquidator" purportedly sold Oriental's rights in the Picture to another Italian company, called Cinestampa Internazionale s.r.1. ("Cinestampa"). IMF claims to have acquired its purported rights in the Picture from Cinestampa in 2001.

9

31727287v4

## C.   Plaintiffs' Predecessors Openly Exploited The Picture In The United States; IMF's Predecessors Neither Exploited The Picture Nor Objected To The Exploitation By Plaintiffs' Predecessors.

The companies in Plaintiffs' chain of title openly exploited the Picture in the United States and Canada.  Particularly in the 1960s, when the Picture was new, Astor Pictures' exploitation and, later, Landau-Unger's exploitation, were well-publicized. [SUF 66.][12]  By significant contrast, **none** of the companies in IMF's supposed chain of title ever exploited the United States or Canadian rights in the Picture.

IMF is unaware of any United States or Canadian exploitation of the Picture by any of its purported predecessors during the **39 years** between the time that Cinemat acquired these rights in 1962 and IMF purportedly acquired them in 2001.  Moreover, to IMF's knowledge, none of IMF's purported predecessors ever objected during this 39-year period to the public exploitation of the Picture in the United States and Canada by Plaintiffs' predecessors.  [SUF 68, 69.]  And there are no documents recorded with the Copyright Office evidencing any claim of ownership to the Picture by any of IMF's predecessors.  [SUF 70.]

## D.   IMF's Direct and Secondary Copyright Infringement

For at least the last three years, IMF has engaged in a course of copyright infringement by, among other things, purporting to license exclusive distribution rights in the Picture to third parties.  [SUF 46.]  By an agreement dated May 14, 2003, IMF purported to grant to KOCH Lorber Films, LLC ("KLF") an exclusive license to manufacture and distribute "video devices" (*e.g.*, videotapes and DVDs) embodying the Picture for "home use", and to exploit the Picture via Internet sales.  [SUF 47.] The term of the agreement was for seven years (*i.e.*, to May 14, 2010) with an automatic two-year renewal term (*i.e.*, to May 14, 2012).  [SUF 48.]  The territories

---

[12]     In later years, when the Picture had become a "library title," media reports diminished but the exploitation of the Picture continued to be reported to its owners' shareholders in annual reports.  [SUF 67.]

Katten
Katten Muchin Rosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

covered are the United States and English-speaking Canada.  [SUF 49.][13]

By an Exclusive Distribution Agreement dated November 16, 2009, IMF purported to grant to E1 Entertainment U.S., LP ("E1") – KLF's successor-in-interest – the exclusive right to distribute and otherwise exploit the Picture in a wide range of media, including home video, all forms of television, all forms of video-on-demand and via the Internet.  [SUF 51.]  The term of E1's license runs for 12 years following E1's initial commercial release of the Picture.  [SUF 52.]  The territory covered by the agreement is North America.  [SUF 53.][14]  KLF and E1 have actively distributed (and E1 currently distributes) the Picture on DVD through various retailers and "e-tailers." [SUF 58.]   E1 also currently offers digital downloads of the Picture via its own website.  [SUF 59.]

IMF granted a variety of licenses to other companies, as well.[15]  Based upon the information that IMF provided to Plaintiffs during discovery, IMF has earned in excess of $1 million from its infringing activities.  [SUF 60.]  But there is more.  IMF has continuously represented to the public that it is the exclusive owner of the Picture in the United States.   The DVD sets of the Picture that IMF authorized KLF and, thereafter, E1 to distribute prominently feature IMF's name on the front cover, which

---

[13]    The agreement between IMF and KLF ensured that IMF would retain certain controls over KLF's distribution of the Picture.  For instance, paragraph 2.6 of the agreement gave IMF the right to approve a statement on all packaging "to the effect that KLF has licensed from Owner the right to distribute the Video Devices embodying the Program," as well as approval over an on-screen credit for IMF on the Picture itself.  Pursuant to paragraph 4.2, IMF had the right to approve the English-, Spanish- and French-language subtitled versions of the Picture that KLF was required and/or had the right to create.  Paragraphs 9.1 and 9.5 gave IMF approval over all artwork to be used in KLF's marketing and distribution of the Picture.  [SUF 50.]

[14]    The agreement between IMF and E1 also ensured that IMF would retain certain controls over E1's distribution of the Picture.  For example, IMF retained approval rights over all clip licensing (¶ 4.7); approval over promotional materials (¶ 4.8); and prohibitions against E1 altering the credit to IMF or IMF's copyright notice (¶ 10). [SUF 54.]

[15]    For example, IMF purported to grant to GB Posters the right to duplicate and distribution movie posters and postcards featuring still images from the Picture; it purported to grant to The Phillips Collection the right to exhibit the Picture; and it purported to grant to Get The Shot Productions the right to include clips from the Picture in a documentary.  [SUF 55-57.]

11

Katten
KattenMuchinRosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

1    reads: "International Media Films Presents ... Federico Fellini' s La Dolce Vita." The
2    back cover includes the following copyright notice: "© 2004 International Media
3    Films. All Rights Reserved." [SUF 64, 65.]

4        IMF identifies the Picture on its Internet website as one of the films in its
5    library that is available for licensing. IMF proudly states: "The highlights of the IMF
6    library are the precious treasures *La Dolce Vita* and *I Vitteloni* by Federico Fellini."
7    IMF represents on its website that it owns and controls the rights to the Picture
8    throughout the world except for Italy and France, and that it holds these rights in
9    perpetuity. And on the "About" page of its website, IMF claims that it currently "is
10   developing the classic film LA DOLCE VITA into a Broadway Musical." [SUF 61-
11   63.]

## III.   ARGUMENT

### A.   Melange Is The Copyright Owner Of The Picture In The United States; Paramount Is Melange's Exclusive Licensee; And IMF Owns No Rights In The Picture Whatsoever In The United States.

16       In an action that seeks a judicial declaration as to copyright ownership, the
17   obvious first step is for the plaintiff to make a *prima facie* showing of its ownership of
18   the copyright in the work at issue. *See generally Washington Shoe Co. v. A–Z*
19   *Sporting Goods Inc.*, 704 F.3d 668, 674 (9th Cir. 2012). A copyright plaintiff often
20   satisfies its initial burden of proof by offering evidence of valid copyright registrations
21   in its name. However, only a certificate of a registration made within five years after
22   first publication of the work constitutes *prima facie* evidence of the validity of the
23   copyright and of the facts stated in the certificate. The evidentiary weight to be
24   accorded a certificate of registration issued more than five years after first publication
25   of the work is within the discretion of the court. 17 U.S.C. § 410(c).

26       If a copyright registration is not entitled to a presumption of validity, a
27   copyright plaintiff typically will establish its ownership of the work at issue by
28   demonstrating its "chain of title" from the original copyright owner to the plaintiff.

Katten
KattenMuchinRosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

12

*See generally Fleischer Studios, Inc. v. A.V.E.L.A., Inc.*, 654 F.3d 958, 961 (9th Cir. 2011); *United Fabrics International, Inc. v. C & J Wear, Inc.*, 630 F.3d 1255, 1257 (9th Cir. 2011); 3 M. & D. Nimmer, *Nimmer on Copyright* § 12.11[C] (1996).

All of Plaintiffs' copyright registrations for the Picture were issued more than five years after the Picture's first publication in the United States. Accordingly, Plaintiffs have established their copyright ownership of the Picture in the United States by the chain of title described in Section II.A. above, which is evidenced by the exhibits attached to the accompanying Redlich and Woodhead Declarations.

If Plaintiff's chain of title is valid, then Plaintiffs, and not IMF, necessarily own the copyright in the Picture in the United States. This is because Plaintiffs' chain of title and IMF's purported chain of title share a common link: a transfer of the United States and Canadian rights in the Picture from the Picture's producer (Riama) to Cinemat. In Plaintiffs' chain of title, Cinemat transferred these rights to Astor Pictures in 1962; in IMF's purported chain of title, these rights supposedly were transferred by Cinemat to Hor in 1980. If the transfer from Cinemat to Astor Pictures in 1962 and Cinemat's 1962 signed, written acknowledgement that it no longer possessed any United States or Canadian rights in the Picture are valid, then Cinemat had no United States or Canadian rights to transfer to Hor in 1980 and, consequently, IMF's chain of title is broken at its very first link.

**B.   All Of Plaintiffs' Chain-Of-Title Documents Are Indisputably Authentic And Admissible.**

Recognizing that its only hope for success in this action is to prevent Plaintiffs' chain of title documents from being admitted into evidence, IMF intends to challenge the authenticity and admissibility of Plaintiffs' chain of title documents on a variety of grounds, none of which has even the slightest merit.[16] Plaintiffs can establish the

---

[16]   Preliminarily, it should be noted that a party's burden to establish a document's authenticity is minimal. Federal Rule of Evidence 901(a) provides generally that "the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." The proponent need not conclusively prove that a piece of evidence is authentic; "[a]ll that is required is a foundation from which the fact-

Katten
KattenMuchinRosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

authenticity and admissibility of their chain of title documents on several independent grounds:  (1) Plaintiffs' declarant can testify from personal knowledge that the documents constitute Plaintiffs' business records pursuant to Federal Rule of Evidence ("FRE") 901(b)(1) which are admissible under FRE 803(6); (2) the documents qualify as "ancient documents" pursuant to FRE 901(b)(8) and are therefore admissible under FRE 803(16); and (3) certain of the documents were recorded or filed in a public office, and therefore are authenticated pursuant to FRE 901(b)(7) and admissible under FRE 803(6).  So that no possible doubt exists as to the authenticity and admissibility of Plaintiffs' chain of title documents, each of these bases is discussed in further detail below.

1.   The Business Records That Plaintiffs Inherited From Republic Are Admissible As Plaintiffs' Own Business Records.

The majority of Plaintiffs' chain of title documents were in the possession of Republic Entertainment at the time that its motion picture library (including the Picture) was transferred to Melange.[17]   Melange "inherited" all of Republic Entertainment's chain of title documents when it acquired ownership of the Picture from Republic Entertainment.  These documents have been incorporated into and have become Plaintiffs' own business records, and Plaintiffs rely upon the accuracy of those records in the regular course of its business.  Plaintiffs' declarant (Richard Redlich, Jr., the Senior Vice President, Business Affairs and Legal, of Paramount and a former employee of Republic, as well), testifies in his declaration to the facts that authenticate the documents constituting Plaintiffs' chain of title to the Picture, thereby establishing the documents' authenticity pursuant to FRE 901(b)(1).

---

finder could legitimately infer that the evidence is what the proponent claims it to be." *McQueeney v. Wilmington Trust Co.*, 779 F.2d 916, 928 (3d Cir. 1985); *see also United States v. Goichman*, 547 F.2d 778, 784 (3d Cir.1976) (although authenticity is a condition precedent to admissibility, "[t]he burden of proof for authentication is slight.")

[17]   The remaining documents in Plaintiffs' chain of title were created by Plaintiffs.

14

Katten

KattenMuchinRosenman LLP

2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

All of these documents therefore now constitute Plaintiffs' business records and are admissible under FRE 803(6).[18]  *See*, *e.g.*, *United States v. Childs*, 5 F.3d 1328, 1334 (9th Cir. 1993) (records a business receives from others are admissible under Federal Rule of Evidence 803(6) when those records are kept in the regular course of that business, relied upon by that business, and where that business has a substantial interest in the accuracy of the records); *MRT Const. Inc. v. Hardrives, Inc.*, 158 F.3d 478, 483 (9th Cir. 1998) (district court properly admitted into evidence under Rule 803(6) the legal bills that the defendant had received from its outside counsel because the defendant maintained the bills in its files, relied upon the bills as statements of fees owed to the law firm, and had a substantial interest in the accuracy of the bills).

Numerous federal appellate courts have expressly found that business records that have been inherited from a predecessor in interest should be considered the business records of the successor company.  *See*, *e.g.*, *Federal Deposit Ins. Corp. v. Staudinger*, 797 F.2d 908, 910 (10th Cir. 1986) (business records that a financial institution inherited from its predecessor were properly admitted as the business records of the successor institution); *U.S. v. Adefehinti*, 510 F.3d 319, 326 (D.C.Cir. 2007) (pursuant to "the rule of incorporation," the records of which a business takes custody are thereby "made" by the business within the meaning of FRE 803(6)); *Matter of Ollag Construction Equipment Corp.*, 665 F.2d 43, 46 (2d Cir. 1981) (finding that "business records are admissible if witnesses testify that the records are

---

[18]      FRE 803(6) provides:  The following are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness . . . . (6) Records of a Regularly Conducted Activity. A record of an act, event, condition, opinion, or diagnosis if:  (A) the record was made at or near the time by – or from information transmitted by – someone with knowledge; (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit; (C) making the record was a regular practice of that activity; (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and (E) neither the source of information nor the method or circumstances of preparation indicate a lack of trustworthiness.

Katten
KattenMuchinRosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

15

1    integrated into a company's records and relied upon in its day-to-day operations").[19]

2    Republic Entertainment's chain of title documents have been incorporated into

3    and become Plaintiffs' business records.  Plaintiffs rely upon the accuracy of these

4    records in the ordinary course of business.  These records have been properly

5    authenticated by Plaintiffs' declarant and they are admissible under Rule 803(6).

6           2.    The Overwhelming Majority Of Plaintiffs' Chain Of Title

7                 Documents Constitute "Ancient Documents," As Well.

8    FRE 901(b)(8) provides that a document may be authenticated by evidence that

9    it:  (1) is in a condition that creates no suspicion about its authenticity; (2) was in a

10   place where, if authentic, it would likely be; and (3) is at least 20 years old when

11   offered.  Ancient documents constitute an exception to the rule against hearsay

12   pursuant to FRE 803(16), so if the documents qualify as ancient documents, they

13   cannot be objected to on hearsay grounds.

14   Although FRE 901(b)(8) requires that ancient documents must be in a condition

15   that creates no suspicion about their authenticity, that suspicion "does not go to the

16   content of the document but rather to whether the document is what it purports to be."

17   *United States v. Kairys*, 782 F.2d 1374, 1379 (7th Cir. 1986).  Whether the

18   document's contents are trustworthy, accurate, or complete does not bear upon

19   authenticity, but "upon the weight to be accorded the evidence."  *Id.* at 1379; *see also*

20   *U.S. v. Demjanjuk*, 367 F.3d 623, 631 (6th Cir. 2004); *United States v. Stelmokas*, 100

21   F.3d 302, 312 (3d Cir.1996); *Twentieth Century Fox Film Corp. v. Dastar Corp.*,

22   2000 WL 35503105 (C.D.Cal. 2000); *see generally*, Wright & Gold, *Federal Practice*

23   *and Procedure: Evidence* § 7113.[20]

24   _____

[19]      *See also FirstMerit Bank, N.A. v. Balin*,  2012 WL 4017948 (N.D.Ill. 2012),
25   (custodian of records of successor bank "constituted a qualified witness since the
     records of Midwest became FirstMerit's records as the successor bank"); *U.S. Bank*
26   *Nat. Ass'n v. American Screw & Rivet Corp.*, 2010 WL 3172772 (N.D.Ill. 2010)
     (holding that witness from successor bank could authenticate records of bank that
27   went into receivership).

28   [20]      According to Wright & Gold, examples of a document's physical characteristics
     that might raise suspicions about its authenticity could include critical erasures,

Katten
KattenMuchinRosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

None of the chain of title documents offered by Plaintiffs is in a condition that would create suspicion about its authenticity;[21] all of the documents were in the business records that Plaintiffs inherited from Republic Entertainment (some of which also were filed with government offices or departments), which is exactly where one would expect them to be; and all of the documents dated April 1993 or earlier are more than 20 years old.

3. <u>Any Remaining Chain Of Title Documents Were Filed Or Recorded In A Public Office.</u>

Finally, FRE 901(b)(7) provides that a document may be authenticated by evidence that (i) the document was recorded or filed in a public office as authorized by law or (ii) a purported public record or statement is from the office where items of this kind are kept.  Such documents are admissible under FRE 803(8).  A significant number of the documents comprising Plaintiffs' chain of title have been recorded in the Copyright Office; several comprise Bankruptcy Court filings; and others are corporate records obtained from a state's Secretary of State.[22]

---

missing parts, changes in handwriting, unusual format, anachronistic content and a freshness of appearance that belies age.  *Id.* at § 7113.  Plaintiffs' chain of title documents rather clearly show their age, and contain no physical characteristics that would create suspicion that the documents are not what they purport to be.

[21]   The only challenges that IMF can come up with are that one version of the Cinemat-Astor International Agreement bears a file stamp from a New York court and that some handwritten interlineations not relevant to this action were made on one copy of the agreement.  If anything, the physical condition of this agreement – including the handwritten interlineations – evidence the age of the document and support the conclusion that it is exactly what it purports to be.  In order to leave no doubt whatsoever about the authenticity of the Cinemat-Astor International Agreement, Plaintiffs have provided the Court with a copy of the original "Republic Business Affairs" folder in which the three distinct copies of this agreement in Plaintiffs' possession have been stored, as well as the three copies themselves.  One copy appears to be an original carbon copy and bears original handwritten interlineations and original "/s/" signatures; another is a traditional photocopy; and the third is on paper that has "browned" substantially, clearly evidencing its age and authenticity. [Redlich Decl., ¶¶ 9-15 and Exhs. 1-4.]

[22]   For example, Exhibits 8, 24-27, 29 and 30 are filed with the Copyright Office. Exhibits 9 and 22 are Bankruptcy Court filings.  And Exhibits 14, 18, 23, 28, and 31 are recorded in the public records of the New York State Secretary of State.

17

Katten
KattenMuchinRosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel  310.788.4471 fax

### C.   IMF Has Directly Infringed Upon Plaintiffs' Rights In The Picture.

17 U.S.C. § 106 provides that the owner of a copyrighted work "has the exclusive rights to do <u>and to authorize,</u>" among other things, the reproduction of the work in copies;  the distribution of copies to the public by sale, transfer, or by rental;  the preparation of derivative works; and, in the case of motion pictures and other audiovisual works, to perform or display the work publicly.  17 U.S.C. § 501(a), in turn, provides that anyone who violates any of the exclusive rights of the copyright owner as provided by Section 106 is an infringer of the copyright.  Accordingly, a person who either duplicates and distributes copies of a work <u>or who authorizes others to do so</u> constitutes an infringer.

The undisputed evidence submitted with this Motion evidences that IMF has authorized others – its licensees – to reproduce the Picture in copies and to distribute them to the public by sale.  It has authorized other licensees to duplicate images copied from the Picture and to distribute those images on a variety of merchandise.  It has also licensed the right to display the Picture publicly.  If Plaintiffs have established as a matter of undisputed fact and law that they own the copyright in the Picture in the United States, each of these actions constitutes a direct violation of 17 U.S.C. § 106, and an infringement under 17 U.S.C. § 501.

### D.   IMF Is Also Liable For Contributory Infringement.

In order to establish an entitlement to recovery for contributory copyright infringement, a plaintiff must prove its copyright ownership of the work at issue, that a third party engaged in acts constituting direct copyright infringement, that the defendant had actual knowledge of that infringement, and that the defendant caused, enabled, facilitated, and/or materially contributed to that infringement.  *See Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 261-63 (9th Cir. 1996); *Ellison v. Robertson*, 357 F.3d 1072, 1076 (9th Cir. 2004).  Put differently, liability exists if the defendant engages in "personal conduct that encourages or assists the infringement." *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1019 (9th Cir. 2001).

18

Katten
KattenMuchinRosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

31727287v4

There can be no dispute that IMF's licensees, including KLF and E1, have duplicated and distributed copies of the Picture for sale to the public and have made the Picture available for download via the Internet, as well.  If Plaintiffs have established as a matter of undisputed fact and law that they own the copyright in the Picture in the United States, this conduct constitutes direct infringement of Plaintiffs' rights in the Picture by IMF's licensees.  There also can be no legitimate dispute that by virtue of the license agreements that IMF entered into with its licensees and the payments it received on account thereof, IMF had actual knowledge of its licensees' direct infringement, and that IMF  caused, enabled, facilitated, and/or materially contributed to that infringement.

### E.     IMF Is Also Liable For Vicarious Infringement.

A defendant is liable for vicarious copyright infringement if it "profit[s] from direct infringement while declining to exercise a right to stop or limit it."  *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 (2005).  In order to establish an entitlement to recovery for vicarious copyright infringement, a plaintiff must prove its copyright ownership of the work at issue, that a third party engaged in acts constituting direct copyright infringement, that the defendant had the right and ability to control and/or supervise the infringing conduct, and that the defendant had a direct financial interest in, and derived financial benefit from, the infringement.  *See Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 931 n.9 (2005); *Ellison v. Robertson*, 357 F.3d 1072, 1076 (9th Cir. 2004).

Once again, there can be no dispute that IMF's licensees, including KLF and E1, have duplicated and distributed copies of the Picture for sale to the public and have made the Picture available for download via the Internet, as well.  If Plaintiffs have established as a matter of undisputed fact and law that they own the copyright in the Picture in the United States, this conduct constitutes direct infringement of Plaintiffs' rights in the Picture by IMF's licensees.

The undisputed evidence also establishes that IMF had the right and ability to

Katten
Katten Muchin Rosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

31727287v4

**CASE NO. CV11-09112-SJO (AJWx)**

control and/or supervise the infringing conduct and had a direct financial interest in, and derived financial benefit from, the direct infringement of its licensees.   IMF purported to grant licenses to the direct infringers, which by itself satisfies the first requirement for vicarious infringement.   Not only did IMF not exercise a right to stop its licensees' infringement; it *authorized* its licensees to infringe Plaintiffs' rights in the Picture.   Moreover, the two license agreements that IMF produced during discovery (with KLF and E1) evidence that IMF retained certain controls over its licensees' distribution of the Picture.   *See* Section II.D. at notes 9 and 11 above.   The license agreements with KLF and E1, as well as the few financial records that IMF produced, also evidence that IMF both had a direct financial interest in and derived substantial benefit from its licensees' unauthorized exploitation of the Picture.   If Plaintiffs own the copyright in the Picture in the United States, IMF is liable for vicarious infringement as a matter of law.

## IV.    <u>CONCLUSION</u>

As a matter of uncontroverted fact and law, Plaintiffs own all of the rights in the Picture in the United States and IMF, which owns no such rights, is a direct and secondary infringer.   For all of the foregoing reasons, Plaintiffs' respectfully urge the Court to grant this motion in its entirety.

Dated:  April 3, 2013             KATTEN MUCHIN ROSENMAN LLP
                                  David Halberstadter
                                  Rebecca F. Ganz


                                  By:   /s/
                                        David Halberstadter
                                        Attorneys for Plaintiffs