# EXHIBIT 7

EXHIBIT 7

EXHIBIT 7

102

July 25, 1962

Astor Pictures, Inc.
New York, New York

RE  "La Dolce Vita"

Gentlemen:

Reference is made to the agreement dated January 8, 1962, ("Sale Agreement") between the undersigned, Cinemat, S.A. ("Cinemat"), and Astor Pictures International, Inc. ("International"), pursuant to which there was transferred to International the motion picture "La Dolce Vita" ("Film"), subject to the terms of the Sale Agreement.

Included in the sale was the transfer by Cinemat to International of Cinemat's rights in and to the Film with respect to the exploitation thereof in the United States of America, its territories and possessions and the Dominion of Canada and vessels flying the flags of such countries ("United States-Canada Territory"). You, Astor Pictures, Inc., ("Astor") have advised Cinemat that by agreement dated as of January 11, 1962, International transferred to Astor all of International's rights in the Film in the United States-Canada Territory, and Cinemat hereby consents to the same.

In consideration of the payment to Cinemat of the sum of $350,000., $50,000. of which sum has been previously

CONFIDENTIAL

EXHIBIT 7
103
PAR 00043

paid and $300,000. of which sum is being paid herewith, by
certified check, receipt of which Cinemat hereby acknowledges,
the parties hereto hereby agree as follows:

1. Cinemat has no further rights of any kind in
and to the Film in the United States-Canada Territory.  Payment
for all such rights has been made in full.

2. The provisions of Paragraphs "4", "12" and "13"
of the Sale Agreement remain in full force and effect as of the
date of the Sale Agreement insofar as they pertain to the
United States-Canada Territory.

3. The provisions of Paragraphs "5", "7", "8",
"9" and "11" of the Sale Agreement shall have no further
force and effect with respect to the rights in the Film in the
United States-Canada Territory, it being understood that such
provisions shall be deemed applicable solely and only to the
remainder of the "Purchaser's Territory", as that term is
used in the Sale Agreement.

4. Cinemat acknowledges:

(i) that Astor has no further obliga-
tion to Cinemat for any further payments under
or pursuant to the Sale Agreement; and

(ii) that with respect to Paragraph "5"
of the Sale Agreement, the restriction as to the

-2-

EXHIBIT 7

CONFIDENTIAL

television exhibition of the Film in the United

States-Canada Territory is removed.

Very truly yours,

CINEMAT S.A.

By _V. B. Rickup_
      _President._

Approved and agreed to:

ASTOR PICTURES, INC.

By _George Foley_
      _President_

-3-

CONFIDENTIAL

EXHIBIT 7
105
PAR 00045

# EXHIBIT 8

EXHIBIT 8

106
EXHIBIT 8

VOL 1137 PAGE 383

## Mortgage of Chattels
### (Including Copyright)
## Pledge and Assignment

ASTOR PICTURES, INC.                              New York
                                    distributor,²
corporation (herein called "Mortgagor") by occupation a producer of motion pictures, whose address is
625 Madison Avenue, New York, N.Y.,                                           hereby

mortgages, pledges and assigns to _____ INLAND CREDIT CORPORATION,
                                                    New York
                                                                                  corporation
(herein called "Mortgagee"), whose address is ____ 11 West 42nd Street, New York, N.Y.,
the herein described personal property, wheresoever situated and in whomsoever's possession, and whether now
owned or hereafter acquired by Mortgagor.

1. The property hereby mortgaged, pledged and assigned is described as follows:    ALL those
That certain motion picture photoplay-television film or series of television films (herein for convenience
referred to as the "picture"), together with all physical properties thereof, all rights and things of value
pertaining thereto, all revenues and proceeds to accrue or be derived therefrom and the copyright thereof
(and renewals and extensions of such copyright), produced and completed and/or to be completed by
Mortgagor, by whatever title finally designated. ~~but more particularly~~    listed in the
schedule attached hereto and bearing the titles set forth in
said schedule,

including, but without limiting the generality of the foregoing the following:

(a)  All negatives, negative film, sound and music tracks, recordings, positive prints, "out takes" and trims, stills and
other film material of the picture whether in completed form or in some stage of completion and all duplicates and copies
thereof, and all scripts, treatments and other manuscripts pertaining to the picture;

(b)  All of Mortgagor's rights, title and interest in the literary, music, dramatic and other material upon or from which
the picture is based or adapted or which is used or included in the picture, including all usual and necessary rights and licenses
to use any and all of the music and musical compositions which are contained in the picture;

(c)  All copyrights, rights of copyright and renewals and extensions of copyright, domestic and foreign, heretofore or
hereafter obtained on the picture or any part thereof and the right to make publication thereof for copyright purposes, to register
claim to copyright to any or all thereof, and to renew and extend such copyrights; including all of Mortgagor's rights, title and

Page One

EXHIBIT 8
107
PAR 00047

VOL **1137** PAGE **384**

interest in any copyrights on the literary, music, dramatic and other material upon which the picture is based or adapted or which is used or included in the picture and renewals and extensions of any such copyrights;

(d) All insurance and insurance policies heretofore or hereafter placed on the picture, the insurable properties thereof or upon any person or persons engaged in the production of the picture, together with the proceeds of all such insurance;

(e) To the extent necessary to complete the picture all assignable rights, present and future, in and to all agreements for personal services, agreements for the purchase or rental of material or facilities and all other agreements relating to the production, financing and completion of the picture;

(f) The right to distribute, exploit, market and turn to account the picture and all television, substandard width, and allied and other rights in the picture in any manner whatsoever throughout the world;

(g) All rent, revenue, income, compensation and profits of Mortgagor from the release, exhibition, distribution, exploitation and marketing of the picture or of any rights therein and from all other sources in connection with any rights owned by Mortgagor relating directly or indirectly to the picture or the subject matter thereof, including but not limited to any and all sums due or to become due to Mortgagor under any distribution agreement relating to the picture, and all other rights of Mortgagor in and to each such distribution agreement; and

(h) All other rights, title, interest and ownership of Mortgagor in and to the picture, whether or not described herein, including all rights of Mortgagor relating to or in connection with the picture arising out of or based upon any agreement or agreements whereby the picture or any rights therein or thereto is acquired by Mortgagor.

The property hypothecated herein includes the property herein described whether it now be in existence or may hereafter come into existence. All of the foregoing described property shall be deemed included in all references herein to the "picture"; and this mortgage of chattels (including copyright) pledge and assignment is herein referred to as the "mortgage".

2.   This mortgage is given as security for and shall secure:

(a) All loans, credits and advances (including interest thereon and collection charges, if any) whether or not evidenced by a promissory note or notes, and now or hereafter made or extended by Mortgagee to Mortgagor hereunder or under an agreement between Mortgagor and Mortgagee dated......of even date herewith............ as such agreement may be modified, supplemented, renewed or extended, which agreement as it may be modified, supplemented, renewed or extended, is incorporated herein by reference with the same force and effect as though set forth in full herein and is herein referred to as the "agreement"; A true and correct copy of the agreement is available for inspection at the offices of Mortgagee at the address hereinabove specified;

(b) The payment of all costs and expenses (including counsel fees in a reasonable amount) incurred by Mortgagee in collecting or endeavoring to collect any indebtedness hereby secured or in any action or proceeding to protect or enforce the rights of Mortgagee under the agreement or herein or affecting or purporting to affect the security therefor; and

(c) Payment, when due or at any time hereafter, of any and all other indebtedness now or hereafter owing by Mortgagor to Mortgagee and the prompt and faithful performance by Mortgagor of each and every agreement, undertaking and obligation to be performed by the Mortgagor, whether pursuant to the provisions of this mortgage, the agreement or otherwise.

The maximum amount, the repayment of which is to be secured by this mortgage at any one time shall not exceed $1,000,000 ......... then outstanding and unpaid, not including in such amount any items which theretofore may have been repaid or discharged.

3.   Mortgagor agrees to execute, acknowledge and deliver to Mortgagee such additional documents and instruments, including further supplemental mortgages, agreements of pledge and assignments of the picture or any part thereof, as Mortgagee may from time to time require to enable it to exercise and protect its rights hereunder and to maintain and evidence the security provided for herein. Mortgagor shall deliver to Mortgagee satisfactory evidence that the picture has been duly copyrighted in the United States of America and in other places where motion picture copyrights are customarily secured in the name of Mortgagor, free and clear of any adverse claims and liens.

4.   Mortgagor warrants and agrees that, except as expressly specified herein or in the agreement, it owns and at all times will own the full, complete and unencumbered title in and to the picture, free and clear of any claims, rights, liens or charges thereon, together with the sole, exclusive and unencumbered worldwide silent, sound, synchronized, talking and television motion picture rights and licenses of every kind in and to the literary, music, dramatic and other material therein contained or upon which the picture is based, in whole or in part, and that no interest in the picture has heretofore been transferred to any person, firm or corporation, or claim against it is now held by anyone whomsoever. Mortgagor agrees that it will not suffer or permit any lien, charge, encumbrance or adverse claim of whatever kind to accrue or be acquired upon or against the picture or any part thereof or rights therein which might be or become prior to or on a parity with the rights and liens of Mortgagee under the agreement and this mortgage. Mortgagor agrees to pay promptly all franchise taxes and license fees required by law and all taxes, whether general or special, assessments and other governmental charges lawfully levied or assessed against Mortgagor for the picture or any part thereof and upon request of Mortgagee to furnish satisfactory evidence of such payments.

.   Mortgagor agrees to preserve and defend at its own cost and expense (a) its title to the picture as herein and in the agreement warranted; (b) this mortgage as a lien and charge upon the picture and as an assignment and pledge thereof, subject only to such prior rights, if any, as herein expressly specified; and (c) the picture and rights of Mortgagee under the agreement and hereunder against all claims of infringement and all claims based on or resulting from the use in the picture of any literary, music, dramatic, film or other material or of any character or rights of any party, and the assertion by anyone of any such claim shall not constitute a default hereunder if such claim is diligently, adequately and successfully contested by Mortgagor or is settled and discharged by Mortgagor with reasonable diligence.

6.   Until the delivery of the picture to the distributor thereof, Mortgagor agrees that it holds and will hold the picture as trustee for Mortgagee to hold as trustee for Mortgagee. Following the delivery of the picture or any part thereof to distributor thereof and while possession of the picture by the distributor continues, distributor is hereby appointed as pledgeholder for Mortgagee with like effect as though the picture were in the possession of Mortgagee as pledgee. Every laboratory and other person, firm or corporation which acquires possession of the picture or any part thereof is also hereby appointed pledgeholder thereof for Mortgagee in like manner as distributor. Upon a default under the agreement or this mortgage, Mortgagor does hereby authorize

Page Two

EXHIBIT 8
108
PAR 00048

VOL **1137** PAGE **385**

any such pledgeholder to sell the picture or any part thereof in its possession upon the order and direction of Mortgagee, and Mortgagor does hereby waive any and all claim for damages or otherwise for any action taken by such pledgeholder. Mortgagor will obtain from distributor, laboratory and each such other person, firm or corporation acting as pledgeholder instruments by which such pledgeholder assents to and agrees to be bound by the provisions of this mortgage applicable to such pledgeholder. Mortgagor agrees to keep or cause to be kept the negative or master protective positive print (including sound track) of the picture in the custody of a laboratory in Los Angeles, California, or New York, New York, which laboratory has delivered to Mortgagee a pledgeholder's acceptance; and Mortgagor agrees not to remove or attempt to remove or suffer or permit to be removed any of such film material from any such place or places without Mortgagee's written consent first obtained.

7.   If Mortgagor fails to make any payment required to be made to any third party in connection with the picture or do any act required to be done by the agreement or under this mortgage, then Mortgagee in its sole discretion, in addition to any other rights or remedies herein, with or without notice to or demand upon Mortgagor and without releasing Mortgagor from any obligation hereunder or under the agreement, may, but shall not be obligated to, (a) make such payment or do such act, in such manner and to such extent as Mortgagee deems necessary to protect its security interest and rights in the picture; (b) commence, appear in, defend or compromise any action or proceeding affecting Mortgagee's security or the rights or powers of Mortgagee; (c) pay, purchase, contest or compromise any encumbrance, charge, lien or claim which in Mortgagee's judgment is or might be prior to, on a parity with or prejudicial to Mortgagee's rights and lien under the agreement and hereunder; and (d) in exercising any such powers and authority to pay necessary costs and expenses, employ counsel and pay reasonable counsel fees. Mortgagor agrees to repay to Mortgagee immediately upon demand all sums so expended or expenses incurred by Mortgagee with interest from the date of expenditure at the rate of 6% per annum. The failure of Mortgagor to pay Mortgagee any such sums upon demand shall constitute an event of default hereunder, all of which sums shall be secured hereby.

8.   If any one of the following events, herein termed "event of default" or "default" shall happen, that is, thereon:

(a)   Default shall be made in the due and punctual payment of any indebtedness secured hereby or of any interest thereon;

(b)   Default shall be made in any of Mortgagor's agreements or in the due performance of any of Mortgagor's obligations contained in the agreement, this mortgage or any other agreement or instrument between Mortgagor and Mortgagee or executed by Mortgagor in favor of Mortgagee relating to the picture, and such default is not cured within fifteen days after the happening thereof; and reference herein to Mortgagor's agreements and obligations apply to those not expressly referred to under any other provisions of this Paragraph 8;

(c)   Should any representation, warranty or statement made by Mortgagor in the agreement, this mortgage, or other instrument executed by Mortgagor in connection with this transaction including any application, financial or other statement heretofore or hereafter furnished by Mortgagor to Mortgagee prove to be false or misleading in any material respect;

(d)   Should the picture be abandoned or not produced, completed and delivered to distributor for distribution in accordance with the distribution agreement and in the manner and within the time specified in the agreements;

(e)   If the distribution agreement relating to the picture or any other agreement under which Mortgagor has acquired any rights to produce the picture or utilize the services of any personnel in connection therewith is terminated or rescinded by reason of Mortgagor's breach or default; or Mortgagor's failure to cure promptly a default on its part under any other agreement with third persons to be performed by it in connection with the picture, the breach of which shall involve a substantial liability on Mortgagor's part and will jeopardize the fulfillment of any of Mortgagor's obligations hereunder or under the agreement;

(f)   If any Motion Picture Association of America (sometimes referred to as the Johnson Office) or any successor or substitute organization fails or refuses to give instead of certificate evidencing its approval of the completed picture prior to the delivery thereof to the distributor;

(g)   If Mortgagee is prevented by any act or neglect of Mortgagor from receiving the assigned revenue and income from the picture for application to the indebtedness hereby secured;

(h)   If for any reason, whether valid or invalid, the distributor fails or refuses to accept delivery of the picture or to release or distribute the picture or discontinues the distribution thereof or in any material respect breaches the distribution agreement, and unless within thirty days after written notice thereof from Mortgagee to Mortgagor such failure or breach is discontinued or cured or in lieu thereof at Mortgagee's request Mortgagor has substituted another distributor satisfactory to Mortgagee;

(i)   If Mortgagor shall become involved in financial difficulties evidenced as follows: (1) by an attachment, execution or other writ being levied on Mortgagor's property or assets which shall remain in effect for more than thirty days; (2) by Mortgagor admitting in writing its inability to pay its debts generally as they become due; (3) by Mortgagor making an assignment for the benefit of its creditors; (4) by Mortgagor consenting to the appointment of a receiver, trustee or similar officer for the picture or all or a substantial part of its property; (5) by Mortgagor filing a petition in bankruptcy or for reorganization or for the adoption of an arrangement or composition under the Bankruptcy Act (as now or in the future amended) or an answer or admission seeking or consenting to the relief therein requested; (6) by Mortgagor being adjudicated a bankrupt; (7) by the entry of a court order with or without Mortgagor's consent which appoints a receiver, trustee or similar officer for the picture or all or a substantial part of Mortgagor's property or which approves a petition filed against Mortgagor for or effecting an arrangement or for a reorganization pursuant to the Bankruptcy Act, or for any other judicial modification or alteration of the rights of creditors, which order shall not be vacated, set aside or stayed within thirty days from the date of entry; or (8) by the assumption or custody or sequestration by a court of competent jurisdiction of the picture or all or substantially all of Mortgagor's property, which custody or sequestration shall not be suspended or terminated within thirty days from its inception;

(j)   If prior to the repayment in full of the loan with interest the directors and/or shareholders of Mortgagor elect to wind up and dissolve Mortgagor and to distribute its assets or if they elect to enter into any merger or consolidation without first obtaining Mortgagee's written consent;

(k)   If Mortgagee suffers or permits any right, title, interest, lien, grant or encumbrance prior in effect to, on a parity with or prejudicial to Mortgagee's right and lien to attach to the picture;

then, upon the happening of any event of default as herein specified, Mortgagee shall have and is hereby granted the following rights, remedies and elections, to wit: (i) to refuse to advance or remit to Mortgagor any further moneys on account of the loan to be made by Mortgagee under the agreement; (ii) to accelerate and declare due and payable the entire indebtedness of Mortgagor to Mortgagee under the agreement and any note or notes given by Mortgagor to Mortgagee; (iii) to enter upon the premises or wherever the picture may be and take possession thereof, to demand and receive its possession from anyone who has possession thereof, to remove, keep and store the picture or any portion of it, to put a custodian in charge thereof, and Mortgagee may take such measures as it may deem necessary or proper for the care or protection thereof, including but not limited to the right to complete the picture and to cause it to be delivered for distribution; (iv) to sell or dispose of the picture or any portion thereof as an entirety or in parcels at one time or from time to time either at public or private sale, with or without

Page Three

EXHIBIT 8
109
PAR 00049

VOL 1137 PAGE 386

notice of the time, place or terms of such sale or sales (or any postponement thereof) and without demand for performance, which sale or sales may be for cash and/or for credit and upon such terms as Mortgagee or its agents may elect, the presence of the property to be sold at such sale or sales being hereby waived by Mortgagor as well as any right of redemption that Mortgagor may have at law or otherwise, and Mortgagor agrees that Mortgagee or its nominee may become a bidder or purchaser at any such sale or sales; and for the foregoing purposes Mortgagor does hereby appoint Mortgagee as its agent and attorney-in-fact (such agency being irrevocable and coupled with an interest) to execute for and on Mortgagor's behalf any and all bills of sale, assignments, transfers, conveyances and other instruments, including without limitation the transfer and assignment of the copyright of the picture and literary and other material upon which the picture is based. To the extent permitted by law Mortgagor waives the benefit of all statutory provisions in favor of a pledgee in connection with any such pledge sale. The proceeds of any such sale and any other moneys, the application of which is not otherwise provided for under the agreement or herein shall be applied as follows: first, to the payment of the costs and expenses of such sale or sales and the reasonable compensation of Mortgagee's counsel in connection therewith; second, any surplus then remaining to the payment of the principal of and interest on Mortgagor's indebtedness to Mortgagee (to be allocated as Mortgagee may determine); third, any surplus then remaining to the payment of any other obligations incurred by Mortgagor to Mortgagee under the agreement or hereunder; fourth, any surplus then remaining to the party or parties legally entitled thereto; provided, however, if there be a deficiency Mortgagor shall pay such deficiency to Mortgagee forthwith: (v) to cause the pledgeholders or any of them to hold a pledge sale or sales of the picture or any part thereof in the same manner, with the same effect and subject to all of the same terms and conditions as specified in subparagraph (iv) of this paragraph 8; provided, however, that if any such pledgeholder fails or refuses to hold such sale for such periods thereof then in the possession of such pledgeholder, and Mortgagee may then hold a sale of the picture or any part thereof in the same manner, with the same effect and subject to all of the same terms and conditions as specified under subparagraph (iv) of this paragraph 8, and nothing contained in this subparagraph (v) shall be construed to limit or derogate from Mortgagee's rights under subparagraph (iv) or any other provision hereof. In the event any pledgeholder fails or refuses to deliver to Mortgagee the picture or any part thereof then in the possession of such pledgeholder, such possession thereof by said pledgeholder shall be deemed the possession of Mortgagee, who shall be deemed in constructive possession thereof; and/or (vi) to institute any proceedings at law, in equity or otherwise that Mortgagee may deem advisable for the foreclosure of any mortgage or mortgages which Mortgagee may hold and/or for the enforcement of any of Mortgagee's rights under the agreement or hereunder, including, but without limitation, an action for the appointment of a receiver, and in any such proceeding Mortgagor, to the extent permitted by law, does hereby waive all rights or equities of redemption. To the extent permitted by law, any sale hereunder shall be held in the same manner, with the same effect and subject to the same terms and conditions as specified with respect to a pledge sale held pursuant to the provisions of subparagraph (iv) of this paragraph 8 hereof.

All rights and remedies granted to Mortgagee under this mortgage, the agreement and documents executed pursuant hereto and thereto are cumulative and the exercise of one shall not limit, preclude or affect Mortgagee's rights concurrently or subsequently to exercise any other right or remedy and shall be in addition to such other rights or remedies as Mortgagee may have at law or in equity or otherwise. Without limiting the generality of the foregoing or any of Mortgagee's rights and remedies hereunder, under the agreement or otherwise, Mortgagee shall have all of the rights and remedies given to a mortgagee and pledgee under the laws of any state or place where the picture or any properties thereof may be located. Time is hereby expressly made of the essence hereof with respect to all acts to be performed by Mortgagor under the agreement or hereunder. The neglect or failure of Mortgagee to exercise any right, remedy or privilege of Mortgagee at any particular time shall not excuse Mortgagor from performance in accordance with the strict terms hereof nor waive any term or condition hereof as to the future nor of itself act to cure any default by Mortgagor hereunder and Mortgagee may exercise any rights or remedies available to Mortgagee upon default by Mortgagor at any time prior to the actual curing of such default.

9.   Mortgagor waives and agrees not to plead, invoke or set up in any way any statute of limitations as a defense to any action or proceeding for the payment of any indebtedness hereby secured or for the enforcement of any provision hereof or for any deficiency which remains after any sale, whether private or pursuant to a judicial decree or otherwise, of all or any part of the picture. Mortgagor agrees to pay all costs and expenses, including attorneys' fees in a reasonable amount, incurred by Mortgagee at any time in the collection of any obligation hereby secured or in the protection or enforcement of any of Mortgagee's rights hereunder or under the agreement or in the care, management and protection of the picture, whether or not an action is commenced or in any action to foreclose this mortgage.

10.   In the event any term or provision of this mortgage shall be finally adjudged or determined by a court of competent jurisdiction to be void or unenforceable, such invalidity or unenforceability shall be solely applicable to the terms or provisions so affected and shall not limit, impair or derogate from any of the other terms or provisions of this mortgage all of which shall continue in full force and effect. Nothing herein contained shall be construed to require the commission of any acts contrary to law. This mortgage shall bind and inure to the benefit of Mortgagor and Mortgagee and their respective successors and assigns. Mortgagor acknowledges that this mortgage shall be deemed to supplement and implement the agreement and shall not be in substitution of any rights or remedies of Mortgagee under the agreement. This mortgage may not be cancelled, modified or supplemented without the written consent of Mortgagee. If there are two or more signatories to this mortgage then this mortgage shall be binding jointly and severally upon the parties so signing, and reference herein to "Mortgagor" shall mean all or any one or more of such signatories, and the words used herein in the singular shall be deemed to have been used in the plural where the context and construction so require.

Page Four

EXHIBIT 8
110
PAR 00050

SPECIAL PROVISIONS                    VOL 1137 PAGE 387

11.  This Chattel Mortgage, Pledge and Assignment is subject
to a prior assignment by Mortgagor to Irving Trust Company of cer-
tain exhibition contracts heretofore entered into with respect to
the pictures and the sums due and to become due under said out-
standing exhibition contracts.

12.  The execution and delivery of this Chattel Mortgage,
Pledge and Assignment has been duly consented to in writing by
the holders of all of the issued, outstanding capital stock of
Mortgagor.

IN WITNESS WHEREOF, the undersigned has caused this instrument to be executed this 21st
day of August, 1962.

                                    ASTOR PICTURES, INC.

                                    By  _George F. Foley_
                                        George F. Foley, Pres.

                                    And _Robert C. Stebbins_
                                        Richard C. Stebbins, Ass't.Secy.
                                        Robert

STATE OF    NEW YORK
COUNTY OF   NEW YORK    } ss.:

On this 21st day of August, before me came GEORGE F. FOLEY
and Robert RICHARD C. STEBBINS, to me known, who being by me duly sworn, did depose and say that
they reside, respectively, XXX on Alden Road, Greenwich, Connecticut,

and  223 Sullivan Street, New York, N.Y.,
that they are respectively the  President  and  Assistant Secretary
of  ASTOR PICTURES, INC., the corporation described in and which executed the fore-
going instrument; that they know the seal of said corporation; that the seal affixed to said instrument is such corporate seal;
that it was so affixed by order of the Board of Directors of said corporation and that they signed their names thereto by
like order.

                                    _[signature]_
                                    Notary Public

                                    NOTARY                    New York
                                    No. 43 ...              ..unty
                                    Cert. file            ..unty
                                    Term Exp.             1964

STATE OF
COUNTY OF    } ss.:

On this        day of        , before me came
to me known who being by me duly sworn did depose and say that he resides at

and that he is the individual described in and who executed the foregoing instrument.

                                    _____
                                    Notary Public

                                    Page Five

EXHIBIT 8
PAR 00051

ASTOR PICTURES, INC.          VOL 1137 PAGE 388

| TITLE | LOCATION OF NEGATIVE | | | ADDRESS | | | |
|---|---|---|---|---|---|---|---|
| ADOPTED MOTHER | Astor Pictures, Inc. | | | 130 West 46th St., New York, N.Y. | | | |
| ALONG CAME LOVE | " | " | " | " | " | " | " |
| ADOLESCENCE (Stolen Paradise) | " | " | " | " | " | " | " |
| BACHELOR'S DAUGHTERS | " | " | " | " | " | " | " |
| BATTLING MARSHAL | " | " | " | " | " | " | " |
| BEYOND TOMORROW | " | " | " | " | " | " | " |
| BLACK DOLL | " | " | " | " | " | " | " |
| BLACK DRAGONS | " | " | " | " | " | " | " |
| BLACK TIDE | " | " | " | " | " | " | " |
| BLOCK BUSTERS | " | " | " | " | " | " | " |
| BORN TO THE SADDLE | " | " | " | " | " | " | " |
| BOWERY CHAMPS | " | " | " | " | " | " | " |
| BOWERY AT MIDNIGHT | " | " | " | " | " | " | " |
| BORDER FENCE (Cactus Barrier) | " | " | " | " | " | " | " |
| CATWOMEN OF THE MOON (Rocket To The Moon) | " | " | " | " | " | " | " |
| CAVALCADE OF THE WEST | Movielab Film Laboratories | | | 619 West 54th St., New York, N.Y. | | | |
| CHAMPION | De Luxe Laboratories | | | 850 Tenth Avenue, New York, N.Y. | | | |
| CHEERS FOR MISS BISHOP | Astor Pictures, Inc. | | | 130 West 46th St., New York, N.Y. | | | |
| CHRISTMAS EVE | " | " | " | " | " | " | " |
| CLANCY STREET BOYS | " | " | " | " | " | " | " |
| COOKIN' UP TROUBLE (Three Of A Kind) | " | " | " | " | " | " | " |
| COURAGEOUS DR. CHRISTIAN | De Luxe Laboratories | | | 850 Tenth Avenue, New York, N.Y. | | | |
| CROOKED CIRCLE | Astor Pictures, Inc. | | | 130 West 46th St., New York, N.Y. | | | |
| CRAZY KNIGHTS (Ghost Crazy) | " | " | " | " | " | " | " |
| CARNIVAL LADY | " | " | " | " | " | " | " |

-1-

EXHIBIT 8
112
PAR 00052

VOL 1137 PAGE 389

| TITLE | LOCATION OF NEGATIVE | | | ADDRESS | | | |
|---|---|---|---|---|---|---|---|
| CHILDREN OF THE WILD | Astor Pictures, | Inc. | | 130 West 46th St., New York, N.Y. | | | |
| DANGER ON THE AIR | " | " | " | " | " | " | " |
| DEADLINE | " | " | " | " | " | " | " |
| DELIGHTFULLY DANGEROUS | " | " | " | " | " | " | " |
| DESERT GUNS | " | " | " | " | " | " | " |
| DEVIL AND MISS JONES | " | " | " | " | " | " | " |
| DR. CHRISTIAN MEETS THE WOMEN | De Luxe Laboratories | | | 850 Tenth Ave., New York, N. Y. | | | |
| THE DREAMER | Astor Pictures, Inc. | | | 130 West 46th St., New York, N.Y. | | | |
| DEFENDERS OF THE LAW | De Luxe Laboratories | | | 850 Tenth Ave., New York, N.Y. | | | |
| FEUD OF THE WEST | Astor Pictures, Inc. | | | 130 West 46th St., New York, N.Y. | | | |
| FIGHTING MUSTANG | De Luxe Laboratories | | | 850 Tenth Ave., New York, N.Y. | | | |
| FLYING DEUCES | Movielab Film Laboratories | | | 619 West 54th St., New York, N.Y. | | | |
| FOLLOW THE LEADER | Astor Pictures, Inc. | | | 130 West 46th St., New York, N.Y. | | | |
| FRONTIER JUSTICE | " | " | " | " | " | " | " |
| GHOST ON THE LOOSE | " | " | " | " | " | " | " |
| GUNNERS & GUNS | " | " | " | " | " | " | " |
| GIANT FROM THE UNKNOWN | " | " | " | " | " | " | " |
| HARMONY TRAIL (White Stallion) | " | " | " | " | " | " | " |
| HER FAVORITE PATIENT (Bedside Manner) | " | " | " | " | " | " | " |
| HI DIDDLE DIDDLE | " | " | " | " | " | " | " |
| HOME OF THE BRAVE | De Luxe Laboratories | | | 850 Tenth Ave., New York, N.Y. | | | |
| HONG KONG NIGHTS | Astor Pictures, Inc. | | | 130 West 46th St., New York, N.Y. | | | |
| HOUR OF DECISION | " | " | " | " | " | " | " |
| I'D GIVE MY LIFE (The Noose) | " | " | " | " | " | " | " |
| INVISIBLE GHOST | " | " | " | " | " | " | " |
| ISLAND CAPTIVES | " | " | " | " | " | " | " |

-2-

EXHIBIT 8
113
PAR 00053

Vol. 1137 Page 390

| TITLE | LOCATION OF NEGATIVE | ADDRESS |
|---|---|---|
| JOHNNY HOLIDAY | De Luxe Laboratories | 850 Tenth Ave., New York, N.Y. |
| JUDGMENT BOOK | Astor Pictures, Inc. | 130 W. 46th St., New York, N.Y. |
| KID DYNAMITE | " " " | " " " |
| KING OF THE CIRCUS | " " " | " " " |
| LADY IN THE MORGUE | " " " | " " " |
| LITTLE MEN | " " " | " " " |
| LONE BANDIT | Movielab Film Laboratories | 619 West 54th St., New York, N.Y. |
| LOVE ISLAND | Astor Pictures, Inc. | 130 W. 46th St., New York, N.Y. |
| LUCKY TERROR | " " " | " " " |
| MEET DR. CHRISTIAN | " " " | " " " |
| MELODY FOR THREE | " " " | " " " |
| MILLION DOLLAR KID | " " " | " " "@ |
| MARINES COME THRU | " " " | " " " |
| NEVADA CYCLONE | " " " | " " " |
| OUTLAW TAMER | " " " | " " " |
| OUR GIRL SHIRLEY | " " " | " " " |
| PASSPORT TO TREASON | " " " | " " " |
| ROMANCE REVIERE | " " " | " " " |
| REST PETITE AND GONE | " " " | " " " |
| REMEDY FOR RICHES | De Luxe Laboratories | 850 Tenth Ave., New York, N.Y. |
| RIDE 'EM COWGIRL | Movielab Film Laboratories | 619 West 54th St., New York, N.Y. |
| RID'EM GENTS | Astor Pictures, Inc. | 130 W. 46th St., New York, N.Y. |
| RIDING AVENGER | " " " | " " " |
| ROGUE OF THE RIO GRANDE | " " " | " " " |
| SWIFTY | " " " | " " " |
| SECOND CHORUS | " " " | " " " |
| SENSATIONS | " " " | " " " |
| SINGING COWGIRL | Movielab Film Laboratories | 619 West 54th St., New York, N.Y. |
| SINISTER HANDS | Astor Pictures, Inc. | 130 W. 46th St., New York, N.Y. |

-3-

EXHIBIT 8
114
PAR 00054

VOL 1137 PAGE 391

| TITLE | LOCATION OF NEGATIVE | ADDRESS |
|---|---|---|
| SPOOKS RUN WILD | Astor Pictures, Inc. | 130 W. 46th St., New York, N.Y. |
| STRANGER IN TOWN | " " " | " " " |
| SUNSET CARSON RIDES AGAIN | " " " | " " " |
| SPOTLIGHT SCANDALS | " " " | " " " |
| SHE DEMONS | " " " | " " " |
| TERROR OF TINYTOWN | " " " | " " " |
| THEY MEET AGAIN | De Luxe Laboratories | 850 Tenth Ave., New York, N.Y. |
| TOM BROWN'S SCHOOL DAYS (Adventures At Rugby) | Astor Pictures, Inc. " | 130 W. 46th St., New York, N. Y. |
| TRAIL'S END | " " " | " " " |
| U-67 | " " " | " " " |
| VOODOO MAN | " " " | " " " |
| WATER RUSTLERS | Movielab Film Laboratories | 619 West 54th St., New York, N.Y. |
| WESTERN TERROR | Astor Pictures, Inc. | 130 W. 46th St., New York, N. Y. |
| WEST ON PARADE | " " " | " " " |
| ZIS BOOM BAH (College Days) | " " " | " " " |
| WESTLAND CASE | " " " | " " " |

EXHIBIT 8
PAR 00055

ASTOR PICTURES, INC.   VOL 1137 PAGE 392

| TITLE | LOCATION OF NEGATIVE | ADDRESS |
|---|---|---|
| LA DOLCE VITA | De Luxe Laboratories | 850 Tenth Ave., New York, N.Y. |
| LES LIAISONS DANGEREUSES | " " " | " " " " " |
| LAST YEAR AT MARIENBAD | Pathe Laboratories | 105 East 106th St., N.Y., N.Y. |
| SHOOT THE PIANO PLAYER | De Luxe Laboratories | 850 Tenth Ave., New York, N.Y. |
| MOST WANTED MAN (Public Enemy #1) | Pathe Laboratories | 105 East 106th St., N.Y., N.Y. |
| PEEPING TOM | " " | " " " " " |
| ROCCO AND HIS BROTHERS IL BIDONE | " " | " " " " " |
| THE SWINDLER | De Luxe Laboratories | 850 Tenth Ave., New York, N.Y. |
| OUTCRY (Il Grido) | " " | " " " " " |
| GIRL IN ROOM 13 | Pathe Laboratories | 105 East 106th St., N.Y., N.Y. |
| SUN LOVERS HOLIDAY | De Luxe Laboratories | 850 Tenth Ave., New York, N.Y. |
| SIN OF MONA KENT | " " | " " " " " |
| CAREER GIRL | " " | " " " " |
| HIDEOUT IN THE SUN | Astor Pictures, Inc. | 130 W. 46th St., New York, N.Y. |
| FRANKENSTEIN'S DAUGHTER | " " | " " " |
| MISSILE TO THE MOON | " " | " " " " |
| DURING ONE NIGHT (Night of Passion) | | |
| FIVE SINNERS | | |
| ARIZONA NITES | " " | " " " " |
| LOOK OUT SISTER | " " | " " " " |
| POTLUCK PARDS | " " | " " " " |
| TALL TAN AND TERRIFIC | " " | " " " " |

EXHIBIT 8
116
PAR 00056

# EXHIBIT 9

EXHIBIT 9

EXHIBIT 9
117

VOL **1333** PAGE **58**

TRUSTEE'S BILL OF SALE

KNOW ALL MEN BY THESE PRESENTS, that Joseph
J. Bernstein, as Trustee of the Estate of Astor Pictures,
Inc., Bankrupt, pursuant to an order of Hon. Edward J.
Ryan, Referee in Bankruptcy, duly entered on June 17,
1965 in the Bankruptcy Proceedings of said Astor Pictures,
Inc. in the United States District Court for the Southern
District of New York (In Bankruptcy #63-B-93), in considera-
tion of the sum of $25,000.00 paid to him by Ardisco Finan-
cial Corporation, a New York corporation, with its princi-
pal office at 200 Park Avenue, New York, N.Y. ("Ardisco"),
receipt of which is hereby acknowledged, has bargained
and sold and by these presents does hereby grant and
convey to Ardisco and its successors and assigns, all
of the right, title and interest of said Astor Pictures,
Inc., Bankrupt, and all of his right, title and interest,
as Trustee in Bankruptcy of said Astor Pictures, Inc., in
and to the following:

> (a)  All motion picture films and
> all motion picture film distribution
> rights of every kind and nature owned by
> the said Bankrupt, including without
> limitation, those described in the schedules
> attached to a certain chattel mortgage,
> pledge and assignment of income and copy-
> right made by the Bankrupt to Inland Credit
> Corporation ("Inland"), dated August 21,
> 1962, filed in the Office of the City
> Register, New York County, on August 23,
> 1962, under File #33986 and recorded in the

EXHIBIT 9
118
PA R 00059

vol 1333 page 59

United States Copyright Office on
August 24, 1962, in Volume 1137, at
Pages 383 to 392 (the "Mortgage"),
and those listed on Schedule A annexed
hereto;

(b)  All physical properties of
every kind and all copyrights and outstanding
exhibition and distribution contracts re-
lating to said motion picture films and
distribution rights;

(c)  All negatives and prints,
sound and music tracks and tapes, recordings,
advertising, publicity and promotional
material, scripts, dialogue sheets and all
literary, musical, dramatic and other rights
of every kind and nature relating to said
motion picture films and distribution
rights;

(d)  All rents, revenues, income
and other proceeds now due or hereafter becom-
ing due in connection with the ownership,
exhibition and distribution of said motion
picture films and the motion picture films
covered by said distribution rights;

(e)  All books and records of the
Bankrupt relating to the exhibition and dis-
tribution, to date, of said motion picture
films and the motion picture films covered
by said distribution rights;

subject to the Mortgage and to the liens, if any, of motion

picture film laboratories and others.

TO HAVE AND TO HOLD the same unto Ardisco, its

successors and assigns, forever.

Without limiting the generality of the foregoing,

this bill of sale is intended to convey and assign to

-2-

EXHIBIT 9
119
PAR 00060

VOL 1333 PAGE 60

Ardisco all right, title and interest of the undersigned
Trustee and of said Bankrupt in and to each and every
copyright of the said motion picture films, and in and
to each and every distribution and exhibition agreement
covering any one or more of said motion picture films.
The undersigned Trustee agrees that he will, upon demand,
from time to time, execute, acknowledge and deliver to
Ardisco and its successors and assigns such separate
written assignments of copyrights and of rights under
distribution, exhibition and other agreements relating
to and covering said motion picture films as may reason-
ably be required by it or them.

This sale and conveyance is made by the
undersigned Trustee and is accepted by Ardisco without
any representation or warranty of any kind on the part
of said Trustee, and Ardisco hereby accepts delivery from
the Trustee of all physical properties covered by and in-
cluded in this sale and conveyance "as is" and in their
present state and condition, whatever the same may be
and wherever located.   This bill of sale cannot be changed
orally.

IN WITNESS WHEREOF, the undersigned has here-
unto set his hand and seal this 29th day of June, 1965.

Joseph J. Bernstein, as Trustee
of the Estate of Astor Pictures,
Inc., Bankrupt.

EXHIBIT 9
120

PAR 00061

1333 PAGE 61

STATE OF NEW YORK )
                  :
COUNTY OF NEW YORK )

On the 29th day of June , 1965 before me
personally came JOSEPH J. BERNSTEIN, to me known, and
known to me to be the individual described in, and who
executed the foregoing instrument, and duly acknowledged
to me that he executed the same.

_____
Notary Public.

FRED E. SALAMON
NOTARY PUBLIC, State of New York
No. 41-7565640
Qualified in Queens County
Cert. filed in New York County
Commission Expires March 30, 1966

EXHIBIT 9
121
PAR 00062

vol 1333 PAGE 62

SCHEDULE A ANNEXED TO TRUSTEE'S BILL OF SALE
DATED JUNE 29, 1965.

Motion Picture Films As To Which The Bankrupt,
Astor Pictures, Inc., Claimed Outright Ownership
Of All Rights For The Entire World (except as
otherwise indicated):

Adopted Mother

Arizona Nites

Along Came Love

Adolescence
(Stolen Paradise)

Bachelor's Daughters

Battling Marshal

Beyond Tomorrow

Black Doll

Black Dragons   (U.S., Canada, United Kingdom only)

Black Tide (Western Hemisphere only)

Block Busters  (U.S., Canada, United Kingdom only)

Born to the Saddle

Bowery Champs (U.S., Canada, United Kingdom only)

Bowery at Midnight (U.S., Canada, United Kingdom only)

Border Fence
(Cactus Barrier)

Catwomen of the Moon
(Rocket to the Moon)

Cavalcade of the West

Champion

Cheers for Miss Bishop

EXHIBIT 9
122
PAR 00063

1333 page 63

Page Two

Christmas Eve

Clancy Street Boys (U.S., Canada, United Kingdom only)

Cookin' Up Trouble  (U.S., Canada, United Kingdom only)
(Three of a Kind)

Courageous Dr. Christian  (excluding Scandinavia)

Crooked Circle

Crazy Knights  (U.S., Canada, United Kingdom only)
(Ghost Crazy)

Carnival Lady

Children of the Wild

Danger on the Air

Deadline

Delightfully Dangerous

Desert Guns

Devil and Miss Jones

Dr. Christian Meets the Women  (excluding Scandinavia)

Dreamer, The

Defenders of the Law

Feud of the West

Fighting Mustang

Flying Deuces  (Western Hemisphere only)

Follow the Leader (U.S., Canada, United Kingdom only)

Frontier Justice

Frankenstein's Daughter

Ghost on the Loose (U.S., Canada, United Kingdom only)

Gunners and Guns

EXHIBIT 9
123
PAR 00064

VOL 1333 PAGE 64

Page Three

Giant from the Unknown

Harmony Trail
(White Stallion)

Her Favorite Patient
(Bedside Manner)

El Diddle Diddle

Home of the Brave

Hong Kong Nights

Hour of Decision   (Western Hemisphere only)

I'd Give my Life
(The Noose)

Invisible Ghost (U.S., Canada, United Kingdom only)

Island Captives

Johnny Holiday

Judgment Book

Kid Dynamite (U.S., Canada, United Kingdom only)

King of the Circus (Western Hemisphere only)

La Dolce Vita (U.S. and Canada only)

Lady in the Morgue

Little Men

Lone Bandit

Lookout Sister

Love Island

Lucky Terror

Missile to the Moon

Meet Dr. Christian (excluding Scandinavia)

EXHIBIT 9
124
PAR 00065

1339 PAGE 65

Page Four

Melody for Three   (excluding Scandinavia)

Million Dollar Kid   (U.S., Canada, United Kingdom only)

Marines Come Thru

Nevada Cyclone

Night of Passion   (U.S., Alaska, Hawaii only,
(During one Night)   excluding Puerto Rico and Virgin Islands)

Outlaw Tamer

Our Girl Shirley

Passport to Treason   (Western Hemisphere only)

Potluck Pards

Romance Reviere

Reet Petite and Gone

Remedy for Riches   (excluding Scandinavia)

Ride 'Em Cowgirl   (U.S. only)

Ride 'Em Gents

Riding Avenger

Rogue of the Rio Grande

Swifty

Second Chorus (Western Hemisphere only)

Sensations

Singing Cowgirl

Sinister Hands

Spooks Run Wild (U.S., Canada, United Kingdom only)

Stranger in Town (Western Hemisphere only)

EXHIBIT 9
125
PAR 00066



VOL 1333 PAGE 66

Page Five

Sunset Carson Rides Again

Spotlight Scandals (U.S., Canada, United Kingdom only
except TV)

She Demons

Tall Tan and Terrific

Terror of Tinytown

They Meet Again (excluding Scandinavia)

Tom Brown's School Days
(Adventures at Rugby)

Trail's End

U-67

Voodoo Man (U.S., Canada, United Kingdom only)

Water Rustlers

Western Terror

West on Parade

Westland Case

Zis Boom Bah        (U.S., Canada, United Kingdom only)
(College Days)

EXHIBIT 9
126
PAR 00067

# EXHIBIT 10

EXHIBIT 10

EXHIBIT 10
127



MEMORANDUM

TO:      Kent Christensen        DATE:  November 20, 1975

RE:      ASTOR PICTURES


Pursuant to your request I have reviewed the numerous file
cartons left with us by Commonwealth in an effort to locate
any documents which would substantiate and define Common-
wealth's prior claim of ownership to this package of films.

My search did not turn up any production or other underlying
agreements in regard to any of these films; nor was I able to
uncover any agreements for the acquisition of rights in these
films by Commonwealth.

I did however, locate two documents which do shed some light
on the chain of ownership in these films.  The first such
document is a copy of a letter search report from the U.S.
Copyright Office which I have given to Mr. Hatch for his
review.  This report apparently was rendered in response to
a request for the copyright status on some of the Astor
pictures.  I do not have it in front of me, but my recoll-
ection is that it indicates a company named Ardisco Financial
Corporation bought rights to a number of pictures which appear
to be Astor pictures from a trustee in bankruptcy and that a
company called either Landau Releasing Corporation, Unger
Pictures or Unger Productions acquired rights from Ardisco.
Nothing could be found in the files searched indicating the
relationship of the latter company to Commonwealth.

The second document, a copy of which is attached hereto, is
an abstract of a mortgage purchase agreement which indicates
rights to the Astor pictures were acquired by Landau Releasing
Organization, Inc. from Inland Credit Corporation.  Note that
the next to the last page of the Schedule A attached to the
abstract makes reference to the Ardisco purchase.  Again,
nothing was found in the files searched explaining the rela-
tionship of Landau Releasing to Commonwealth.  However, the
files do suggest that the law firm of Golenbock and Barell
may have handled the legal affairs of the Landau and Unger
companies.

                          Very truly yours,



                          Richard B. Glenn


CONFIDENTIAL

EXHIBIT 10
PAR 00068

## MORTGAGE PURCHASE AGREEMENT

PICTURE:                Listing Annexed (Astor Pictures)

ALTERNATE TITLES:

PARTIES:                LANDAU RELEASING ORGANIZATION, INC. (Distributor)
                        Time and Life Building, New York, N.Y.

                        INLAND CREDIT CORP.,
                        Pan American Building, New York, N.Y.

DATE OF AGREEMENT:      September 21, 1965 (signed 8-3-66)

TERM:

RIGHTS:                 Exploit picture in all media in all gauges

TERRITORY:              Listing annexed

ADVANCE CONSIDERATION:      $ 456,913.87 payable

|  |  |
|---|---|
| 9-26-66 | 173,200.00 |
| 7-20-67 | 83,713.87 |
| 10-20-67 | 25,000.00 |
| 1-20-68 | 25,000.00 |
| 4-20-68 | 25,000.00 |
| 7-20-68 | 25,000.00 |
| 10-20-68 | 25,000.00 |
| 1-20-69 | 25,000.00 |
| 4-20-69 | 25,000.00 |
| 7-20-69 | 25,000.00 |

MISCELLANEOUS:

EXHIBIT 10
128

CONFIDENTIAL

LAR 00069

## SECURITY TO INLAND FOR PURCHASE PRICE

LRO assigns and pledges to Inland: (1) the 1st $ 300,000. on all contracts
for exhibitions of pictures made by LRO, by 9-2-66; and (2) after LRO
recoups dubbing costs of LA DOLCE VITA, on contracts made after 9-2-66,
50% of Gross Receipts from TV contracts and 50% of Gross Receipts from
non-theatrical in territory and theatrically outside U.S. territory; and
(3) only 35% of net U.S. theatrical receipts (gross theatrical receipts
in U.S. less aggregate of print costs and advertising costs up to
$ 100,000. which deductions must be certified by LRO and same is subject
to audit by Inland.)

## GROSS RECEIPTS

Includes moneys received by LRO, its agents or subdistributors from
distribution and exploitation of pictures via all media, including proceeds
less attorneys fees from claims and actions against 3rd parties for infringe-
ment; also includes net moneys paid to LRO for license on outright basis
for flat fee or on agency or subdistribution basis for any madia outside
U.S. or non-theatrical (Not TV) rights in U.S.; and also any moneys
retained by agents or subdistributors as their fees; but deducting sums
paid to other persons (excepting Inland, Ardisco, LRO and UPI) for
production or acquisition of pictures and for coop ads, allowances and
refunds to theatrical exhibitors and attorneys fees to protect distribution
rights; and any taxes paid based on value of pictures, distribution rights,
physical properties on pictures and sums received by LRO on pictures but
excluding LRO sales, receipts or income taxes.

## ACCOUNTING AND REPORTS

LRO to give to Inland written reports of gross receipts on monthly basis
by 20th of following month. Reports to have cumulative report in detail
to extent LRO has same and show: (a) amounts paid and payable on gross
receipts its nature, source and computation; and
(b) the print costs when not paid by licensee (includes print and lab
costs, rerecording, editing, shipping, customs duties, insurance and
censorship) for U.S. theatrical, non-theatrical (no TV) in entire
territory and all media out side U.S.; and
(c) LA DOLCE VITA dubbing costs into English; and
(d) deductible advertising and exploitation expenses (up to $ 100,000.
from U.S. theatrical gross); and
(e) any other deductions; and
(f) any information as to bank loans (see Income Assignable to Lender,
below).
The first report due 9-20-66 for period ending 8-31-66. Concurrently,
LRO tp pay Inland amount due and also deliver all TV exhibition contracts
and all theatrical and non-theatrical distribution contracts made and
delivered to LRO during such period. LRO not obliged to account for gross
on contracts made after 9-2-66 which were assigned to bank for loan
(see Income Assignable to Lender, below) except for the reserve maintained
on the share of such contracts as to which Inland has securih interest.

EXHIBIT 10
180
LR 00070

## SCHEDULE A

Motion Picture Films As To Which Astor Pictures, Inc., Claimed
Outright Ownership of All Rights For The Entire World (except
as otherwise indicated):

1. Adopted Mother
2. Arizona Nites
3. Along Came Love
4. Adolescence
   (a/k/a/ Stolen Paradise)
5. Bachelor's Daughters
6. Battling Marshal
7. Beyond Tomorrow
8. Black Doll
9. Black Dragons
   (U.S., Canada, U.K. only)
10. Black Tide
    (Western Hemisphere only)
11. Block Busters
    (U.S., Canada, U.K. only)
12. Born to the Saddle
13. Bowery Champs
    (U.S., Canada, U.K. only)
14. Bowery at Midnight
    (U.S., Canada, U.K. only)
15. Border Fence
    (a/k/a Cactus Barrier)
16. Catwomen of the Moon
    (a/k/a Rocket to the Moon)
17. Cavalcade of the West
18. Champion
19. Cheers for Miss Bishop
20. Christmas Eve
21. Clancy Street Boys
    (U.S., Canada, U.K. only)
22. Cookin' Up Trouble
    (a/k/a Three of a Kind)
    (U.S., Canada, U.K. only)
23. Courageous Dr. Christian
    (excluding Scandinavia)
24. Crooked Circle
25. Crazy Knights
    (a/k/a Ghost Crazy)
    (U.S., Canada, U.K. only)
26. Carnival Lady
27. Children of the Wild
28. Danger on the Air
29. Deadline
30. Delightfully Dangerous
31. Desert Guns
32. Devil and Miss Jones
33. Dr. Christian Meets the Women
    (excluding Scandinavia)

34. Dreamer, The
35. Defenders of the Law
36. Feud of the West
37. Fighting Mustang
38. Flying Deuces
    (Western Hemisphere only)
39. Follow the Leader
    (U.S., Canada, U.K. only)
40. Frontier Justice
41. Frankenstein's Daughter
42. Ghost on the Loose
    (U.S., Canada, U.K. only)
43. Gunners and Guns
44. Giant from the Unknown
45. Harmony Trail
    (a/k/a White Stallion)
46. Her Favorite Patient
    (a/k/a Bedside Manner)
47. Hi Diddle Diddle
48. Home of the Brave
49. Hong Kong Nights
50. Hour of Decision
    (Western Hemisphere only)
51. I'd Give My Life
    (a/k/a The Noose)
52. Invisible Ghost
    (U.S., Canada, U.K. only)
53. Island Captives
54. Johnny Holiday
55. Judgment Book
56. Kid Dynamite
    (U.S., Canada, U.K. only)
57. King of the Circus
    (Western Hemisphere only)
58. La Dolce Vita
    (U.S. and Canada only)
59. Lady in the Morgue
60. Little Men
61. Lone Bandit
62. Lookout Sister
63. Love Island
64. Lucky Terror
65. Missile to the Moon
66. Meet Dr. Christian
    (excluding Scandinavia)
67. Melody for Three
    (excluding Scandinavia)
68. Million Dollar Kid
    (U.S., Canada, U.K. only)

~ (illegible handwriting)

EXHIBIT 10
131
PAR 00071

CONFIDENTIAL

## SCHEDULE A (contd.)

69. Marines Come Thru
70. Nevada Cyclone
71. Night of Passion
    (a/k/a During One Night)
    (U.S., Alaska, Hawii only,
     excluding Puerto Rico and
     Virgin Islands)
72. Outlaw Tamer
73. Our Girl Shirley
74. Passport To Treason
    (Western Hemisphere only)
75. Potluck Pards
76. Romance Reviere
77. Reet Petite and Gone
78. Remedy for Riches
    (excluding Scandinavia)
79. Ride 'Em Cowgirl
    (U.S. only)
80. Ride 'Em Gents
81. Riding Avenger
82. Rogue of the Rio Grande
83. Swifty
84. Second Chorus
    (Western Hemisphere only)
85. Sensations
86. Singing Cowgirl
87. Sinister Hands
88. Spooks Run Wild
    (U.S., Canada, U.K. only)
89. Stranger in Town
    (Western Hemisphere only)
90. Sunset Carson Rides Again
91. Spotlight Scandals
    (U.S., Canada, U.K. only
     except TV)
92. She Demons
93. Tall Tan and Terrific
94. Terror of Tinytown
95. They Meet Again
    (excluding Scandinavia)
96. Tom Brown's School Days
    (a/k/a Adventures at Rugby)
97. Trail's End
98. U-67
99. Voodoo Man
    (U.S., Canada, U.K. only)
100. Water Rustlers
101. Western Terror
102. West On Parade
103. Westland Case
104. Zis Boom Bah
    (a/k/a College Days)
    (U.S., Canada, U.K. only)

EXHIBIT 10

182R 00072

CONFIDENTIAL

## SCHEDULE A (contd.)

Motion Picture Films As To Which Astor Pictures, Inc. Claimed
Distribution Rights As Indicated

| Title | Territory | Nature of Rights |
|---|---|---|
| 1. Too Late For Tears | World | All rights until 7/31/68 |
| 2. Rocco & His Brothers | U.S. & Canada & territories & Possessions | All rights until 4/11/68 |
| 3. Les Liaisons Dangereuses | U.S., Canada & Territories & Possessions | All rights until 8/2/68 |
| 4. Last Year At Marienbad | U.S. & Territories & Possessions | All rights until 12/4/68 |
| 5. The Outcry (a/k/a Il Grido) | U.S. & Territories & Possessions | All rights until 4/16/67 |
| 6. The Swindle (a/k/a Il Bidone) | U.S. & Canada & Territories & Possessions | all rights until 4/11/68 |
| 7. Career Girl | World | all rights until 12/68 |
| 8. Girl in Room 13 | World (except Brazil) | All rights until 1/68 |
| 9. Hideout in the Sun | World | All rights until 12/66 |
| 10. Sun Lover's Holiday | World (except Brazil) | All rights until 12/68 |
| 11. Sin of Mona Kent | World | All rights until 12/68 |
| 12. Cavalleria Rusticana | U.S. & Canada & Territories & Possessions | All rights in Perpetuity |
| 13. Country Parson | World | All rights, month-to-month |
| 14. Delinquents | World | All rights, month-to-month |
| 15. Fear | U.S. & Territories & Possessions | TV Rights only until 3/31/66 |
| 16. Great John L. | World | All rights, month-to-month |

CONFIDENTIAL

EXHIBIT 10
BAR 00073
186

8.

## SCHEDULE A (contd.)

| Title | Territory | Nature of Right |
|-------|-----------|-----------------|
| 17. Lone Avenger | U.S. & Territories & Possessions | all Rights in Perpetuity |
| 18. La Traviata | U.S. & Canada & Territories & Possessions | All Rights in Perpetuity |
| 19. Master Plan | U.S. & Canada & Territories & Possessions | TV rights only until 1/15/66 |
| 20. Marilyn (a/k/a Roadhouse Girl) | Western Hemisphere only | All rights until 5/1/68 |
| 21. Pagliacci | U.S. & Canada & Territories & Possessions | All rights until 6/10/67 |
| 22. Pride of the Bowery | U.S., Canada, U.K. & Territories & Possessions | TV rights in perpetuity |
| 23. Seeds of Destruction (a/k/a Youth For The Kingdom) | World | All rights, month-to-month |
| 24. Five Sinners | U.S. & Territories & Possessions | All rights except TV, until 2/27/6 |
| 25. Most Wanted Man | Western Hemisphere | All rights until 4/1/69 |

In addition to the motion picture films specifically enumerated and described above, this Schedule and the definition of the word "Pictures" in the Agreement to which this Schedule is attached, are intended to include all other motion picture films, properties and rights of every kind and nature, as to which Ardisco acquired any right, title and interest under a certain Bill of Sale, dated June 29, 1965, from Joseph J. Bernstein, as Trustee of the Estate of Astor Pictures, Inc., Bankrupt.

EXHIBIT 10

134

PAR 00074

CONFIDENTIAL

## SCHEDULE "A" (contd.)

SCHEDULE OF ACQUISITION AND DISTRIBUTION LICENSE
AGREEMENTS OF ASTOR PICTURES, INC.

| Picture | Date of Agreement |
|---|---|
| ROCCO AND HIS BROTHERS<br>and<br>IL BIDONE | 4/11/61 |
| IL GRIDO (a/k/a THE OUTCRY) | 4/16/62 |
| DURING ONE NIGHT | 7/28/61 |
| PEEPING TOM | 8/11/61 |
| LA DOLCE VITA | 1/8/62 |
| LAST YEAR AT MARIENBAD | 12/5/61 |
| LES LIAISONS DANGEREUSES 1960 | 8/2/61 |
| SHOOT THE PIANO PLAYER | 12/12/61 |
| SECOND CHORUS and FLYING DEUCES | 1/17/46 |
| THE BLACK DOLL and 10 other pictures | 12/8/45 |
| DR. CHRISTIAN MEETS THE WOMEN and 5 other pictures | 1/20/55 |
| JOHNNY HOLIDAY | 3/31/55 |
| CHEERS FOR MISS BISHOP and 2 other pictures | 10/18/46 |
| THE DEVIL AND MISS JONES | 7/31/57 |
| CHRISTMAS EVE,<br>DELIGHTFULLY DANGEROUS,<br>BEDSIDE MANNER,<br>THE BACHELOR'S DAUGHTERS | 11/23/49 |
| HI DIDDLE DIDDLE | 5/3/50 |
| TOO LATE FOR TEARS | 7/29/55 |
| FIVE SINNERS | 2/27/61 |

EXHIBIT 10

CONFIDENTIAL

# EXHIBIT 11

EXHIBIT 11

EXHIBIT 11
136

## INTER-OFFICE MEMORANDUM

TO _____ ALL PERSONNEL                          DATE AUGUST 14, 1967

FROM _____ EDYTHE REIN                          SUBJECT CORPORATE NAMES

The following name changes are being effected:

1. LANDAU/UNGER CO. INC. TO COMMONWEALTH UNITED ENTERTAINMENT CORP.

2. LRO, INC. TO COMMONWEALTH UNITED RELEASING ORGANIZATION INC.

3. LANDAU PRODUCTIONS, INC. TO COMMONWEALTH UNITED PRODUCTIONS INC.

4. UNGER PRODUCTIONS INC. TO U.P.I. INC.

I will notify you as soon as the new names are formally approved
by us so that we may then take all necessary actions, i.e. new
stationery, bank accounts, etc.

The following companies are being dissolved by the Golenbock office:

1. LANDAU CO. INC.

2. PAWNBROKER CO.

3. THREE SISTERS PRODUCTIONS INC.

4. FIRST FILM CORP.

5. L.A.S. PRODUCTION INC.

ER:lg
cc: Jud Golenbock

EXHIBIT 11

18AR 00082

CONFIDENTIAL

# EXHIBIT 12

EXHIBIT 12

EXHIBIT 12
138

*PROSPECTUS*

# COMMONWEALTH UNITED CORPORATION

## COMMON STOCK PURCHASE WARRANTS
for
### 375,000 SHARES
of
### COMMON STOCK
### (Par Value $1 Per Share)
and
### 375,000 Shares of Common Stock
### (issuable upon exercise thereof)

THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION NOR HAS THE COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THIS PROSPECTUS ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

NEITHER THE ATTORNEY GENERAL OF THE STATE OF NEW YORK NOR THE ATTORNEY GENERAL OF THE STATE OF NEW JERSEY NOR THE BUREAU OF SECURITIES OF THE STATE OF NEW JERSEY HAS PASSED ON OR ENDORSED THE MERITS OF THIS OFFERING. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

The Prospectus is applicable to the offer and sale of Commonwealth United Corporation ("Commonwealth") Warrants ("Warrants") to purchase an aggregate of 375,000 shares of Common Stock, $1 par value, issued and to be issued to Messrs. Delbert W. Coleman and Louis J. Nicastro pursuant to the transactions described in this Prospectus under the caption "Background of the Exchange Offer". Said Warrants, which expire November 15, 1978, are exercisable at a price of $17.25 per share and this Prospectus also covers the aggregate of 375,000 shares of Commonwealth Common Stock (subject to adjustment) issuable upon the exercise thereof. There is no present market for the Warrants. The Common Stock is traded on the American Stock Exchange and application has been made to list the Warrants for trading thereon. For information as to the market prices of Commonwealth Common Stock, see "Prices of Common Stock of Commonwealth and Seeburg" herein.

Commonwealth has no knowledge of any underwriting arrangements that have been made in connection with the offering of any of the securities to which this Prospectus relates. However, the Selling Warrantholders (or Stockholders, as the case may be) identified above, and any brokerage firm executing transactions on behalf of such persons may each be deemed to be an underwriter pursuant to the Securities Act of 1933, as amended, and any profit realized upon the sale of such securities may be regarded as underwriting compensation. The Common Stock may be offered for sale on the American Stock Exchange by the persons holding such securities at prices prevailing on that Exchange at the time of sale, or in the over-the-counter market at the prices prevailing in such market at the time of sale, or in private transactions. None of the proceeds of any such sales will be received by Commonwealth.

This Prospectus, with a different cover page, is also being used in connection with an offering by Commonwealth to the holders of common stock of The Seeburg Corporation to exchange their shares for securities of Commonwealth. (See "The Exchange Offer" herein.)

The closing price of Commonwealth Common Stock on the American Stock Exchange on October 15, 1968 was $20 per share.

**The date of this Prospectus is October 16, 1968**

EXHIBIT 12
139

## BUSINESS OF COMMONWEALTH

Commonwealth was organized in June, 1961 and until July, 1967 had primarily been involved in the operation of general insurance agencies and the ownership of improved and unimproved real property. As a result of acquisitions in July, 1967 and during 1968, Commonwealth is presently engaged in four areas of business: (i) the entertainment field, which includes the production, acquisition, disposition and distribution of motion pictures for theatrical and television markets, as well as music publishing and record production; (ii) the operation of oil and gas properties; (iii) the investment in, as well as the purchase and sale of improved and unimproved real property; and (iv) the professional services field, which currently includes the operation of a general insurance agency and the operation of credit collection agencies.

During the five years ended December 31, 1967, and the six months ended June 30, 1967, and June 30, 1968, the percentages of gross revenues of Commonwealth on a consolidated basis, as derived from its principal areas of business activity, were as follows:

|  | Years Ended | | | | | Six Months Ended June 30, | |
|---|---|---|---|---|---|---|---|
|  | 1963 | 1964 | 1965 | 1966 | 1967 | 1967 | 1968 |
| Motion Pictures .................. | 2% | 10% | 50% | 70% | 57% | 59% | 29% |
| Music Publishing and Record Royalties ...................... | — | — | 2% | 9% | 13% | 14% | 3% |
| Real Estate Activities ............. | 79% | 72% | 39% | 15% | 8% | 9% | 39% |
| Oil and Gas Activities ............ | — | — | — | — | — | — | 20% |
| Professional Service Fees and other Sources .............. | 19% | 18% | 9% | 6% | 22% | 18% | 9% |

The oil and gas properties and a significant portion of the real estate were acquired in the purchase of Sunset International Petroleum Corporation in January, 1968. Prior to that time depreciation and amortization expenses were primarily applicable to rental property. Depletion, depreciation and amortization applicable to the operations of Sunset from the date of its acquisition to June 30, 1968 was $1,433,053. Accordingly, relative contributions to gross profits can be determined by reference to Commonwealth's Statement of Consolidated Operations.

### Entertainment Group

### Motion Picture Division

*General.* Commonwealth's motion picture activities are operated primarily through a wholly-owned subsidiary, Commonwealth United Entertainment, Inc. (which, together with its predecessors, affiliates and subsidiaries is hereinafter called "C. U. E."). Commonwealth's entry into this field is the result of two relatively recent acquisitions: On July 31, 1967, Commonwealth acquired all of the issued and outstanding shares of The Landau/Unger Company, Inc. (a New York corporation organized in 1965) and its subsidiaries from Ely A. Landau, Oliver A. Unger, members of their families and trusts and Herbert Steinmann for 500,000 shares of Commonwealth Common Stock. The name of The Landau/Unger Company, Inc. was thereafter changed to Commonwealth United Entertainment, Inc. On March 1, 1968, Television Enterprises Corporation ("TEC"), a wholly-owned Delaware subsidiary of Commonwealth, acquired the assets and liabilities of a California corporation of the same name, (owned by Harold Goldman, Milton T, Raynor and Jerome Kurtz) for 300,000 shares of Commonwealth Common Stock. The information on Commonwealth's motion picture activities as set forth below represents, in part, a combined historical description of the activities of both The Landau/Unger Company, Inc. and Television Enterprises Corporation.

Commonwealth, through its subsidiaries, is now engaged in the production and acquisition of motion pictures and their exploitation and distribution in the theatrical, non-theatrical and tele-

27

EXHIBIT 12
140

vision media in various territories throughout the world. The principal assets of this division consist of (i) motion pictures produced by it or its affiliates; (ii) motion pictures produced pursuant to co-production agreements with others, (iii) distribution rights in motion pictures produced by it alone and in pictures produced with others; (iv) distribution rights in motion pictures acquired by it which were produced by others; and (v) motion picture rights and literary properties for use in connection with future productions.

As a result of a recent reorganization of the entertainment subsidiaries, all production and co-production activities, as well as the acquisition of motion picture rights to properties and the general arrangement for financing of such activities, will be handled through the primary entertainment subsidiary, C .U. E. Various subsidiaries of C. U. E. will be responsible for special production and financing arrangements, domestic theatrical distribution, foreign theatrical distribution, domestic non-theatrical distribution and world-wide television rights.

*Production and Acquisition of Motion Pictures.*   C. U. E. has produced three motion pictures: "Long Day's Journey Into Night" (1963), "The Pawnbroker" (1965) and "The Fool Killer" (not yet in general domestic release)—in which it exercised complete artistic supervision and arranged for the financing of the entire production costs. C. U. E. is presently acting in a similar capacity in connection with "The Madwoman of Chaillot", directed by Bryan Forbes and starring Katherine Hepburn, Yul Brynner, Charles Boyer and Danny Kaye, the filming of which has been completed in Europe. Production of another motion picture involving artistic supervision by C. U. E. is scheduled to commence shortly. This picture, tentatively entitled "Viva Max", will be directed by Arthur Hiller and co-produced by Montmorency Productions, Ltd. World-wide distribution rights in all media to "The Madwoman of Chaillot" have been sold to Warner Bros.-Seven Arts, Inc., while C. U. E. retains such rights in "Viva Max." Television rights to "The Fool Killer" are held by C. U. E. and theatrical as well as certain other rights are held by others. Distribution rights in "The Pawnbroker" and "Long Day's Journey into Night" were originally held by C. U. E., but have been the subject of distribution agreements with others.

C. U. E. has also produced motion pictures pursuant to agreements with other producers. While the arrangements between C. U. E. and such other producers have varied substantially with respect to artistic supervision, C. U. E. has generally maintained a certain degree of such supervision through the retention of rights to approve cast, director, screenplay and/or budget before principal photography is commenced. However in all such cases C. U. E. has furnished some portion of the financing. Such financing has generally been provided through the furnishing of a letter of credit (often for 50% or more of the approved budget) which was payable upon delivery of the completed motion picture. Under these arrangements C. U. E. has generally acquired exclusive theatrical, non-theatrical and television distribution rights in the United States, Canada and in other territories. Some of the pictures which C. U. E. has co-produced pursuant to agreements with other producers include the following: "A Face of War"; "The Desperate Ones"; "Bang, Bang, You're Dead"; "The Dirty Game"; "The Face of Fu Manchu"; "Ten Little Indians"; "24 Hours to Kill"; "Coast of Skeletons"; "Sandy"; "Mozambique"; "Mondo Teeno"; "Cervantes"; "Circus of Terror"; "Five Golden Dragons"; "Destination Inner Space"; "Cyborg 2087"; "Dimension 5"; "Panic in the City"; "The Money Jungle"; "The Destructors"; "The Violent Ones"; and "Run Like a Thief." In addition, C. U. E. is co-producing ten pictures which are currently in release or are expected to be released shortly— "The Angry Breed"; "Dayton's Devils"; "Eve"; "The Girl Who Knew too Much"; "Kiss and Kill."; "Subterfuge"; "It Takes All Kinds"; "99 Women"; "The Day the Hot Line Got Hot" and "The Monitors" — and principal photography has been completed on another, "A Black Veil for Lisa". Agreements have been executed to co-produce other pictures, including "Dead Heat"; "Color Me Dead"; "Assignment: Istanbul"; "Strangers at Sunrise"; "The Committee"; "The Fire Within" and "Venus in Furs".

28

EXHIBIT 12
141

C. U. E. has acquired distribution rights in the United States and other territories in certain motion pictures produced by others, including the following : "The Umbrellas of Cherbourg"; "The Servant"; "King and Country"; "The Girlgetters"; "Life Upside Down"; "Ninety Degrees in the Shade"; "Sands of Beersheba"; "The Eleanor Roosevelt Story"; "Rope Around the Neck"; "Ride the High Wind"; "Journey to the Center of Time"; "Brightly of the Grand Canyon" and "You Are What You Eat". All but the last four of these pictures had previously been exhibited in the United States at the time that the distribution rights were acquired. C. U. E. has also acquired the exclusive distribution rights to the Russian-made feature film "The Good Doctor Aibolit". In addition, C. U. E. co-produced and has acquired the world-wide television distribution rights to a motion picture made on tape (and intended primarily for TV distribution) entitled "The Three Sisters" and also acquired the world-wide television distribution rights for the following four half-hour television series "As it Happened" (78 episodes) ; "Racket Squad" (98 episodes) "Passport to Danger" (39 episodes) and "Code 3" (39 episodes).

In 1965 C. U. E. acquired various distribution rights to a group of approximately 120 pictures which had previously been distributed in the United States. Certain pictures in this group, including "La Dolce Vita", "The Girl in Room 13" and "The Swindle" had not previously been televised in the United States. "La Dolce Vita" has been reissued theatrically by C. U. E. in an English-language version.

C. U. E. has a film library of over 50 pictures other than those referred to above. C. U. E. also holds motion picture rights in certain literary properties, screen plays or screen treatments which it has acquired for possible future production. These include "The Journey of Simon McKeever"; "Freedom Road"; "Witness to a Killing"; "The Nutcracker"; "Leonardo Di Vinci"; "A Ride on the Milky Way"; "The President's Plane is Missing"; "The Girl from Moscow"; "Odd Man Dies"; "Legion of the Damned" and "The Quarry".

At any given time, Commonwealth may be negotiating for the acquisition of additional motion pictures, distribution rights, motion picture rights or for the sale of any properties of this nature which it holds.

There can be no assurance that any pictures now in production will be completed, that any future production will be commenced, or that the cost of developing or acquiring any of the pictures, distribution rights, screen rights or screenplays referred to above will be profitably recovered.

*Method of Film Distribution.* C. U. E. has distributed its films by various means. To a limited extent C. U. E. has itself arranged theatrical bookings in the United States. More commonly, however, C. U. E. has effected theatrical distribution in the United States through unrelated companies which have existing distribution facilities and which enter into contracts with exhibitors in C. U. E.'s name, or as in the case of six pictures being distributed by Warner Bros.-Seven Arts, Inc., in the distributors name. C. U. E. generally tries to retain substantial controls over the manner of distribution. At the present time 23 of C. U. E.'s pictures are being distributed for television exhibition (excluding network TV in the case of four pictures which has been retained by C. U. E.) by American International Pictures ("AIP"), which company has also been granted theatrical distribution rights in certain of those pictures. C. U. E. has reserved for its own exercise the theatrical distribution rights in certain other pictures licensed to AIP. C. U. E. recently began expanding its theatrical distribution activities and currently handles the distribution for the thirteen western states through its California offices. A New York office to handle the New York, Philadelphia and Buffalo territory has been opened recently, and a Chicago office is scheduled to open shortly.

Distribution outside the United States is effected pursuant to agreements with respect to various pictures with many unrelated Companies which include the following : Associated British-Pathe in England; 20th Century-Fox in Australia, New Zealand and South Africa; Metro-Goldwyn-Mayer in Japan, Latin

EXHIBIT 12
142

America and the Philippines, Warner Bros.-Seven Arts, Inc. in Canada; Empire Films in Canada; Franco-London Film in France; Skouras Films in Greece; Sven Nuygren Films in Sweden; Gloria-Film in Denmark; Nora Films in Germany; Messeri Films in Israel; Doperfilm in Portugal; Euro International Films in Italy; Elan Films in Belgium; Produs S.A.R.L. in France; Columbus Films in Switzerland; Peliculas Nationales in Mexico; Peliculas Mecicanas in Latin America and Udia Films in the Philippines. C. U. E. recently appointed Screen Distributors Pty. Ltd. as a distributor for film properties in the Far East.

A London office was recently opened to handle European production agreements and the distribution of motion pictures in which Commonwealth has retained distribution rights for Great Britain. In addition this office will supervise legitimate stage productions in which Commonwealth has an interest. One such production, "OUT OF THE QUESTION", a comedy by Ira Wallach, is scheduled for an opening in London in October, 1968.

From time to time various governments may impose restrictions regarding foreign monetary exchange. Although C. U. E. has not been affected by any such restrictions, there is no assurance that such a result might not occur in the future.

A large number of the pictures co-produced by C. U. E. have been presold to television prior to the commencement of production. Currently there is a contractual arrangement with the CBS network for the delivery to it of 20 pictures by May 1, 1972, four of which have already been delivered. C. U. E. also has contracts with about 75 television stations in the United States calling for the delivery of 13 pictures, of which 8 pictures have already been delivered, and it is anticipated that the remainder will be delivered prior to the close of 1968. C. U. E. is presently negotiating contracts with many TV stations in the United States for the delivery of an additional 13 pictures; some of these contracts have been signed, but no pictures have been delivered thereunder as of the date hereof. Both network and syndication contracts of this type generally provide that TV showings are not permitted for a period of 18 months to 2 years after the date of delivery of the film.

*Method of Financing.* C. U. E.'s costs of production and acquisition have been generally financed through borrowings from institutional and private lenders. The institutional interest rates range from 6% to 9% per annum, and at May 31, 1968 the highest interest rate of the private lenders was 18% per annum. In August, 1968 Commonwealth repaid the secured note bearing interest at 18% from the funds received from the July public sale of its 6% Convertible Subordinated Debentures, and at the present time the highest interest rate of the private lenders is 12% per annum. The average interest rate for all such motion picture borrowings as of June 30, 1968 was approximately 7.4% (which figure includes the loan with an 18% interest rate). In some instances C. U. E. has joined with other parties in the production or acquisition of motion pictures, and in such cases the other parties have interests in such motion pictures. In connection with C. U. E.'s production activities, profit participations in some cases have been granted to stars, directors, writers and others.

C. U. E. has granted security interests in substantially all of its film rights, properties and receivables to secure repayment of its motion picture debt obligations. A substantial portion of the proceeds derived by C. U. E. from the exploitation of its film properties may be required to be paid in reduction of such debt obligations. The ready availability of financing is essential to the continued production and acquisition of motion pictures by C. U. E. There is no assurance that such financing will be available in the future, and no representation can be made as to the terms upon which future financing, if available, will be made.

## Music Division

In July 1968, Commonwealth acquired all the issued and outstanding shares of Koppelman-Rubin Associates, Inc., Troika Management, Inc., Hot Biscuit Disc Company, Inc., Blue Magic Music, Inc. and Chardon Music, Inc. (New York corporations organized since 1965), from Charles Koppelman, Don Rubin and Leon Koppelman for 265,062 shares of Commonwealth Common Stock, plus additional shares predicated upon pre-tax earnings above $275,000 annually payable in the second, fourth and fifth years after

30

EXHIBIT 12
143

Commonwealth whose aggregate direct remuneration exceeded that amount, and to all directors and officers as a group:

| Name of Individual or Identity of Group | Capacity in Which Remuneration Received | Aggregate Direct Remuneration |
|---|---|---|
| Theodore R. Sayers | President and/or Chairman of the Board of Commonwealth | $ 48,450(1) |
| Oliver A. Unger | Executive Vice President of Commonwealth United Entertainment, Inc. and Commonwealth | 44,780(2) |
| Lawrence Kerstein | President of Kerstein, Weiner and Kane, Inc., subsidiary of Commonwealth | 35,400 |
| Ely A. Landau | President of Commonwealth United Entertainment, Inc. and/or Commonwealth | 50,652(3) |
| All Directors and Officers as a group (consisting of nine persons) | | 212,582(4) |

(1) Includes $3,000 fee for services rendered as managing agent for the Park Building.

(2) The amount set forth above includes $4,441 as additional compensation accrued to Mr. Unger under his employment contract.

(3) On July 31, 1967, Commonwealth United Entertainment, Inc. entered into an employment agreement with Mr. Landau for a 5-year term, providing for an annual base salary of $59,000 plus additional compensation equal to 2½% of the annual "Combined Film Earnings" of Commonwealth United Entertainment, Inc. (as that term is defined in said employment agreement). Commonwealth has assumed the obligations of Commonwealth United Entertainment, Inc. under this contract. The amount set forth above includes $4,441 of such additional compensation which accrued to Mr. Landau. This contract was amended subsequently to eliminate the 2½% earnings participation in consideration of the grant to Mr. Landau of a non-exclusive contract.

(4) This does not include $59,100 paid or accrued to the law firm of Edward Gettinger and Peter Gettinger, of which Peter Gettinger is a member, for legal services rendered during the year ended December 31, 1967. Peter Gettinger is an officer and director of Commonwealth.

For additional information relating to remuneration, see also the material under "Transactions With Management" and "Qualified Stock Option Plan" below.

### Transactions with Management

On July 31, 1967 Commonwealth acquired all of the issued and outstanding stock of The Landau/Unger Company, Inc. in exchange for 500,000 shares of Class A Common Stock (later reclassified as Common Stock). Ely A. Landau, formerly a director of Commonwealth, and members of his family or trusts for their benefit received 200,000 of such shares, Oliver A. Unger, presently an officer and director of Commonwealth, and members of his family or trusts for their benefit received 200,000 of such shares and Herbert Steinmann, formerly a director of Commonwealth, received 100,000 of such shares.

On December 31, 1966, Ely A. Landau sold to C.U.E. all of his right, title and interest in a joint venture known as the Landau-Dreyfus Company and his profit participation interest in all proceeds now due or hereafter to become due to him from "THE PAWNBROKER" and "THE FOOL KILLER." The total purchase price therefor was $98,000. Of this amount, C.U.E. has been given credit in the amount of $34,250 on account of monies due to C.U.E. from Mr. Landau. The balance of the purchase price of $63,750 was paid in 1967 and 1968.

47

EXHIBIT 12
144