**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

Priority ____
Send ____
Enter ____
Closed ____
JS-5/JS-6 ____
Scan Only ____

CASE NO.:  **CV 11-09112 SJO (AJWx)**          DATE:  **June 12, 2013**

TITLE:          **Paramount Pictures Corporation, et al. v. International Media Films Inc.**

========================================================================
**PRESENT:  THE HONORABLE S. JAMES OTERO, UNITED STATES DISTRICT JUDGE**

Victor Paul Cruz                                    Not Present
Courtroom Clerk                                    Court Reporter

**COUNSEL PRESENT FOR PLAINTIFFS:**          **COUNSEL PRESENT FOR DEFENDANT:**

Not Present                                    Not Present

========================================================================
**PROCEEDINGS (in chambers): ORDER GRANTING IN PART AND DENYING IN PART
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT** [Docket No. 54]

This matter is before the Court on Plaintiffs Paramount Pictures Corporation ("Paramount") and
Melange Pictures LLC's ("Melange") (collectively, "Plaintiffs") Motion for Partial Summary
Judgment ("Motion"), filed April 4, 2013. Defendant International Media Films, Inc. ("Defendant")
filed its Opposition on April 22, 2013, to which Plaintiffs filed their Reply on May 13, 2013. The
Court found this matter suitable for disposition without oral argument and vacated the hearing set
for June 3, 2013. *See* Fed. R. Civ. P. 78(b). For the following reasons, the Court **GRANTS IN
PART** and **DENYING IN PART** Plaintiffs' Motion.

I.          FACTUAL AND PROCEDURAL BACKGROUND

          A.          Factual Background

The motion picture *La Dolce Vita* (the "Film") was written and directed by critically acclaimed
director Federico Fellini in 1960. (Def.'s Statement of Genuine Disputed Material Facts in Opp'n
to Pls.' Mot. ("Def.'s SGD") ¶ 1, ECF No. 67-1.) The Film was produced in Italy by, *inter alia*,
Riama Films S.p.A. ("Riama"). (Def.'s SGD ¶ 2.) The Film was nominated for four Academy
Awards, winning one, and also received the Palme d'Or at the 1960 Cannes Film Festival. (Def.'s
SGD ¶ 3.)

At issue in this case are competing chains of title to the ownership rights to the Film. Both
Plaintiffs' and Defendant's purported chains of title begin with the same company, Cinemat S.A.
("Cinemat"), as it is undisputed that Riama transferred its rights to the Film to Cinemat on March 9,
1962. (Def.'s SGD ¶ 8.) The parties' respective chains of title thereafter diverge, with Plaintiffs
claiming that their chain of title originates from a 1962 transfer from Cinemat to Astor Pictures,
Inc., ("Astor Pictures") while Defendant claims that it owns the rights to the Film through a transfer
from Cinemat to Hor A.G. ("Hor") in 1980. (Def.'s SGD ¶ 4.) It will thus be useful to set out the
competing chains of title in detail.

          1.          Plaintiffs' Purported Chain of Title to the Film

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

Priority _____
Send _____
Enter _____
Closed _____
JS-5/JS-6 _____
Scan Only _____

**CASE NO.:** <u>CV 11-09112 SJO (AJWx)</u>        **DATE:** <u>June 12, 2013</u>

As stated, it is undisputed that Riama transferred to Cinemat its worldwide rights to the Film, excluding France, Italy, and their respective former colonies. (Def.'s SGD ¶ 8.)  Plaintiffs then set out the following chain of title that they assert demonstrates their ownership of the copyright to the Film.  Plaintiffs assert that Cinemat thereafter entered into an agreement with Astor Pictures International, Inc. ("Astor International") on January 7, 1962 (the "Cinemat-Astor International Agreement"), by which Cinemat agreed to transfer to Astor International all of Cinemat's rights in the Film in return for a total of $1.5 million. (Pls.' Statement of Proposed Uncontroverted Facts and Conclusions of Law in Supp. of Mot.  ("Pls.' SUF") ¶¶ 4-5.)  The Cinemat-Astor International Agreement provided that "[a]ll copyrights to the Film and registrations if and where existing thereof shall remain in the name of the Producers and/or the Seller" until Astor made all required payments. (Pls.' SUF ¶ 7; Decl. of Richard Redlich, Jr. in Supp. of Mot. ("Redlich Decl.") Exs. 2-4,[1] at ¶ 5, ECF No. 56.)  On July 25, 1962, Cinemat executed a written assignment (the "Cinemat Assignment") of the United States and Canadian rights in the Film to Astor Pictures. (Redlich Decl. ¶ 19, Ex. 6.)  On July 26, 1962, Cinemat and Astor Pictures entered into a further agreement (the "Cinemat-Astor Pictures Agreement") which provided that (1) pursuant to the Cinemat-Astor International Agreement, the rights in the Film that had been transferred to Astor International included the rights in the Film in the United States and Canada; (2) subsequent to the execution of the Cinemat-Astor International Agreement, Astor International transferred to Astor Pictures all of Astor International's rights in the Film in the United States and Canada; (3) Cinemat consented to the transfer of United States and Canadian rights in the Film to Astor Pictures; and (4) in consideration of the payment of $350,000 to Cinemat, Cinemat had "no further rights of any kind in and to the Film in the United States-Canada Territory." (Redlich Decl. ¶¶ 20-22; Ex. 7, at 1-2.)

Pursuant to a mortgage of chattels dated August 21, 1962, between Astor Pictures and Inland Credit Corporation ("Inland Credit"), Astor Pictures granted a security interest in its rights in the Film to Inland Credit as collateral for a loan. (Redlich Decl. ¶ 23, Ex. 8.)  Astor Pictures subsequently filed for bankruptcy, and Astor Pictures's bankruptcy trustee assigned Astor Pictures's rights in the Film (that is, all rights in the United States and Canada) to Ardisco Financial Corporation ("Ardisco"), a subsidiary of Inland Credit. (Redlich Decl. ¶ 24, Ex. 9; Decl. of Stephanie Woodhead in Supp. of Mot. ("Woodhead Decl.") ¶¶ 8-9, Exs. 38-39, ECF No. 59.)  In September 1965, Inland Credit sold its interest in the United States and Canadian rights in the Film to Landau Releasing Organization, Inc. ("Landau Releasing"), a subsidiary of The Landau-Unger Company ("Landau-Unger"). (Redlich Decl. ¶¶ 25-26, Exs. 10-13; Woodhead Decl. ¶ 10, Ex. 40.)  Unger Productions, Inc. was another subsidiary of Landau-Unger at the time. (Redlich Decl. ¶ 26, Exs. 11-13; Woodlich Decl. ¶ 10, Ex. 40.)

---

[1] Exhibits 2 through 4 to the Redlich Declaration are "three non-identical copies of the Cinemat Astor-International Agreement" possessed by Plaintiffs, although the differences in the copies are not relevant to Plaintiffs' chain of title claim. (Redlich Decl. ¶¶ 8-15.)

Priority ____
Send ____
Enter ____
Closed ____
JS-5/JS-6 ____
Scan Only ____

CASE NO.:  CV 11-09112 SJO (AJWx)          DATE:  June 12, 2013

In August 1967, Landau-Unger and its subsidiaries were acquired by Commonwealth United Corporation ("CUC").  (Woodhead Decl. ¶¶ 10-11, Exs. 40-41.)  Thereafter, Landau-Unger and its subsidiaries underwent the following name changes: (1) Landau-Unger changed to Commonwealth United Entertainment Corp. ("CUE"); (2) Landau Releasing changed to Commonwealth United Releasing Organization; and (3) Unger Productions, Inc. changed to UPI Productions, Inc.  (Woodhead Decl. ¶¶ 10-11, Exs. 40-41; Redlich Decl. ¶¶ 26-28, Exs. 11-14.)  On January 30, 1969, Ardisco assigned all of its rights in the Film to Unger Productions, so that CUE owned, through its subsidiaries, all of the United States and Canadian rights in the Film. (Redlich Decl. ¶¶ 25-29, Exs. 10-15, Woodhead Decl. ¶¶ 8-12, Exs. 38-40.)

On June 30, 1971, CUE granted National Telefilm Associates, Inc. ("NTA") the exclusive and perpetual right to distribute the Film in the United States and Canada for broadcast television exhibition, non-theatrical 8 mm and 16 mm uses, theatrical exhibition in Canada only, and cable television exhibition (the "NTA Television Rights Agreement").  (Redlich Decl. ¶ 30, Ex. 16.)  On June 29, 1972, CUE granted NTA the exclusive and perpetual right to distribute the Film in the United States and Canada for theatrical exhibition (the "NTA Theatrical Rights Agreement"). (Redlich Decl. ¶ 31, Ex. 17.)

In April 1973, CUE changed its name to Iota Entertainment, Inc.  ("Iota").  (Redlich Decl. ¶ 32, Ex. 18; Woodhead Decl. ¶ 11, Ex. 41.)  On November 12, 1973, Iota granted NTA the exclusive and perpetual United States and Canadian home video rights in the Film (the "NTA Video Rights Agreement").  (Redlich Decl. ¶ 33, Ex. 19.)  Thus, as of November 12, 1973, Plaintiffs assert that NTA owned the perpetual and exclusive right to distribute the Film in the United States and Canada for broadcast and cable television exhibition, non-theatrical exhibition, theatrical exhibition, and home video exploitation.  (Redlich Decl. ¶¶ 30-33, Exs. 16-19.)

In 1982, Iota filed for bankruptcy, and Iota's bankruptcy trustee sold all of Iota's stock to Redwood Investors Syndicate ("RIS").  (Redlich Decl. ¶¶ 34-35, Exs. 20-22.)  To fund the sale, RIS obtained a secured loan from NTA, and RIS pledged the stock and assets of Iota as collateral for the loan. (Redlich Decl. ¶¶ 34-35, Exs. 20-22.)  RIS later defaulted on the loan from NTA, and on July 30, 1984, RIS transferred to NTA all of its rights, title, and interest in the stock and assets of Iota. (Redlich Decl. ¶¶ 34-35, Exs. 20-22.)  Thus, as of July 30, 1984, NTA owned all of the United States and Canadian rights in the Film that had formerly been owned by Iota/CUE/Landau-Unger. Further, since 1972 NTA had owned the film library of Republic Pictures Corporation, in addition to CUE's film library.  (Woodhead Decl. ¶ 12, Ex. 42.)  In January 1985, NTA formally merged with Republic Pictures Corporation.  (Redlich Decl. ¶ 36, Ex. 23; Woodhead Decl. ¶ 13, Ex. 43.)

In 1989, Republic Pictures Corporation obtained both an original and a renewal United States Copyright registration for the English language subtitled version of the Film.  (Redlich Decl. ¶¶ 37-38, Exs. 24-25.)  In 1991, Republic Pictures Corporations obtained an original United States copyright registration for the English language dubbed version of the Film, and in 1994, Republic Pictures Corporation obtained a renewal United States copyright registration for the English

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

Priority     _____
Send         _____
Enter        _____
Closed       _____
JS-5/JS-6    _____
Scan Only    _____

**CASE NO.:** <u>CV 11-09112 SJO (AJWx)</u>          **DATE:** <u>June 12, 2013</u>

language dubbed version of the Film. (Redlich Decl. ¶¶ 39-40, Exs. 26-27.) In 1994, Republic Pictures Corporation changed its name to Republic Entertainment Inc. (Redlich Decl. ¶ 41, Ex. 28.) On December 31, 1996, Republic Entertainment Inc. filed a Form GATT with the United States Copyright Office, evidencing its restoration of the United States copyright in the original, Italian language version of the Film. (Redlich Decl. ¶ 42, Ex. 29.) On April 27, 1998, the United States Copyright Office issued a copyright registration for the original, Italian-language version of the Film to Republic Entertainment. (Redlich Decl. ¶ 43, Ex. 30.)

In 2005, Republic Entertainment Inc. converted from a corporation to a limited liability company and became Republic Entertainment LLC. (Redlich Decl. ¶ 44, Ex. 31.) Pursuant to a short form assignment executed December 21, 2005, Republic Entertainment LLC assigned its rights in the Film to Melange, and Melange licensed the rights to distribute and otherwise exploit the Film in the United States and Canada to Paramount on the same day. (Redlich Decl. ¶¶ 45-46, Exs. 32, 33.) Thus, according to Plaintiffs, as of December 21, 2005, Melange was the copyright owner of the Film in the United States and Canada, and Paramount was Melange's exclusive licensee of these rights. The companies in Plaintiffs' purported chain of title have jointly exploited the rights to the Film in the United States and Canada. (Def.'s SGD ¶¶ 66-67;[2] Halberstadter Decl. ¶ 15, Ex. 56; Woodhead Decl. ¶¶ 10, 12, Exs. 40, 42.)

        2.    <u>Defendant's Purported Chain of Title to the Film</u>

As with Plaintiffs' purported chain of title, it is undisputed that Riama transferred to Cinemat its worldwide rights to the Film, excluding France, Italy, and their respective former colonies. (Def.'s SGD ¶ 8.) Defendant asserts, however, that the next link in the chain is a transfer of the United States rights in the Film from Cinemat to Hor on December 9, 1980 (the "Cinemat-Hor Transfer"). (Decl. of Alfredo Leone in Opp'n to Mot. ("Leone Decl.") ¶¶ 4-5, Exs. C, D, ECF No. 68.)[3] On November 20, 1981, Hor transferred all rights it had in the Film to Oriental Films S.r.L. ("Oriental Films"). (Leone Decl. ¶¶ 6-7, Exs. E, F.) On October 23, 1997, Oriental Films and Cinestampa Internazionale S.r.L. ("Cinestampa") entered into an agreement by which Oriental Films granted Cinestampa the right to lease and sell the Film. (Leone Decl. ¶ 8, Ex. G.) On January 7, 1998, Oriental Films transferred all of its rights in the Film to Cinestampa. (Leone Decl. ¶¶ 9-10, Exs. H, I.) On September 20, 2001, Cinestampa transferred these rights to Defendant. (Leone Decl. ¶¶ 11-12, Exs. 11, 12.) IMF holds a certificate of recordation from the United States Copyright Office dated October 29, 2001 evidencing the transfer of rights to the Film from Cinestampa to

_____

[2]  Defendant states that it "lacks sufficient information to respond" to this fact asserted by Plaintiffs. (Def.'s SGD ¶¶ 66-67.) This is insufficient to create a genuine dispute of material fact. *See* Fed. R. Civ. P. 56(c)(1), (e).

[3]  Defendant also offers the declarations of Mushi Glam and Francesco Marconi as evidence of the purported Cinemat-Hor Transfer. The Court considers the admissibility and relevance of these declarations below.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

Priority _____
Send _____
Enter _____
Closed _____
JS-5/JS-6 _____
Scan Only _____

**CASE NO.:** <u>CV 11-09112 SJO (AJWx)</u>          **DATE:** <u>June 12, 2013</u>

IMF.  (Leone Decl. ¶ 15, Ex. N.)  On February 2, 2010, Defendant assigned its rights in the Film to International Classic Films, LLC ("ICF").  (Leone Decl. ¶ 14, Ex. M.)  ICF recorded its assignment of the rights to the Film with the United States Copyright Office.  (Leone Decl. ¶ 17, Ex. O.)  The Court notes that Defendant is not aware of any exploitation of the Film in the United States or Canada by any of Defendant's purported predecessors in interest to the Film rights.  (Def.'s SGD ¶ 68.)

       3.    <u>Defendant's Alleged Infringement</u>

It is undisputed that Defendant has been exploiting the Film in the United States since at least May 14, 2003.  (Def.'s SGD ¶¶ 46-47.)  In a May 14, 2003, agreement, Defendant granted an exclusive license to reproduce, distribute, license, sublicense, and manufacture "video devices" such as videotapes and DVDs, embodying the Film for home use and to exploit the Film via internet sales to KOCH Lorber Films, LLC ("KLF").  (Def.'s SGD ¶ 47.)  The term of this agreement was for seven years with an automatic two-year renewal term, and the territories covered including the United States and English-speaking Canada.  (Def.'s SGD ¶¶ 48-49.)  The agreement gave Defendant the right to approve a statement on all packaging that KLF licensed the right to distribute the Film from Defendant, as well as an on-screen credit in the Film itself.  (Decl. of David Halberstadter in Supp. of Mot.  ("Halberstadter Decl.") ¶ 4, Ex. 45, at ¶ 2.6, ECF No. 61.)  The agreement also gave Defendant the right to approve the subtitled versions of the Film that KLF created, as well as giving Defendant the right to approve all artwork used by KLF's marketing and distribution of the Film.  (Halberstadter Decl. ¶ 4, Ex. 45, at ¶¶ 4.2, 9.1, 9.5.)

In addition, on November 16, 2009, Defendant granted to E1 Entertainment United States, LP ("E1") the exclusive right to distribute, license, sublicense, and otherwise exploit the Film in theaters, in institutional settings, by means of video recording devices, by means of all forms of television exhibition, and via the internet.  (Halberstadter Decl. ¶ 5, Ex. 46.)  This agreement provides that it shall run from the date of the agreement until the date that is twelve years following E1's initial commercial release of each film covered by the agreement.  (Def.'s SGD ¶ 52.)  The agreement covers rights in North America.  (Def.'s SGD ¶ 53.)  The agreement further provides that Defendant retained approval rights over all clip licensing, approval over promotional material, and prohibitions against E1 altering the credit to Defendant or Defendant's copyright notice.  (Halberstadter Decl. ¶ 5, Ex. 46, at ¶¶ 4.7, 4.8, 10.)

Moreover, in a May 24, 2007, agreement Defendant granted to G B Posters the right to duplicate and distribute movie posters and postcards featuring still images from the Film.  (Def.'s SGD ¶ 55.)  In December 2008, Defendant granted The Phillips Collection the right to exhibit the Film.  (Def.'s SGD ¶ 56.)  In February 2009, IMF granted Get the Shot Productions the right to include clips from the Film in a documentary.  (Def.'s SGD ¶ 57.)  KLF and E1 have actively distributed the Film on DVD via the internet, and E1 also currently offers digital downloads of the Film on its website.  (Halberstadter Decl. ¶¶ 6-8, Exs. 47, 48, 49.)

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

Priority    ____
Send        ____
Enter       ____
Closed      ____
JS-5/JS-6   ____
Scan Only   ____

**CASE NO.:**  CV 11-09112 SJO (AJWx)          **DATE:**  June 12, 2013

Defendant has earned more than $1 million from its exploitation of the rights to the Film, and Defendant claims on its website that it owns the rights to the Film in perpetuity throughout the world except for Italy and France.  (Def's SGD ¶¶ 61-62.)  Defendant also states on its web site that it is currently developing the Film into a Broadway musical.  (Def.'s SGD ¶ 63.)  Further, it is undisputed that the DVDs of the Film sold by KLF and E1 feature Defendant's name on the front cover, and that the back cover includes a copyright notice naming Defendant as the copyright holder to the Film.  (Def.'s SGD ¶¶ 64-65.)

### 4.   Defendant's Previous Suit for Copyright Infringement

In a previous Southern District of New York case ("SDNY Case"), Defendant brought its own action for copyright infringement against several parties: Lucas Entertainment, Inc., Lucas Distribution, Inc., and Andrei Treivas Bregman (collectively, the "Lucas Companies").  *Int'l Media Films, Inc. v. Lucas Entm't, Inc.*, 703 F. Supp. 2d 456, 457 (S.D.N.Y. 2010).  Defendant maintained that the Lucas Companies allegedly violated Defendant's copyright to the Film by producing a two-part pornographic film entitled *Michael Lucas' La Dolce Vita*.  *Id.*  The court held that Defendant "failed to establish by a preponderance of the evidence that it holds a valid copyright." *Id.* at 464.  The court granted summary judgment, dismissing Defendant's claims for copyright infringement because Defendant failed to show that it had "sufficient admissible evidence from which a reasonable fact finder could conclude that it was the copyright owner of the [Film]."  *Id.* at 465.  The court found that the copy of the Cinemat-Hor agreement offered by Defendant, which was Defendant's only evidence of the initial link in Defendant's chain of title, was inadmissible because significant questions were raised about the copy's authenticity.  *Id.* at 464.

### B.   Procedural Background

Plaintiffs filed their Complaint on November 2, 2011.  (*See generally* Compl.)  The Complaint asserts causes of action for (1) declaratory relief as to Defendant's lack of ownership of copyright in the Film; (2) declaratory relief as to Plaintiffs' exclusive ownership of United States copyright in the Film; (3) direct copyright infringement; (4) contributory copyright infringement; and (5) vicarious copyright infringement.  (*See generally* Compl.)  On February 27, 2012, Plaintiffs filed a motion for judgment on the pleadings as to Plaintiffs' first claim for declaratory relief, in which Plaintiffs sought a declaration that Defendant did not have any ownership interest in the Film because the court's ruling in the SDNY Case acted to collaterally estop Defendant from continuing to assert that it owned the copyright to the Film.  (*See generally* Pls.' Mot. for J. on the Pleadings, ECF No. 20.)  The Court declined to apply the doctrine of offensive collateral estoppel against Defendant.  (Order Den. Pls.' Mot. for Partial J. on the Pleadings 4, ECF No. 34.)

At a pretrial conference on February 4, 2013, the Court ordered the parties to file cross-motions for summary judgment on or before April 4, 2013, and continued trial until September 24, 2013.

Priority _____
Send _____
Enter _____
Closed _____
JS-5/JS-6 _____
Scan Only _____

**CASE NO.:** <u>CV 11-09112 SJO (AJWx)</u>      **DATE:** <u>June 12, 2013</u>

(Mins. of Pretrial Conference, ECF No. 51; Order, ECF No. 53.)  On April 4, 2013, Plaintiffs filed the instant Motion.[4]

## II.   DISCUSSION

Federal Rule of Civil Procedure 56(a) mandates that "the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of establishing the absence of a genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence [that] would entitle it to a directed verdict if the evidence went uncontroverted at trial.  In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citations and internal quotation marks omitted).  In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party need not produce any evidence or prove the absence of a genuine issue of material fact.  *See Celotex*, 477 U.S. at 325.  Rather, the moving party's initial burden "may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.*

Once the moving party meets its initial burden, the "party asserting that a fact cannot be or is genuinely disputed must support the assertion."  Fed. R. Civ. P. 56(c)(1).  "The mere existence of a scintilla of evidence in support of the [nonmoving party]'s position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *accord Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) ("[O]pponent must do more than simply show that there is some metaphysical doubt as to the material facts.").  Further, "[o]nly disputes over facts that might affect the outcome of the suit . . . will properly preclude the entry of summary judgment [and] [f]actual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.  At the summary judgment stage, a court does not make credibility determinations or weigh conflicting evidence.  *See id.* at 249.  A court deciding a summary judgment motion must view the facts, and draw all reasonable inferences therefrom, in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587.

Plaintiffs argue that they are entitled to summary judgment on the following issues: (1) whether Plaintiffs are entitled to a declaration that Defendant does not own, and has never owned, the United States copyright in the Film; (2) whether Plaintiffs are entitled to a declaration that Plaintiffs do own, and at all relevant times have exclusively owned, the United States copyright in the Film; and (3) whether Defendant is liable for direct, contributory, and vicarious copyright infringement

---

[4]  Defendant states it elected not to file a motion for summary judgment.  (Opp'n 16.)

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

Priority ____
Send ____
Enter ____
Closed ____
JS-5/JS-6 ____
Scan Only ____

**CASE NO.: CV 11-09112 SJO (AJWx)**      **DATE: June 12, 2013**

based on Defendant's unauthorized licensing of the rights to the Film.  (*See generally* Mot., ECF No. 54.)

Defendant argues that Plaintiffs' Motion should be denied because (1) there is a genuine issue of material fact as to who owns the United States copyright to the Film; and (2) Plaintiffs' failure to join ICF as a defendant in this case is fatal to Plaintiffs' claims.  (*See generally* Opp'n, ECF No. 66.)  The Court considers each of Defendant's contentions in turn before turning to whether Plaintiffs are entitled to summary judgment on their claims.

A.    Defendant's Arguments

1.    Plaintiff's Chain of Title to the Film Rights

While generally a plaintiff in a copyright action establishes its *prima facie* ownership of a copyright by introducing evidence that they have a valid copyright registration, "[t]he evidentiary weight to be accorded . . . a registration made" more than five years after publication of the work "shall be within the discretion of the court."  17 U.S.C. § 410(c).  Thus, Plaintiffs here must establish that there is a valid chain of title to the rights to the Film linking Riama to Plaintiffs.  *See* 4 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 13.01, at 13-7 (2012).  Plaintiffs' evidence, taken at face value, shows a valid chain of title to the United States and Canadian rights to the Film.  Defendant, however, contests the sufficiency of the evidence comprising this chain of title because (1) the purported transfer of the rights to the Film in the 1980 Cinemat-Hor Transfer calls into question Plaintiffs' chain of title based on the earlier 1962 Cinemat-Astor International Transfer; (2) the Cinemat-Astor International Transfer is invalid because it purports to grant rights that Cinemat did not yet own; and (3) Plaintiffs have failed to properly authenticate the evidence demonstrating Plaintiffs' chain of title.  (*See generally* Opp'n.)

a.    The 1980 Cinemat-Hor Transfer

Defendant has submitted the declarations of Mushi Glam ("Glam") and Francesco Marconi ("Marconi") in support of their contention that Cinemat transferred the rights to the Film to Hor in 1980.  Glam purports to authenticate documents that show that Bruno M. Hugi ("Hugi"), the administrator of Cinemat in 1980, transferred the rights to the Film to Hor, and thus Defendant argues that "if [Hugi] is saying that he is transferring the worldwide rights to the film to Hor . . . , he is effectively saying that he still has them and has not turned them over to anyone else," and thus the Motion should be denied.  (Opp'n 8.)

Defendant's argument fails for two reasons.  First, as noted by Plaintiffs, Defendant has not submitted admissible evidence authenticating the documents that purport to show Defendant's chain of title, including the 1980 Cinemat-Hor Transfer.  The Leone Declaration fails to properly authenticate the documents because Leone does not testify as to how Defendant obtained the documents, how they have been maintained, or any other facts that would authenticate the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

Priority _____
Send _____
Enter _____
Closed _____
JS-5/JS-6 _____
Scan Only _____

**CASE NO.:** <u>CV 11-09112 SJO (AJWx)</u>          **DATE:** <u>June 12, 2013</u>

documents pursuant to the Federal Rules of Evidence ("FRE").  This is especially true in light of the finding of the court in the SDNY Case that there were questions concerning the authenticity of the certified copy of the Cinemat-Hor Transfer agreement provided by Defendant.[5]  *See Int'l Media Films*, 703 F. Supp. 2d at 464.  This certified copy is the same copy that Defendant has produced in this case.  (Leone Decl. Ex. C.)

Moreover, the declarations of Glam and Marconi are inadmissible due to Defendant's failure to disclose these declarants pursuant to Federal Rule of Civil Procedure ("Rule") 26.  Rule 26(a)(1)(A) requires parties to disclose the identity of "each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment."  Fed. R. Civ. P. 26(a)(1)(A)(i).  Parties must supplement their disclosures pursuant to Rule 26(a)(2)(E) and Rule 26(e)(1).  "If a party fails to . . . identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that . . . witness to supply evidence **on a motion**, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  Fed. R. Civ. Proc. 37(c)(1) (emphasis added).  As such, "Rule 37(c)(1) gives teeth to [Rule 26's] requirements by forbidding the use . . . of any information required to be disclosed by Rule 26(a) that is not properly disclosed."  *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001).

There is no dispute that Defendant did not identify Glam or Marconi as potential witnesses in their initial Rule 26 disclosures or that Defendant did not supplement their disclosures.  Indeed, Defendant did not disclose the identities of Glam and Marconi until it filed its Opposition to Plaintiffs' Motion.  (Def.'s Opp'n to Pls.' Req. to Strike Decls. of Glam and Marconi ("Glam and Marconi Opp'n") 3, ECF No. 79.)  Defendant states that it "first discovered on March 28, 2013 that [Glam] had any relevant testimony" when counsel for Defendant and Leone spoke with Glam.  (Glam and Marconi Opp'n 3.)  Defendant goes on to argue that no supplemental disclosure was necessary under Rule 26 because "opposing counsel was provided with the disclosure within three weeks of Defendant['s] learning that [Glam] had relevant information and within three days of [Defendant]'s receipt of [Glam's] declaration."  (Glam and Marconi Opp'n 3.)  Defendant argues that Marconi's declaration is admissible for the same reason.

Defendant's failure to supplement its Rule 26 disclosures was neither substantially justified nor harmless.  Defendant could have reasonably anticipated that Glam's testimony would be necessary to establish Defendant's chain of title well before March 28, 2013, as Glam was the

---

[5]  For instance, "the alleged certified copy uses the English abbreviation 'Dec.' for 'December' rather than the German 'Dez.,' which would have been standard in Liechtenstein."  *Int'l Media Films*, 703 F. Supp. 2d at 463.  Additionally, "the document recites a fee which was not in effect on the date the document purports to have been signed, and bears the signature of an official who was not working for the Public Register on that date."  *Id.*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

Priority ____
Send ____
Enter ____
Closed ____
JS-5/JS-6 ____
Scan Only ____

CASE NO.:  __CV 11-09112 SJO (AJWx)__          DATE:  __June 12, 2013__

Managing Director of Cinestampa, the entity that purportedly transferred its rights to the Film to Defendant in September 2005.  (Leone Decl. ¶¶ 11-12, Exs. J, K.)  As such, Defendant's failure to disclose was not substantially justified.[6]  *See Wong v. Regents of Univ. of Cal.*, 410 F.3d 1052, 1061 (9th Cir. 2004) (holding that a failure to disclose a potential witness was not substantially justified when it could have been reasonably anticipated).  Further, Defendant's failure to disclose Glam and Marconi prejudices Plaintiffs because Plaintiffs were not able to depose Glam or Marconi or otherwise conduct discovery concerning Glam and Marconi's proffered testimony. Accordingly, the Court finds that the Glam and Marconi declarations are not admissible, and thus Defendant has failed to authenticate the document purporting to memorialize the Cinemat-Hor Transfer.

Second, even if Defendant did have admissible evidence authenticating the Cinemat-Hor Transfer agreement, this would still not create a genuine dispute of a material fact as to the validity of Plaintiffs' chain of title.  The purported Cinemat-Hor Transfer does not, in and of itself, call into question Plaintiffs' ownership of the rights to the Film because it does not directly attack the authenticity or validity of any of the transfers in Plaintiffs' chain of title.  Rather, if Cinemat had already transferred the same rights to Astor Pictures in 1962, then the Cinemat-Hor Transfer eighteen years later is a nullity and therefore irrelevant to Plaintiffs' Motion.  Further, Defendant has cited to no case law, and the Court can find none, holding that evidence of a subsequent, conflicting transfer of rights calls into question an earlier transfer whose authenticity is established.[7]  Accordingly, the Court finds that evidence of the purported 1980 Cinemat-Hor Transfer is immaterial to the disposition of Plaintiffs' Motion.

b.  Purported Inconsistencies in the Cinemat-Astor International Transfer

Defendant next argues that Plaintiffs cannot establish a valid chain of title to the rights in the Film because the Cinemat-Astor International Agreement purported to transfer rights that Cinemat did not own.  (Opp'n 8-9.)  Specifically, the Cinemat-Astor International Agreement, which was executed on January 7, 1962, provides that "the Seller [Cinemat] is now the owner of the Film and the rights desired to be acquired by the Purchaser [Astor International] and is willing to sell the same to the Purchaser [Astor International] subject to and pursuant to the terms hereinafter stated."  (Redlich Decl. Exs. 2-4, at 1.)  However, it is undisputed that Riama did not transfer its rights to the Film to Cinemat until March 9, 1962.  (Def.'s SGD ¶ 8.)  Thus, Defendant argues that

_____

    [6]  Even if Defendant could not have reasonably anticipated that Glam and Marconi would have relevant testimony, Defendant still could have supplemented its initial Rule 26 disclosures at any time after March 28, 2013, when Defendant avers that it first learned that Glam and Marconi had relevant information.  Instead, Defendant blindsided Plaintiffs with these declarations in opposition to Plaintiffs' Motion, more than three weeks later.

    [7]  The Court discusses the authenticity of the documents that make up Plaintiffs' chain of title below.

Priority _____
Send _____
Enter _____
Closed _____
JS-5/JS-6 _____
Scan Only _____

**CASE NO.:   CV 11-09112 SJO (AJWx)          DATE:  June 12, 2013**

"at the time of sale, Cinemat had nothing to sell and . . . a jury could conclude that the Cinemat-Astor Agreement is genuine only if the jury believes that Cinemat purported to assign an interest to Astor, and Astor intended to accept, an interest that did not exist." (Opp'n 9.) Defendant also makes the conclusory assertion that this language "raises serious questions" as to the authenticity of the Cinemat-Astor International Agreement.[8] (Opp'n 10.)

The Court is not persuaded. The Cinemat-Astor International Agreement specifically provides that "[a]ll copyrights to the Film and registrations if and where existing thereof shall remain in the name of the **Producers and/or the Seller**" until Astor International made all required payments under the contract. (Redlich Decl. Exs. 2-4, at ¶ 5 (emphasis added).)  This language clearly contemplates that Riama may still retain some of the rights to the Film at the time the agreement was executed. Further, this language does not directly conflict with the earlier language cited by Defendant, as the earlier language provides that it is "subject to and pursuant to" the remaining terms of the agreement. As such, the Court finds that this language does not support Defendant's contention that the Cinemat-Astor International Agreement is invalid or a sham.

Moreover, assuming *arguendo* that the Cinemat-Astor International Agreement was invalid, this would not affect Plaintiffs' chain of title to the Film rights. This is so because it is undisputed that Cinemat assigned the North American rights to the Film to Astor Pictures in July 1962, three months after Riama transferred its rights to Cinemat.[9]  (Redlich Decl. Exs. 6, 7.) Because Plaintiffs trace their chain of title through Astor Pictures, the Cinemat-Astor International Agreement is ultimately irrelevant, and thus Defendant's arguments that it is internally inconsistent and that it purports to transfer rights that Cinemat did not own are likewise immaterial.

c.      The Authenticity of Plaintiffs' Chain of Title Documents

Defendant has submitted evidentiary objections to nearly all of Plaintiffs' evidence, including the documents showing Plaintiffs' chain of title to the Film rights. The Court has thoroughly examined these objections and found them to be without merit.  The Court will not explicate its analysis of each and every objection.  Rather, the Court will specifically analyze Defendant's objections to

---

[8]   Defendant further speculates concerning what a jury may conclude based on this evidence, such as that "this whole transaction was a fake or a scam." (Opp'n 10-13.) This speculation is unsupported by evidence and is not relevant to whether Plaintiffs have established a valid chain of title to the Film rights.

[9]   Defendant purports to dispute this fact because it contends that the rights were transferred to Hor in 1980, not Astor Pictures in 1962. (Def.'s SGD ¶ 9.)  As discussed above, evidence of a later transfer of rights to the Film is irrelevant to whether Plaintiffs' chain of title is valid.  Defendant also contests the authenticity of the documents that Plaintiffs rely on.  These objections are considered below.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

Priority ____
Send ____
Enter ____
Closed ____
JS-5/JS-6 ____
Scan Only ____

**CASE NO.:  CV 11-09112 SJO (AJWx)**          **DATE:  June 12, 2013**

Paragraph 20 of the Redlich Declaration and Exhibit 7 thereto, as these objections serve as an exemplar of the type of meritless objections asserted by Defendant.

Paragraph 20 of the Redlich Declaration provides that Plaintiffs possess a copy of a letter agreement between Cinemat and Astor Pictures dated July 26, 1962, which copy Plaintiffs inherited from Republic's business records.  (Redlich Decl. ¶ 20.)  Redlich also states that "[t]his agreement explains the circumstances under which Cinemat assigned the United States and Canadian rights in the [Film] to Astor Pictures."  (Redlich Decl. ¶ 20.)  Exhibit 7 to the Redlich Declaration is the copy of the Cinemat-Astor Pictures Agreement referred to by Redlich. Defendant objects to Paragraph 20 of the Redlich Declaration and Exhibit 7 thereto on the following grounds: "Authentication required.  F.R.E. 901 - genuine issues raised as to the documents [sic] authenticity; Violates the Best Evidence Rule.  F.R.E. 1002, 1003; Lacks foundation and personal knowledge.  F.R.E. 403, 602."  (Objection to Evidence in Supp. of Def.'s Opp'n ¶ 19.)

First, Defendant has not raised any valid basis for questioning the authenticity of Exhibit 7.  Insofar as Defendant is raising this objection based on the purported existence of the later Cinemat-Hor Transfer, the Court has already explained that the Cinemat-Hor Transfer has no bearing on the validity of Plaintiffs' chain of title or the authenticity of the supporting documentation.  Moreover, Plaintiffs have properly authenticated Exhibit 7.  Specifically, Redlich is competent to testify that Exhibit 7 is what it claims to be pursuant to FRE 901(b)(1), as Redlich states that he was previously employed by Republic and was involved in the organization of its business files, "including [Republic's] chain of title documents for the various motion pictures and other entertainment works that Republic owned."  (Redlich Decl. ¶ 2.)  Exhibit 7 is also properly authenticated pursuant to FRE 902(b)(4), as "[t]he appearance, contents, substance, internal patterns, [and] other distinctive characteristics . . . , taken together with all the circumstances" establish that Exhibit 7 is what it purports to be: an agreement between Cinemat and Astor Pictures whereby Cinemat transferred its North American rights to the Film to Astor Pictures. Fed. R. Evid. 901(b)(4).  Finally, Exhibit 7 is also properly authenticated as an ancient document under FRE 901(b)(8), as it is in a condition that does not create a suspicion about its authenticity, is in a place where it would likely be if authentic—the business records of Plaintiffs, which were inherited through corporate acquisitions and mergers—and it is over fifty years old.  Fed. R. Evid. 901(b)(8).  Thus, the Court finds that Exhibit 7 is authentic and admissible.[10]

---

[10]  The remaining documents comprising Plaintiffs' chain of title are also admissible non-hearsay either as ancient documents under FRE 803(16) or business records under FRE 803(6), as Redlich has established that Republic's chain of title documents have been incorporated into Plaintiffs' business records and that Plaintiffs rely on these records in the ordinary course of business.  *See United States v. Childs*, 5 F.3d 1328, 1333-34 (9th Cir. 1993) (holding that documents received from another business were admissible as business records under the FRE).

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

Priority _____
Send _____
Enter _____
Closed _____
JS-5/JS-6 _____
Scan Only _____

**CASE NO.:  CV 11-09112 SJO (AJWx)          DATE:  June 12, 2013**

Second, Redlich's testimony does not violate the Best Evidence Rule.  FRE 1002 provides that "[a]n original writing, recording, or photograph is required in order to prove its content unless these rules or a federal statute provide otherwise."  Fed. R. Evid. 1002.  FRE 1003 provides that "[a] duplicate is admissible to the same extent as the original unless a genuine question is raised about the original's authenticity."  Fed. R. Evid. 1003.  While the precise basis for Defendant's objection on this ground is unclear, Redlich's testimony is admissible because it is offered only to highlight the relevant provisions of Exhibit 7, and not to prove the contents of the document itself. *See Warner Bros. Entm't, Inc. v. X One X Prods.*, 644 F.3d 584, 591 (8th Cir. 2011) (finding in a copyright case that an affidavit "tracing the interaction of the various assignment and corporate merger documents that establish plaintiff's chain of title" was admissible evidence).

Lastly, Redlich's testimony is highly relevant, and it does not pose a danger of unfair prejudice or confusion.  Moreover, the testimony is based on Redlich's personal review and knowledge of the chain of title documents, including Exhibit 7.  (Redlich Decl. ¶¶ 1-2.)  As such, Defendant's assertion that Redlich lacks personal knowledge and has failed to lay a proper foundation pursuant to FRE 602 is incorrect.

Defendant's other objections likewise lack merit.  Accordingly, Defendant's objections are overruled, and the Court finds that Plaintiffs have established their ownership of the copyright at issue.

         2.    Joinder of ICF

Defendant also contends that Plaintiffs' Motion must fail due to Plaintiffs' failure to join ICF as a party to this action.  Defendant avers that ICF is a required party under Rule 19 because ICF is the "beneficial owner of the [Film] rights" and so "any adverse determination against [Defendant] would certainly affect and perhaps foreclose ICF's rights as well."  (Opp'n 14-15.)  This argument fails because Defendant has waived it by failing to assert it until this late juncture.  Defendant could have brought a motion pursuant to Rule 12(b)(7) much earlier in this action, but did not. Defendant did not even assert failure to join a required party as an affirmative defense in its Answer, despite asserting twenty others.  (*See generally* Answer, ECF No. 12.)  Indeed, Defendant represented that it intended to file a motion to join ICF as a party in the Joint Scheduling Conference Report, filed on February 21, 2012, but Defendant never did so.  (Joint Scheduling Conference Report 7, ECF No. 19.)  This failure to assert this defense earlier is fatal to Defendant's argument now, as "defenses such as . . . failure to join an indispensable party are waived if the parties fail to assert them at the time specified by the rules."  *Simpson v. Alaska State Comm'n for Human Rights*, 608 F.2d 1171, 1174 (9th Cir. 1979).  Accordingly, the Court finds that Defendant has waived this argument.

         B.    Summary Judgment on Plaintiff's Claims

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

Priority      ____
Send          ____
Enter         ____
Closed        ____
JS-5/JS-6     ____
Scan Only     ____

**CASE NO.:  CV 11-09112 SJO (AJWx)        DATE:  June 12, 2013**

The Copyright Act, 17 U.S.C. § 106, provides that the owner of a copyrighted work "has the exclusive rights to do and to authorize" *inter alia*, the reproduction of the work in copies; the distribution of copies to the public by sale or transfer of ownership; and the public performance of the work.  17 U.S.C. § 106.  To make out a valid claim for direct copyright infringement, Plaintiffs must show "(1) ownership of a valid copyright; and (2) that the defendant violated the copyright owner's exclusive rights under the Copyright Act."  *Ellison v. Robertson*, 357 F.3d 1072, 1076 (9th Cir. 2004).  In turn, 17 U.S.C. § 501(a) provides that contributory copyright infringement occurs if a third party engaged in direct copyright infringement and the defendant had actual knowledge of the infringement and induced, caused, or materially contributed to the infringing conduct.  *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 264 (9th Cir. 1996).  A defendant is liable for vicarious copyright infringement "by profiting from direct infringement while declining to exercise a right to stop or limit it."  *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 (2005).

Here, the Court has already found that Plaintiffs have established ownership of the United States copyright at issue by submitting evidence of their chain of title.  Thus, summary judgment is appropriate on Plaintiffs' claims for declaratory relief to the effect that Defendant does not own, and at no time has owned, the United States copyright in the film; and Plaintiffs do own, and at all relevant times have exclusively owned, the United States copyright in the Film.  The Court therefore next considers whether Plaintiffs are entitled to their claims against Defendant for (1) direct copyright infringement; (2) contributory copyright infringement; and (3) vicarious copyright infringement.

      1.    Direct Copyright Infringement

Plaintiffs argue that they are entitled to summary judgment on their claim of direct copyright infringement because the Copyright Act protects, *inter alia*, the right of an owner of a copyrighted work to authorize others to duplicate or distribute the copyrighted work, and therefore "a person who . . . <u>authorizes others to</u> [duplicate or distribute copies of a work] constitutes an infringer." (Mot. 18.)  Plaintiff is incorrect as a matter of law.  The Ninth Circuit has explained that "the addition of the words 'to authorize' . . . [is] best understood as merely clarifying that the [Copyright] Act contemplates liability for contributory infringement," and thus mere authorization of a third party's infringing acts does not constitute direct copyright infringement on the part of the defendant.  *See also Ryan v. Editions Ltd. West, Inc.*, No. C-06-04812 PSG, 2012 WL 2571326, at *6 n.41 (N.D. Cal. July 2, 2012).  Here, Plaintiffs provide no evidence that Defendant engaged in **direct** copyright infringement by reproducing or distributing the Film itself.  Rather, all the evidence shows is that Defendant authorized others to do so through licensing agreements.  As such, Plaintiffs are not entitled to summary judgment on their claim for direct copyright infringement.

      2.    Contributory Copyright Infringement

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

Priority _____
Send _____
Enter _____
Closed _____
JS-5/JS-6 _____
Scan Only _____

**CASE NO.:   CV 11-09112 SJO (AJWx)          DATE:  June 12, 2013**

However, Plaintiffs are entitled to summary judgment on their claim for contributory copyright infringement.  It is undisputed that KLF and E1, Defendant's licensees, engaged in direct copyright infringement by distributing the Film.  (Def.'s SGD ¶¶ 58-59.)  Additionally, Plaintiff has submitted undisputed evidence that Defendant has earned royalties from KLF's distribution of the Film and thereby had knowledge of this infringing activity.  (Def.'s SGD ¶ 60; Halberstadter Decl. Ex. 44.)  Finally, it is undisputed that the licensing agreements induced or caused KLF and E1 to engage in this infringement.  As such, Defendant is liable to Plaintiffs for contributory infringement of the United States copyright to the Film.

3.    Vicarious Copyright Infringement

Plaintiffs argue that they are also entitled to summary judgment on their claim for vicarious copyright infringement because it is undisputed that (1) KLF and E1 have engaged in direct copyright infringement; (2) Defendant had the right and ability to control or supervise this infringing conduct; and (3) Defendant had a direct financial interest in, and derived a financial benefit from, the infringing conduct.  (Mot. 19-20.)  The Court agrees that KLF and E1 have engaged in direct copyright infringement and that Defendant had a direct financial interest in this infringement by virtue of the licensing agreement, which provides for the payment of royalties to Defendant.  (Halberstadter Decl. Ex. 46, at § 5.2.)   At issue is whether the provisions of the licensing agreements constitute a right to control or supervise KLF and E1's conduct such that the imposition of vicarious liability is appropriate.

The test for right or ability to supervise infringing requires both "a legal right to stop or limit the directly infringing conduct . . . [and] the practical ability to do so." *Perfect 10, Inc. v. Amazon.com, Inc.*, 487 F.3d 701, 730 (9th Cir. 2007).  Here, Plaintiffs argue that this element is satisfied because there is evidence that Defendant retained some controls over the distribution of the Film in the licensing agreements with KLF and E1, including approval over clip licensing, marketing materials, and subtitled versions of the Film.  The Court finds, however, that these miscellaneous controls are not sufficient to impose vicarious liability on Defendant, as they do not give Defendant the right to completely halt or even substantially limit KLF and E1's distribution or reproduction of the Film.  *Cf. Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 262-64 (9th Cir. 1996) (finding that plaintiffs had stated a claim for vicarious copyright infringement when the defendant had the right to terminate third party vendors' right to participate in a flea market).  Rather, these licensing provisions only concern minor, tertiary issues.  Unless KLF or E1 breached the licensing agreement, Defendant had no right to revoke the license until it expired.

Plaintiffs also argue that vicarious liability is appropriate because "[n]ot only did [Defendant] not exercise a right to stop its licensees' infringement; it *authorized* its licensees to infringe Plaintiffs' rights to the [Film]."  (Mot. 20.)  To accept this argument would be to erase the distinction between contributory and vicarious copyright infringement entirely, as the Court has already found that Defendant is liable for contributory copyright infringement based on its authorization of KLF and

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

Priority      ____
Send          ____
Enter         ____
Closed        ____
JS-5/JS-6     ____
Scan Only     ____

**CASE NO.:   CV 11-09112 SJO (AJWx)**          **DATE:  June 12, 2013**

E1's distribution and reproduction of the Film.  Accordingly, the Court finds that Plaintiffs are not entitled to summary judgment on their claim for vicarious copyright infringement.

III.   RULING

For the foregoing reasons, Plaintiff's Motion is **GRANTED IN PART** and **DENIED IN PART** as follows:

1.   Partial summary judgment is granted in favor of Plaintiffs with respect to their First Claim for Relief because as a matter of undisputed fact and law, Defendant does not own, and at no time has owned, the United States copyright in the Film.

2.   Partial summary judgment is granted in favor of Plaintiffs with respect to their Second Claim for Relief because as a matter of undisputed fact and law, Plaintiffs own, and at all relevant times have exclusively owned, the United States copyright in the Film.

3.   Partial summary judgment is granted in favor of Plaintiffs with respect to their Fourth Claim for Relief because as a matter of undisputed fact and law, Defendant has contributorily infringed upon Plaintiffs' United States copyright on the Film.

4.   Plaintiffs' Motion is **DENIED** in all other respects.

IT IS SO ORDERED.